814 A.2d 469

### The MAYOR AND COUNCIL OF ROCKVILLE et al.

v.

### RYLYNS ENTERPRISES, INC.

No. 43, Sept. Term, 2001.

Court of Appeals of Maryland.

Argued Nov. 5, 2001.

Reargued April 5, 2002.

Decided Dec. 31, 2002.

518

Paul T. Glasgow (Kristin M. Koger of Venable, Baetjer and Howard, LLP, on brief; David D. Freishtat, Cara A. Frye of Shulman, Rogers, Gandal, Pordy & Ecker, P.A., on brief), Rockville, for Petitioners.

Frederick C. Sussman, Council, Baradel, Kosmerl & Nolan, P.A., Annapolis, brief and appendix of Amicus Curiae Maryland Municipal League, Inc. filed on behalf of Petitioners.

Charles W. Thompson, Jr., County Atty., Karen F. Henry, Assoc. County Atty., Rockville, Linda M. Schuett, County Atty., Annapolis, Roger L. Fink, County Atty., LaPlata, Sean D. Wallace, County Atty., Steven M. Gilbert, Principal Counsel, Upper Marlboro, Kimberly Millender, County Atty., Timothy C. Burke, Asst. County Atty., Westminster, John S. Mathias, County Atty., Frederick, brief for Amici Curiae, Anne Arundel County, Carroll County, Charles County, Frederick County, Montgomery County, and Prince George's County filed on behalf of Petitioners.

Stephen J. Orens (Helen "Lynn" Primo of DuFour & Kohlhoss, Chtd., on brief), Bethesda, for Respondent.

Adrian R. Gardner, General Counsel, Michele M. Rosenfeld, Debra Yerg Daniel, Assoc. General Counsel, brief for Amicus

Curiae, The Maryland–National Capital Park and Planning Comm. filed on behalf of Respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

HARRELL, Judge.

According to Respondent, Rylyns Enterprises, Inc. (Rylyns), this case presents an unusual situation where a land use restriction demanded by Montgomery County, Maryland, during municipal annexation proceedings by the City of Rockville required the City to impose improper "conditional zoning" on the annexed property. The Court of Special Appeals, in an unreported opinion, held that the municipality's imposition, at the insistence of the County, of a condition limiting the use of the newly annexed property more restrictively than allowed by the City zoning ordinance for the zoning district in which the property was placed was tantamount to improper conditional zoning. The intermediate appellate court also held that the zoning reclassification, in light of the limitation, constituted illegal "spot zoning." We shall affirm that judgment based on the Court's holding as to impermissible conditional zoning, although we shall employ somewhat different reasoning.

## I.

The material facts of this case are not in dispute. They must be considered against the backdrop of Maryland Code (1957, 1998 Repl.Vol.), Article 23A, § 9(c), which restricts the zoning classification into which a municipality may place newly annexed property for a period of five years following annexation unless permission is obtained first from the pre-annexation county. That restriction provides, in pertinent part:

(1) ... no municipality annexing land may for a period of five years following annexation, place that land in a zoning classification which permits a land use substantially different from the use for the land specified in the current and duly adopted master plan or plans or if there is no adopted or approved master plan, the adopted or approved general

plan or plans of the county or agency having planning and zoning jurisdiction over the land prior to its annexation without the express approval of the board of the county commissioners or county council of the county in which the municipality is located.

(2) If the county expressly approves, the municipality, without regard to the provisions of Article 66B, § 4.05(a) of the Code, may place the annexed land in a zoning classification that permits a land use substantially different from the use for the land specified in the current and duly adopted master plan or general plan of the county or agency having planning and zoning jurisdiction over the land prior to its annexation.

On 14 May 1997, Louis Fanaroff, Stanford Steppa, and Elaine Steppa (the "Owners"), owners of the subject property located in Montgomery County abutting the City of Rockville and situated in the northwest quadrant of the intersection of Gude Drive and Southlawn Lane, filed a Petition for Annexation (the Petition) of the property into the City. At the time the Petition was filed, the subject property was zoned I-2 (Heavy Industrial) as defined in the Montgomery County Zoning Ordinance. I-2 was the zone recommended for the property in the County's approved and adopted Upper Rock Creek Master Plan (the "County Master Plan"). The Petition requested that, upon annexation, the property be rezoned to the City's I-1 (Service Industrial) zone, consistent with the zoning of adjacent properties located within the City's boundaries. The Owners intended to erect and operate a gasoline service station on the subject property, a use allowed under the City's I-1 zone with the grant of a special exception. The County's I-2 zone did not allow a gasoline service station under any circumstances.

At a public hearing concerning the proposed annexation and rezoning, held on 17 December 1997 by the Mayor and Council of Rockville, Richard Durishin, the controlling owner of Rylyns, testified against the proposed rezoning. Mr. Durishin claimed to oppose the proposed I-1 rezoning because the loss of the I-2 classification of the subject property would reduce

the "scarce stock" of I–2 zoned property in Montgomery County, a concern also expressed later by some County authorities. Mr. Durishin acknowledged that he was the operator of a gasoline filling station located across Gude Drive from the subject property.

On the day following the City's hearing, the City's Planning Staff issued a final report recommending annexation of the subject property and its placement in the City's I–1 zone. The report pointed out that the City's 1993 Master Plan recommended that the property (should it be annexed) be placed in the City's I–1 zone and that the surrounding properties within the City also were zoned I–1.

On 15 January 1998, the Montgomery County Planning Board considered the proposed rezoning of the subject property. It noted significant differences between the County's I–2 zone and the City's I–1 zone. Among other concerns, the Board fretted that a change in zoning might trigger the need to improve the intersection of Southlawn Lane and Gude Drive.

The County Council's Planning, Housing and Economic Development Committee, on 13 July 1998, recommended, by a vote of 3–0, that the full County Council disapprove the request to rezone the subject property. In a memorandum, dated 18 July 1998, to the County Council, the County Planning Board indicated, based on its review of the proposed annexation and rezoning of the property, that the proposed use of the subject property for a gasoline station was not an appropriate use for the property, as it was not allowed under the County's I–2 zone. Upon consideration of these recommendations, the County Council, on 28 July 1998, adopted Resolution No. 13–1384 disapproving the request of the Owners and the City to rezone the property to the City's I–1 zone.

Seven months later, in a 8 February 1999 memorandum to the County Council, its Planning, Housing and Economic Development Committee announced that, at the request of a County Council member, it had re-examined the Owners' petition for annexation and rezoning and concluded that it

would support the rezoning of the subject property from the County's I–2 zone to the City's I–1 zone, "provided the City restrict the retail use of the site. . . ." On 23 February 1999, the County Council adopted Resolution No. 14–57 approving the City's proposal to rezone the property on condition that "the City prohibits the retail use of the site, except for a gasoline service station."[1]

On 20 July 1999, the Mayor and Council of Rockville entered into a written annexation agreement with the Owners regarding the subject property. The agreement, among other things, provided that the property could not be used for any retail purpose, other than a gasoline service station. There was no mention in the agreement of the requirement in the City Zoning ordinance that a special exception was required in the City's I–1 zone in order to operate a gasoline service station. The Mayor and Council adopted Annexation Resolution No. 13–99 on 26 July 1999, enlarging and extending the boundaries of the City of Rockville by annexing the subject property.

A week later, the Mayor and Council adopted Zoning Ordinance No. 10–99, placing the property in the City's I–1 zoning classification. Zoning Ordinance No. 10–99 specifically stated that "the Mayor and Council of Rockville, having fully considered the matter, has determined to place the annexed property in the City's I–1 zone, under certain conditions to be set forth in an annexation agreement, so as to promote the health, security, and general welfare of the community of the City of Rockville." The annexation of the property and its placement in the City's I–1 zone became effective on 9 September 1999.

Upset with this result, Rylyns filed a petition with the Circuit Court for Montgomery County seeking judicial review

---

1. The City's I–1 zone allows approximately 100 permitted uses and 18 additional uses with the grant of a special exception (Rockville, Md., Code of Ordinances, ch. 25, art. VII, div. 2, § 25–296 (2002)). A variety of commercial retail uses are included in these enumerations, such as antique, garden supply, paint and wallpaper, photographic supply, and pet grooming activities, to name a few.

of City Zoning Ordinance No. 10–99. No direct judicial review of Annexation Resolution No. 13–99 was sought. On 17 March 2000, the Circuit Court reversed Rockville's adoption of Zoning Ordinance 10–99, holding that the manner in which the subject property was rezoned constituted improper conditional and spot zoning, and remanded the case to the Mayor and Council. The Mayor and Council, and the Owners, appealed to the Court of Special Appeals, which affirmed the judgment of the Circuit Court. The Mayor and Council of Rockville and the Owners petitioned this Court for a writ of certiorari, which, on 22 June 2001, we granted. *Rockville v. Rylyns*, 364 Md. 534, 774 A.2d 408 (2001).

The Petitioners initially presented two questions to this Court:

1. Does a limitation in an annexation agreement restricting certain uses on newly annexed property constitute conditional zoning?

2. Did the placement of newly annexed property by the City, in a zone that permitted a land use substantially different from the use for the land specified in the current and duly adopted master plan of Montgomery County, with the approval of the Montgomery County Council pursuant to Art. 23A, § 9(c)(2), constitute invalid spot zoning?

After initial briefing and argument, we set the case in for reargument, on our own initiative, inviting the Maryland Municipal League, the Maryland Association of Counties and the Maryland National Capital Park and Planning Commission to file amici briefs. We requested that the parties and amici address additional issues that we framed as follows:

3. Prior to 1975 there was no subsection (c)(2) of Art. 23A, § 9(c) and subsection (c) had no provisions in respect to county approval. At that time Art. 23A, § 9(c), as relevant to the case at bar, provided that a municipal corporation for a period of five years after annexation could not

'place that [annexed] land in a different zoning classification which permits a land use substantially different from the use specified in the current and duly adopted master plan or plans of the county or agency having planning and zoning jurisdiction over the land prior to annexation.'

In 1975, subsequent to two 1974 Court of Appeals's decisions in which the above language was mentioned, Senate Bill 864 was introduced. As introduced, the bill contained the same language above through the phrase 'current and duly adopted master plan or plans' but then added a provision at the very end of the subsection creating an exception based upon county approval i.e. 'without the express approval of the county.'

The bill, however, was amended during its progress through the Senate. As relevant to the instant case, the amendment added immediately after the phrase 'duly adopted master plan or plans,' the phrase 'or if there is not an adopted and approved master plan, the adopted or approved general plan or plans' of the county.

a) In view of the legislative history of Md.Code (1957, 1998 Repl.Vol.), Art. 23A, § 9(c) (1 and 2) (and particularly Chapter 613, Laws 1975, and Chapter 450, Laws 1988), may a municipality which has planning and zoning authority and has a current and duly adopted master plan covering land within its jurisdiction, zone the annexed property upon annexation irrespective of the land use proposed for such property by the county's current and duly adopted master plans or general plans?

b) If the answer to the above question is yes, does Section 9(c)(2) apply in such cases?

4. Under what circumstances do the provisions of Md.Code (1957, 1998 Repl.Vol., 2001 supp.), Art. 66B, Section 4.01(c) ('may impose such additional conditions, restrictions, or limitations') (which was first enacted in 1970 subsequent to the *Carole Highlands Citizens Ass'n, Inc v. Board of County Comm'rs of Prince Georges County,* 222 Md. 44, 158 A.2d 663 (1960) and *Baylis v. City of*

*Baltimore,* 219 Md. 164, 148 A.2d 429 (1959) cases), and Rockville City Code (2000) Section 25–126 ('may impose additional restrictions, conditions or limitations') (enacted after the enactment of the State statute) authorize conditional zoning by the City?

a) What is the effect, if any, of *Prince George's County v. Collington Corporate Center 1 Limited Partnership,* 358 Md. 296, 747 A.2d 1219 (2000), which upheld conditional zoning in Prince George's County, on this issue?

b) Do the above provisions authorize the City's actions in the present case?

5. What zoning classification, if any, would the subject property have if the Court were to rule that the I–1 Zoning was invalid? Is there a state or City statute covering the situation?

## II.

As a prelude to considering these questions, it may be useful to refresh our collective memories as to the core concepts, terms, and procedures underlying the planning and zoning principles potentially implicated by, or related to, the issues in this case. This framework of planning and zoning principles forms a "flexibility continuum," a continuum within which the present controversy must be placed. Planning and zoning turns on the dynamic interplay between certainty and consistency in the application of land use plans and zoning ordinances on the one hand, and on the other the need for zoning authorities to have flexibility in applying those plans and ordinances to accommodate changing and/or unforseen circumstances.

### A. Planning and Zoning

There exists a distinction between zoning and what commonly is called land use planning, both as a practical matter

and as a function of different statutory grants of power and delegations of duties.[2] For the purposes of this case, the statutes controlling the exercise of the planning function are found primarily in Maryland Code (1957, 1998 Repl.Vol., 2002 Supp.), Article 66B, §§ 3.01–3.09 and those controlling the exercise of the zoning function are found primarily in Md.Code (1957, 1998 Repl.Vol., 2002 Supp.), Art. 66B §§ 4.01–4.08.[3]

---

2. For a detailed discussion of the relationship between planning and zoning in Maryland, see *Nottingham Village, Inc. v. Baltimore County*, 266 Md. 339, 354–55, 292 A.2d 680, 688 (1972); *Richmarr Holly Hills v. American PCS, L.P.*, 117 Md.App. 607, 635–51, 701 A.2d 879, 893–901 (1997); *People's Counsel v. Beachwood I Ltd. P'ship*, 107 Md.App. 627, 656–58, 670 A.2d 484, 499 (1995); Stanley D. Abrams, *A Perfect Union: The Wedding of Planning and Zoning in Maryland*, 13 Maryland Bar Journal 8 (Spring 1980). *See also Pattey v. Board of County Comm'rs for Worcester County*, 271 Md. 352, 360–61, 317 A.2d 142, 147 (1974); *Chapman v. Montgomery County Council*, 259 Md. 641, 644, 271 A.2d 156, 158 (1970); *Board of County Comm'rs for Prince George's County v. Edmonds*, 240 Md. 680, 684–88, 215 A.2d 209, 211–13 (1965).

3. Tracing the entire panoply of related enabling statutes in Maryland is a tad complex. The provisions empowering municipal corporations in Maryland are contained in Maryland Code (1957, 1998 Repl.Vol.), Article 23A, and with regard to home rule powers specifically, Art. 23A, § 9. Similar provisions detailing the powers for non-charter counties are found in Maryland Code (1957, 1998 Repl.Vol., 2002 Supp.), Article 25. Further complicating the matter, the authority of the counties of Montgomery and Prince George's are controlled by Maryland Code (1957, 1998 Repl.Vol., 2002 Supp.), Article 28. The land use provisions of Maryland Code (1957, 1998 Repl.Vol., 2002 Supp.), Article 66B pertain primarily to Art. 23A municipalities and Art. 25 non-charter counties, although certain provisions apply to Maryland Code (1957, 1998 Repl.Vol.), Art. 25A charter counties, as well as to Montgomery and Prince George's Counties, Art. 66B, §§ 1.02 and 7.03, and also to the City of Baltimore, Art. 66B, §§ 2.01–2.13 and 14.02.

As we pointed out in *Montgomery County v. Revere Nat'l Corp.* 341 Md. 366, 383–84, 671 A.2d 1, 9–10 (1996):

Unlike most other home rule chartered counties in Maryland which receive their basic zoning authority from Article XI–A of the Maryland Constitution, the Express Powers Act, Code (1957, 1994 Repl. Vol.), Art. 25A, §§ 5(x), and their county charters, the exclusive source of Montgomery [and Prince George's] County's zoning authority is the Regional District Act, Code (1957, 1993 Repl.Vol., 1995 Supp.), Art. 28; Maryland Code (1957, 1998 Repl.Vol., 2002 Supp.). Art. 66B, relating to zoning, is generally not applicable to chartered counties. *See* Art. 66B, §§ 7.03 [and § 1.02].

Plans are long term and theoretical, and usually contain elements concerning transportation and public facilities, recommended zoning, and other land use recommendations and proposals.[4] Zoning, however, is a more finite term, and its

---

*See also* M. Peter Moser, *County Home Rule–Sharing the State's Legislative Power with Maryland Counties*, 28 Md. L.Rev. 327 (1968).

**4.** *See* D. Brennen Keene, (Student) Comment, *Transportation Conformity and Land-use Planning: Understanding the Inconsistencies*, 30 U. Rich. L.Rev. 1135, 1353–54 (1996):

The framework in which land-use decisions are made under the Euclidean model begins with the master plan. The plan has four principal characteristics:

First, it is future-oriented, establishing goals and objectives for future land use and development, which will be attained incrementally over time through regulations, individual decisions about zoning and rezoning, development approval or disapproval, and municipal expenditures for capital improvements such as road construction and the installation of municipal utilities.

Second, planning is continuous, in that the plan is intended not as a blueprint for future development which must be as carefully executed as the architect's design for a building or the engineer's plan for a sewer line, but rather as a set of policies which must be periodically reevaluated and amended to adjust to changing conditions. A plan that is written purely as a static blueprint for future development will rapidly become obsolete when circumstances change.

Third, the plan must be based upon a determination of present and projected conditions within the area covered by the plan. This requirement ensures that the plan is not simply a list of hoped-for civic improvements . . .

And fourth, planning is comprehensive. . . . The courts have recognized this role of planning, in defining planning as concerned with "the physical development of the community and its environs in relation to its social and economic well being for the fulfillment of the rightful common destiny, according to a 'master plan' based on 'careful and comprehensive surveys and studies of present conditions and the prospects of future growth of the municipality,' and embodying scientific teachings and creative experience."

This process, referred to as the "rational planning process," requires four steps: "data gathering, setting of policies, plan implementation, and plan re-evaluation." The product of rational planning does not lead to a plan "effective for all time," but rather is re-evaluated so as to judge its success in reaching the policies behind the plan. Final adoption of the plan requires approval by the particular legislative body in that locality.

In a majority of states that enable localities to prepare comprehensive plans, the plan serves merely as guidance for the governing body to make zoning decisions and does not have the force of law. The

primary objective is the immediate regulation of property use through the use of use classifications, some relatively rigid and some more flexible.[5] *Howard County v. Dorsey,* 292 Md. 351, 361–62, 438 A.2d 1339, 1345–46 (1982); *Washington County Taxpayers Assn. v. Board of County Comm'rs of Washington County,* 269 Md. 454, 455–57, 306 A.2d 539, 540–41 (1973); *Norbeck Village Joint Venture v. Montgomery County Council,* 254 Md. 59, 65–67, 254 A.2d 700, 704–05 (1969). We repeatedly have noted that plans, which are the result of work done by planning commissions and adopted by ultimate zoning bodies, are advisory in nature and have no force of law absent statues or local ordinances linking planning and zoning.[6] Where the latter exist, however, they serve to elevate the status of comprehensive plans to the level of true regulatory device. *Richmarr Holly Hills v. American PCS, L.P.,* 117

---

trend, however, has been towards making the plan a dispositive document for zoning decisions.
*See also supra* n. 2.

**5.** *See Transportation Conformity and Land-use Planning: Understanding the Inconsistencies,* 30 U. Rich. L.Rev. at 1355–56:

Zoning, in theory, is the process whereby the comprehensive plan is put into effect. The local legislative body that makes zoning decisions divides districts within the locality into zones, and the legislative body defines, *inter alia,* the height, building size, lot size, population density, location, and use of buildings that are permissible in the particular zone. The designation of these zoning districts disallows the development of property within the zone unless the landowner would suffer an undue hardship, whereby the landowner may be able to obtain a variance from the zoning ordinance from the legislative body or a quasi-judicial body known as a board of zoning appeals.

Often, state enabling statutes require the zoning to be "in accordance with a comprehensive plan." Courts have grappled with the meaning of the "in accordance" requirement, especially where the enabling statute does not require the drafting of a comprehensive plan. In those states, the courts have been willing to divine a plan from the zoning ordinance itself. However, other states require the preparation of a comprehensive plan before the adoption of a zoning ordinance. In these states, "not only does this mean that the plan and regulations promulgated under it must be consistent, it also means ... that any development orders and permits issued must be consistent with the local plan."

**6.** *See supra.* n. 2

Md.App. 607, 635–51, 701 A.2d 879, 893–901 (1997); *see also Boyds Civic Ass'n v. Montgomery County Council*, 309 Md. 683, 699–700, 526 A.2d 598, 606 (1987); *Coffey v. Maryland–National Capital Park & Planning Comm'n*, 293 Md. 24, 27–30, 441 A.2d 1041, 1042–44 (1982); *Board of County Comm'rs of Cecil County v. Gaster*, 285 Md. 233, 239–47, 401 A.2d 666, 669–73 (1979); *Aspen Hill Venture v. Montgomery County Council*, 265 Md. 303, 314–15, 289 A.2d 303, 309 (1972); *Floyd v. County Council of Prince George's County*, 55 Md.App. 246, 258–60, 461 A.2d 76, 83 (1983). In those instances where such a statute or ordinance exists, its effect is usually that of requiring that zoning or other land use decisions be consistent with a plan's recommendations regarding land use and density or intensity.

### B. Original, Comprehensive, and Piecemeal Zoning and the Police Power.

In *Harbor Island Marina, Inc. v. Board of County Comm'rs of Calvert County*, 286 Md. 303, 312–13, 407 A.2d 738, 743 (1979), we noted that:

> '[t]he purpose of the zoning law is to promote the health, safety, and general welfare of the public, Md.Code (1957, 1978 Repl.Vol.), Art. 66B, §§ 4.03, and the Act vests in the counties the full measure of power which the State could exercise in pursuit of this objective.' See *Carney v. City of Baltimore*, 201 Md. 130, 135, 93 A.2d 74, 76 (1952). 'The very essence of zoning is territorial division according to the character of the land and ... [its] peculiar suitability for uses, *and uniformity of use within the zone.' Heath v. M. & C.C. of Baltimore*, 187 Md. 296, 305, 49 A.2d 799, 804 (1946)(emphasis added).

The exercise of these broad powers [7] is, in the main, through the implementation of what is known as the planning and

---

7. The extent of governmental powers generally as related to zoning, in light of Maryland's Constitution, is discussed in *Goldman v. Crowther*, 147 Md. 282, 292–96, 128 A. 50, 54–55 (1925). *See also Jack Lewis, Inc. v. Baltimore*, 164 Md. 146, 152–53, 164 A. 220, 223 (1933);

zoning process. In theory, and usually in practice, long study and consideration is given to the location of various human activities as they are distributed on the geographic plain, and analysis is made as to where particular types of growth are likely to occur, and where it would be best to allow growth to occur in reference to all of the other land use activities in the area or region in question. Ideally, growth then may be planned in a manner that allows for the expansion of economic activities and opportunities in the area or region for the benefit of its residents, while at the same time attempting to maintain the quality of life of the region, all without unduly disturbing the reasonable expectations of the citizenry as to the permissible uses they may make of real property. As is the case with most human endeavors, particularly those involving multiple and complex variables, the results of the planning and zoning process are sometimes less than perfect, particularly from the subjective point of view of the property owner who finds that his or her desired use for a property is different from that of the relevant planning and zoning authority.

Zoning authorities in Maryland implement their plans and determinations regarding appropriate land use zoning categories primarily through three processes: 1) original zoning; 2) comprehensive rezoning; and 3) piecemeal rezoning. As will be discussed in more detail, *infra,* a fundamental distinction between original zoning, comprehensive zoning, and piecemeal zoning is that the first two are purely legislative processes, while piecemeal rezoning is achieved, usually at the request of the property owner, through a quasi-judicial process leading to a legislative act. *Montgomery County v. Woodward & Lothrop, Inc.,* 280 Md. 686, 711–13, 376 A.2d 483, 497–98 (1977); *Richmarr,* 117 Md.App. at 636, 701 A.2d at 893–94. The quasi-judicial process must observe the requirements of Art. 66B, § 4.05.

---

*Pocomoke City v. Standard Oil Co.,* 162 Md. 368, 375–78 159 A. 902, 904–905 (1932).

Because the power to regulate land use necessarily places the local government in the position of potentially circumscribing a citizen's rights or expectations as to the desired use for a given piece of real property, our appellate courts repeatedly have identified the source of those powers and set forth the minimum procedures necessary to insure that these powers are exercised in an appropriate manner. In *White v. Spring,* 109 Md.App. 692, 696–97, 675 A.2d 1023, 1025 (1996), the Court of Special Appeals succinctly stated that, absent a confiscatory regulation or result:

> [o]riginal zonings (including master planning) and comprehensive rezoning are limited only by the general boundaries of the ... appropriate procedural and due process considerations. A legislative body establishes zoning policy through its adoption of master plans, comprehensive zoning and comprehensive rezoning. So long as (1) the appropriate procedural criteria are met, (2) the due process limitations have been duly addressed, (3) the policy is designed to achieve a valid public purpose, and (4) the police power is not otherwise exceeded, comprehensive zoning and comprehensive rezoning-i.e., the conclusions of the legislative bodies, cannot be a mistake, except where it is proven by substantial evidence that the information relied upon by the legislative entity was wrong, i.e., a mistake.

*See also Mraz v. County Comm'rs of Cecil County,* 291 Md. 81, 88–89, 433 A.2d 771, 776 (1981); *Grooms v. LaVale Zoning Bd.,* 27 Md.App. 266, 277, 340 A.2d 385, 393 (1975).[8]

## C. Euclidean Zones[9]

"Zoning is concerned with dimensions and uses of land or structures...." *Friends of the Ridge v. Baltimore Gas &*

---

8. For an in depth history and description of the planning and zoning functions authorized by Art. 66B, see *Board of County Comm'rs of Cecil County v. Gaster,* 285 Md. 233, 239–47, 401 A.2d 666, 669–73 (1979).

9. This zoning term is relevant to the present case because both the County's I–2 zone and the City's I–1 zone would be classified as Euclidean zones, versus floating zones (also called planned unit devel-

*Elec. Co.,* 352 Md. 645, 655, 724 A.2d 34, 39 (1999). Euclidean zoning is a fairly static and rigid form of zoning named after the basic zoning ordinance upheld in *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).[10] As explained in *Rouse–Fairwood Dev. Ltd. P'ship v. Supervisor of Assessments for Prince George's County,* 138 Md.App. 589, 623, 773 A.2d 535, 555 (2001):

> The term 'Euclidean' zoning describes the early zoning concept of separating incompatible land uses through the establishment of fixed legislative rules . . . .' 1 ZIEGLER, RATHKOPF'S THE LAW OF ZONING AND PLANNING (4th Ed. Rev.1994), § 1.01(c), at 1–20 ("Rathkopf's"). Generally, by means of Euclidean zoning, a municipality divides an area geographically into particular use districts, specifying certain uses for each district. "Each district or zone is dedicated to a particular purpose, either residential, commercial, or industrial," and the "zones appear on the municipality's official zoning map." 5 Rathkopf's, § 63.01, at 63–1–2. In this way, the municipality 'provides the basic framework for implementation of land use controls at the local level.' 1 Rathkopf's, § 1.01(c), at 1–22.

Euclidian zoning is designed to achieve stability in land use planning and zoning and to be a comparatively inflexible, self-executing mechanism which, once in place, allows for little modification beyond self-contained procedures for predetermined exceptions or variances. This relative inflexibility is reflected in the requirement, found in Art. 66B, § 4.02, of regulatory uniformity within zoning districts.[11]

---

opment (PUD) zones). Floating zones, alluded to later in this opinion for contrast purposes only (*see* n. 15), involve a different set of analytical assumptions than do Euclidean zones.

**10.** For Maryland constitutional limitations on Euclidian zoning, see *Goldman,* 147 Md. at 292–96, 128 A. at 54–55. *See also Jack Lewis, Inc.,* 164 Md. at 152–53, 164 A. at 223.

**11.** Art. 66B, § 4.02 states:

(a) *Districts Created.*—A local legislative body may divide the local jurisdiction into districts of any number, shape, and area that the

## D. The Zoning Process in Greater Depth

### 1. Original and Comprehensive Zoning

■ As noted, *supra*, the act of zoning either may be original or comprehensive (covering a large area and ordinarily initiated by local government) or piecemeal (covering individual parcels, lots, or assemblages, and ordinarily initiated by the property owner). The requirements which must be met for an act of zoning to qualify as proper comprehensive zoning are that the legislative act of zoning must: 1) cover a substantial area; 2) be the product of careful study and consideration; 3) control and direct the use of land and development according to present and planned future conditions, consistent with the public interest; and, 4) set forth and regulate all permitted land uses in all or substantially all of a given political subdivision, though it need not zone or rezone all of the land in the jurisdiction. *Mraz*, 291 Md. at 88–89, 433 A.2d at 776; *Woodward & Lothrop, Inc.*, 280 Md. at 702, 376 A.2d at 492–93; *County Council for Montgomery County v. District Land Corp.*, 274 Md. 691, 699–700, 337 A.2d 712, 717 (1975); *Norbeck*, 254 Md. at 65–66, 254 A.2d at 704–05; *Scull v. Coleman*, 251 Md. 6, 9–11, 246 A.2d 223, 224–25 (1968); *Grooms*, 27 Md.App. at 277, 340 A.2d at 393.

■ The motives or wisdom of the legislative body in adopting an original or comprehensive zoning enjoy a strong presumption of correctness and validity, *Norbeck*, 254 Md. at 65–66, 254 A.2d at 704–05. The zoning so established may be changed thereafter by the zoning authority only by the adoption of a subsequent comprehensive rezoning, or, in the case of a piecemeal Euclidean zoning application, upon a showing that

---

local legislative body considers best suited to execute the purposes of this article.

(b) *Uniformity of regulations.*—(1) Within the districts created, the local legislative body may regulate and restrict the erection, construction, reconstruction, alteration, repair, or use of buildings, structures or land.

(2) All regulations shall be uniform for each class or kind of development throughout each district, but the regulations in one district may differ from those in other districts.

there was a mistake in the prior original or comprehensive zoning or evidence that there has been a substantial change in the character of the neighborhood since the time the original or comprehensive zoning was put in place. *Stratakis v. Beauchamp*, 268 Md. 643, 652–53, 304 A.2d 244, 249 (1973); *Anne Arundel County v. Maryland Nat'l Bank*, 32 Md.App. 437, 440, 361 A.2d 134, 136 (1976). As will be discussed *infra* when we address piecemeal zoning, the impact of this presumption often has been felt to be unduly harsh to the landowner who finds that planned uses of a property are no longer allowed under the zoning classification into which the land has been placed. The presumption performs, however, and perhaps somewhat ironically, a critically essential function to the benefit of the property owner. Because zoning necessarily impacts the economic uses to which land may be put, and thus impacts the economic return to the property owner, the requirement that there be uniformity within each zone throughout the district is an important safeguard of the right to fair and equal treatment of the landowners at the hands of the local zoning authority. Frankly put, the requirement of uniformity serves to protect the landowner from favoritism towards certain landowners within a zone by the grant of less onerous restrictions than are applied to others within the same zone elsewhere in the district, and also serves to prevent the use of zoning as a form of leverage by the local government seeking land concession, transfers, or other consideration in return for more favorable zoning treatment.

Rigidity is not without its drawbacks. No planning and zoning scheme, regardless of how well-studied and designed, can accommodate all of the minute geographical differences found in a given region, or anticipate all of the future changes or desired uses to which the lands subject to zoning conceivably and appropriately may be put, or uses to which owners, in the free exercise of their property interests, may wish their land to be put. In response to the imperfect nature of planning and zoning and the need for greater flexibility in responding to the impacts of these imperfections, various mechanisms have been designed and incorporated into the

planing and zoning process to allow for changes in the uses allowed within a given zone while at the same time retaining the safeguards of the requirement of uniformity within zones. This is the *raison d'etre* for floating zones, variances, conditional uses/special exceptions, and even non-conforming uses. Of some of these vehicles, the venerable scribe of Maryland zoning jurisprudence, Stanley D. Abrams, Esquire, notes:

A special exception or conditional use refers to a permissive land use category authorized by a zoning or administrative body pursuant to the existing provisions of the zoning law and subject to guides, standard and conditions for such special use which is permitted under provisions of the existing zoning law. A variance refers to administrative relief which may be granted from the strict application of a particular development limitation in the zoning ordinance (i.e., setback, area and height limitations, etc.). The principle of a nonconforming use protects the vested rights of property owner against changes in the zoning ordinance which may impair or prohibit the owner's existing use of his property.

Stanley D. Abrams, Guide to Maryland Zoning Decisions, § 11.1 (3d ed., Michie 1992).[12] While these mechanisms give increased flexibility to zoning regulatory schemes, protection against abuse is provided by the fact that the specific requirements and available alternatives for each mechanism must be spelled out in detail as a part of the comprehensive zoning

---

12. For a thorough explanation of the variance process as applied in Maryland, see *Anderson v. Board of Appeals,* 22 Md.App. 28, 38–40, 322 A.2d 220, 226–27 (1974); *See also Alviani v. Dixon,* 365 Md. 95, 112–16, 775 A.2d 1234, 1244–46 (2001); *White v. North,* 356 Md. 31, 736 A.2d 1072 (1999); *Belvoir Farms Homeowners Ass'n, Inc. v. North,* 355 Md. 259, 734 A.2d 227 (1999); *Montgomery County v. Merlands Club,* 202 Md. 279, 96 A.2d 261(1953). Because the concept of non-conforming uses addresses uses in existence before an original zoning or comprehensive zoning occurs which subsequently would prohibit that use, an issue not present in the case before us, we shall not elaborate further here on this zoning tool. For a thorough discussion of non-conforming uses, *see County Comm'rs of Carroll County v. Zent,* 86 Md.App. 745, 587 A.2d 1205 (1991).

ordinance, and thus cannot be "made-up"out of convenience or expediency on a case-by-case basis.[13]

### 2. Piecemeal Zoning

As was pointed out *supra*, the requirement that restrictions within a zone apply uniformly to all of the properties within that zone throughout the district serves to protect land owners from arbitrary use of zoning powers by zoning authorities. Though at first seemingly contradictory, it is for this reason that the motives or wisdom of the legislative body in adopting an original or comprehensive zoning enjoy a strong presumption of correctness and validity. *Norbeck*, 254 Md. at 65–66, 254 A.2d at 704–05. As a consequence, the original or comprehensive zoning may be changed (unless by a subsequent comprehensive zoning) only by a subsequent piecemeal zoning, which in the case of a Euclidean zone may be granted only upon a showing of change or mistake as previously discussed. *Stratakis*, 268 Md. at 652–53, 304 A.2d at 249; *Richmarr*, 117 Md.App. at 635–37, 701 A.2d at 893–94. This requirement, known as the "change-mistake rule," like the rule of uniformity within zones, endeavors to serve the important function of preventing the arbitrary use and/or abuse of the zoning power.

The "change-mistake" rule is a rule of the either/or type. The "change" half of the "change-mistake" rule requires that, in order for a piecemeal Euclidean zoning change to be approved, there must be a satisfactory showing that there has been significant and unanticipated change in a relatively well-defined area (the "neighborhood") surrounding the property in question since its original or last comprehensive rezoning, whichever occurred most recently. The "mistake" option of the rule requires a showing that the underlying assumptions or premises relied upon by the legislative body during the immediately preceding original or comprehensive

---

**13.** *See West Montgomery County Citizens Ass'n. v. Maryland National Capital Park and Planning Comm'n.* 309 Md. 183, 522 A.2d 1328 (1987).

rezoning were incorrect. In other words, there must be a showing of a mistake of fact. Mistake in this context does not refer to a mistake in judgment. Additionally, even where evidence of a change or mistake is adduced, there is no reciprocal right to a change in zoning, nor is there a threshold evidentiary standard which when met compels rezoning. Even with very strong evidence of change or mistake, piecemeal zoning may be granted, but is not required to be granted, except where a failure to do so would deprive the owner of all economically viable use of the property. *See Mayor and Council of Rockville v. Stone,* 271 Md. 655, 660–64, 319 A.2d 536, 540–41 (1974); *Burgess v. 103–29 Ltd. P'ship,* 123 Md.App. 293, 298–99, 718 A.2d 613, 616 (1998); *People's Counsel for Baltimore County v. The Prosser Co., Inc.,* 119 Md.App. 150, 179, 704 A.2d 483, 498 (1998); *The Bowman Group v. Dawson Moser,* 112 Md.App. 694, 699–702, 686 A.2d 643, 646–47 (1996); *People's Counsel for Baltimore County v. Beachwood I Ltd. P'ship,* 107 Md.App. 627, 638–59, 670 A.2d 484, 489–500 (1995); *Boyce v. Sembly,* 25 Md.App. 43, 49–53, 334 A.2d 137, 141–44 (1975). In Maryland, the change-mistake rule applies to all piecemeal zoning applications involving Euclidian zones, including those involving conditional zoning.[14] The change-mistake rule does not apply, in any event, to changes in zoning made in a comprehensive rezoning, or the piecemeal grant of a floating zone.[15]

---

**14.** "Conditional zoning" is a distinct zoning tool not to be confused with the "conditional use" or "special exception" mechanisms discussed later in this opinion.

**15.** At the far end of the flexibility continuum of zoning categories from Euclidean zones are "floating" or planned unit development zones. Dissatisfaction with the relative inflexibility of Euclidian zoning gave rise to the use of "floating zones," the use of which is authorized in Maryland by Md.Code (1957, 1998 Repl.Vol., 2002 Supp.), Article 66B, § 10.01(a)(8). In the case of *Eschinger v. Bus,* 250 Md. 112, 118–119, 242 A.2d 502, 505–506 (1968), we quoted Russell R. Reno, *Non Euclidean Zoning: the Use of the Floating Zone,* 23 Md. L.Rev. 105, 107 (1963), as follows:

In recent years a new device in zoning has developed which provides the machinery for the establishment of small tracts for use as a shopping center, a garden apartment or a light industry in accor-

dance with a comprehensive plan for the entire municipality, and at the same time leaves the exact location of each tract to be determined in the future as demanded for a shopping center, a garden apartment or a light industry develops in a specific area. This device is the creation of special use districts for these various uses, which at the time are unlocated districts, but which can be located by a petition of a property owner desiring to develop his specific tract for any of these special uses. Such unlocated special zoning districts are popularly referred to as 'floating zones,' in that they float over the entire municipality until by application of a property owner one of these special zones descends upon his land thereby reclassifying it for the special use. The zoning ordinance is carefully drawn so as to impose restrictive use limitation upon the owner in these special use zones in order to protect the adjoining residential areas. Usually there is a minimum lot requirement with large set-back restrictions for the structures, both from the streets and from the adjoining residences. Also in the case of light industry, limitations exist as to architecture of the buildings with requirements as to landscaping."

Professor Reno pointed out (pp. 118–19–20) that:

In both the *Rodgers* case [*Rodgers v. Village of Tarrytown*, 302 N.Y. 115, 96 N.E.2d 731 (1951)] and the *Huff* case [*Huff v. Bd. of Zoning Appeals*, 214 Md. 48, 133 A.2d 83 (1957)] there was a complete system of established use districts covering the entire municipal area, with a single floating zone for a specialized use superimposed upon these established districts. Thus, in both cases where the floating zone device was upheld, there existed a comprehensive zoning plan for the municipality to which the floating zone was merely a special exception applicable to the entire plan, analogous to special exceptions applicable to individual zones. This raises the question as to whether the legality of the floating zone device is dependent upon the existence of an established Euclidean zoning system over which the floating zone is superimposed.

\* \* \*

From these cases we can conclude that the most liberal courts still interpret the zoning power to mean Euclidean zoning with the creation of established territorial use districts. The advent of the floating device creates a supplementary device similar to the special exception to give greater flexibility to the established use districts but cannot be used as a substitute for the accepted method of Euclidean zoning.

In order to prevent floating zones from becoming a tool with which to circumvent the prohibition on illegal forms of conditional and spot zoning, we consistently have held that:

... the floating zone is subject to the same conditions that apply to safeguard the granting of special exceptions, i.e., the use must be compatible with the surrounding neighborhood, it must further the purposes of the proposed reclassification, and special precautions are to be applied to insure that there will be no discordance with existing uses. These precautions include such restrictions as building location and style, the percentage of the area covered by the building, minimum green area, minimum and maximum area of the use, minimum setback from streets and other uses, requirement that a site

### 3. Special Exceptions/Conditional Uses

 Another mechanism allowing some flexibility in the land use process, without abandoning the uniformity principle, is the "special exception" or "conditional use." [16] As was noted *supra*, the City of Rockville's I–1 zoning classification does not allow for the operation of a gasoline service station except upon the grant of a special exception. During the legislative process of defining zones and identifying the permitted uses for each zone, the local legislature also identifies additional uses which may be conditionally compatible in each zone, but which should not be allowed unless specific statutory standards assuring compatibility are met by the applicant at the time separate approval of the use is sought. "The special exception use is a valid zoning mechanism that delegates to an administrative Board limited authority to allow enumerated

---

plan be approved, and a provision for revocation of the classification if the specified restrictions are not complied with.

*See also Bigenho v. Montgomery County Council,* 248 Md. 386, 391, 237 A.2d 53, 56–57 (1968); *Aubinoe v. Lewis,* 250 Md. 645, 244 A.2d 879 (1968); *Tauber & Gould v. Montgomery County Council,* 244 Md. 332, 336–37, 223 A.2d 615, 618 (1966); *Knudsen v. Montgomery County Council,* 241 Md. 436, 217 A.2d 97 (1966); *Beall v. Montgomery County Council,* 240 Md. 77, 212 A.2d 751 (1965); *Costello v. Sieling,* 223 Md. 24, 161 A.2d 824 (1960); *Huff v. Bd. of Zoning Appeals of Baltimore County,* 214 Md. 48, 133 A.2d 83 (1957).

In a floating zone case, the zoning authority must make an express determination based upon specific findings of fact and legal conclusions that the application meets each of the statutory criteria and each of the stated purposes of the zone requested. *Colao v. County Council of Prince George's County,* 109 Md.App. 431, 456–57, 675 A.2d 148, 161 (1996); *Floyd v. County Council of Prince George's County,* 55 Md.App. 246, 257–59, 461 A.2d 76, 82–83 (1983). "This showing replaces the usual proof of change or mistake; and the requirement likens a floating zone case to a special exception case ... The zoning agency in a floating zone case must find, just as it does in a special exception case, that compatibility is shown by the applicant's conformance to express ordinance standards." *Richmarr,* 117 Md.App. at 640, 701 A.2d at 895.

16. In Maryland, the terms "special exception" and "conditional use" are synonymous. *Hofmeister v. Frank Realty Company,* 35 Md.App. 691, 698, 373 A.2d 273, 277 (1977); *but see Cromwell v. Ward,* 102 Md.App. 691, 699, n. 5, 651 A.2d 424, 428 n. 5 (1995). A "conditional use" however, is not to be confused with "conditional zoning," discussed *infra*.

uses which the legislature has determined to be permissible absent any fact or circumstance negating the presumption." *Schultz v. Pritts*, 291 Md. 1, 11, 432 A.2d 1319, 1325 (1981).[17] Put another way, a special exception use is an additional use which the controlling zoning ordinance states will be allowed in a given zone unless there is showing that the use would have unique adverse affects on the neighboring properties within the zone. *Rockville Fuel & Feed Co. v. Board of Appeals of the City of Gaithersburg*, 257 Md. 183, 188–91, 262 A.2d 499, 502–03 (1970); *Cadem v. Nanna*, 243 Md. 536, 543, 221 A.2d 703, 707 (1966); *Anderson v. Sawyer*, 23 Md.App. 612, 617–18, 329 A.2d 716, 720–21 (1974).

The disqualifying adverse effect or effects must be more than mere annoyance. Classifying such uses as special exceptions or conditional uses (as opposed to permitted uses) assumes that those uses will include some adverse impacts. *Mossburg v. Montgomery County*, 107 Md.App. 1, 7–11, 666 A.2d 1253, 1256–58 (1995). As we pointed out in *Schultz*, 291 Md. at 11, 432 A.2d at 1325 (1981) "[t]he appropriate standard to be used in determining whether a requested special exception use would have an adverse effect and, therefore, should be denied is whether there are facts and circumstances that show that the particular use proposed at the particular location proposed would have any adverse effects above and beyond those inherently associated with such a special exception use irrespective of its location within the zone."

Because special exceptions are legislatively-created within the comprehensive zoning regulatory scheme, they enjoy the presumption of correctness and are an appropriate

17. *See also Alviani v. Dixon*, 365 Md. 95, 112–114, 775 A.2d 1234, 1244–45 (2001); *Creswell v. Baltimore Aviation Service, Inc.*, 257 Md. 712, 719–21, 264 A.2d 838, 842–43 (1970); *Montgomery County v. Merlands Club, Inc.*, 202 Md. 279, 287–91, 96 A.2d 261, 264–65 (1953); *Hayfields, Inc. v. Valleys Planning Council, Inc.*, 122 Md.App. 616, 639–41, 716 A.2d 311, 322–23 (1998); *Mossburg v. Montgomery County*, 107 Md.App. 1, 7–11, 666 A.2d 1253, 1256–58 (1995); *Sharp v. Howard County Bd. of Appeals*, 98 Md.App. 57, 73–83, 632 A.2d 248, 256–60 (1993).

tool for the exercise of a local government's police powers. *Brandywine Enterprises, Inc. v. Prince George's County Council*, 117 Md.App. 525, 700 A.2d 1216 (1997). Because of this presumption, special exception applications are not governed by the "change-mistake Rule." *Cadem*, 243 Md. at 543, 221 A.2d at 707.

### 4. Conditional Zoning

Another important zoning mechanism is "conditional zoning." At one time, in most States, conditional zoning was improper. This, as late as the 1950's, was also the case in Maryland. Some states, either by case law and/or statute, approved, however, some level of conditional zoning. Particularly illustrative for our purposes is the case of *Collard v. Village of Flower Hill*, 52 N.Y.2d 594, 600–01, 439 N.Y.S.2d 326, 421 N.E.2d 818, 821 (1981), where the Court stated:

Probably the principal objection to conditional rezoning is that it constitutes illegal spot zoning, thus violating the legislative mandate requiring that there be a comprehensive plan for, and that all conditions be uniform within, a given zoning district. When courts have considered the issue (see, e.g., *Baylis v. City of Baltimore*, 219 Md. 164, 148 A.2d 429; *Houston Petroleum Co. v. Automotive Prods. Credit Ass'n.*, 9 N.J. 122, 87 A.2d 319; *Hausmann & Johnson v. Berea Bd. of Appeals*, 40 Ohio App.2d 432, 320 N.E.2d 685), the assumptions have been made that conditional zoning benefits particular landowners rather than the community as a whole and that it undermines the foundation upon which comprehensive zoning depends by destroying uniformity within use districts. Such unexamined assumptions are questionable. First, it is a downward change to a less restrictive zoning classification that benefits the property rezoned and not the opposite imposition of greater restrictions on land use. Indeed, imposing limiting conditions, while benefitting surrounding properties, normally adversely affects the premises on which the conditions are imposed. Second, zoning is not invalid per se merely because only a single parcel is involved or benefitted (*Matter of Mahoney*

*v. O'Shea Funeral Homes,* 45 N.Y.2d 719, 408 N.Y.S.2d 470, 380 N.E.2d 297); the real test for spot zoning is whether the change is other than part of a well-considered and comprehensive plan calculated to serve the general welfare of the community. Such a determination, in turn, depends on the reasonableness of the rezoning in relation to neighboring uses-an inquiry required regardless of whether the change in zone is conditional in form. Third, if it is initially proper to change a zoning classification without the imposition of restrictive conditions notwithstanding that such change may depart from uniformity, then no reason exists why accomplishing that change subject to condition should automatically be classified as impermissible spot zoning.

... If modification to a less restrictive zoning classification is warranted, then *a fortiori* conditions imposed by a local legislature to minimize conflicts among districts should not in and of themselves violate any prohibition against spot zoning. (citation omitted).

As we will address in more detail *infra,* it is clear that Maryland now approves of at least limited conditional zoning, as codified in Art. 66B, § 4.01(c).[18] As we pointed out in

---

**18.** Maryland Code (1957, 1998 Repl.Vol.2002 Supp.), Article 66B, § 4.01(c) provides:

(c) *Construction of Powers.*—(1) On the zoning or rezoning of any land under this article, a local legislative body may impose any additional restrictions, conditions, or limitations that the local legislative body considers appropriate to preserve, improve, or protect the general character and design of:

(i) The lands and improvements being zoned or rezoned; or

(ii) The surrounding or adjacent lands and improvements.

(2) On the zoning or rezoning of any land, a local legislative body may retain or reserve the power to approve or disapprove the design of buildings, construction, landscaping, or other improvements, alterations, and changes made or to be made on the land being zoned or rezoned to assure conformity with the intent and purpose of this article and of the local jurisdiction's zoning ordinance.

(3) The powers provided in this subsection shall apply only if the local legislative body adopts an ordinance which shall include enforcement procedures and requirements for adequate notice of public hearings and conditions sought to be imposed.

*Attman/Glazer P.B. Co. v. Mayor & Aldermen of Annapolis,* 314 Md. 675, 687, n. 8, 552 A.2d 1277, 1284, n. 8 (1989):

Conditional zoning, once roundly condemned, appears to be in the ascendancy. In Maryland, the concept has evolved indirectly through the use of various zoning devices such as planned developments, and has found at least limited favor with the state legislature. *See* Article 66B, §§ 4.01(b) permitting a county or municipal corporation to impose certain conditions at the time of zoning or rezoning land, under certain circumstances. *See also People's Counsel v. Mockard,* 73 Md.App. 340, 343–45, 533 A.2d 1344 (1987); and *Bd. of Co. Comm'rs v. H. Manny Holtz, Inc.,* 65 Md.App. 574, 579–86, 501 A.2d 489 (1985) (holding that §§ 4.01(b) of Article 66B authorizes the imposition of conditions applicable to structural and architectural character of the land and improvements thereon, and does not authorize conditional use rezoning). We need not, and do not, offer an opinion concerning the intermediate appellate court's interpretation of the scope of § 4.01(b).[19]

## 5. Spot Zoning

Although we need not, and therefore shall not, decide whether the City of Rockville's grant of the I–1 zone for the subject property constitutes illegal spot zoning because we decide the case on other grounds, we shall describe briefly the principles of spot zoning so that the potential nexus between it and conditional zoning may be appreciated. In *Tennison v. Shomette,* 38 Md.App. 1, 8, 379 A.2d 187, 192 (1977), the Court of Special Appeals pointed out that

---

**19.** Contrary to the assertions of the Dissent (Dissent, op. at 606–07), the mere fact that, in the proper exercise of judicial restraint, the Court declined in *Attman/Glazer* to address an issue does not mean that it in any way rejected the Court of Special Appeals's holding concerning that issue. It merely means exactly what a plain language reading offers: the issue was left *open* until such future time as that issue must be decided by this Court. The case *sub judice* presents a proper set of circumstances for us to reach that which was unnecessary for us to reach in *Attman/Glazer* and, thus, we shall do so, *infra.*

[s]pot zoning occurs when a small area in a District is placed in a different zoning classification than the surrounding property ... Spot zoning is not invalid *per se*. Rather, its validity depends on the facts of each individual case .... while spot zoning is illegal if it is inconsistent with an established comprehensive plan and is made solely for the benefit of a private interest, it is a valid exercise of the police power where the zoning is in harmony with the comprehensive plan and there is a substantial relationship to the public health, safety and general welfare.

*See also Mraz*, 291 Md. at 88, 433 A.2d at 775.

We discussed the concept of "spot zoning" in the case of *Cassel v. Mayor and City Council of Baltimore*, 195 Md. 348, 73 A.2d 486 (1950), at one time considered a leading case on the topic. There, we said:

Zoning is permissible only as an exercise of the police power of the State. When this power is exercised by a city, it is confined by the limitations fixed in the grant by the State and to the accomplishment of the purposes for which the State authorized the city to zone....

. . .

'Spot zoning,' the *arbitrary* and *unreasonable* devotion of a small area within a zoning district to a use which is inconsistent with the use to which the rest of the district is restricted, has appeared in many cities in America as the result of pressure put upon councilmen to pass amendments to zoning ordinances solely for the benefit of private interests.... It is, therefore, universally held that a 'spot zoning' ordinance, which singles out a parcel of land within the limits of a use district and *marks it off into a separate district* for the benefit of the owner, thereby permitting a use of that parcel inconsistent with the use permitted in the rest of the district, is invalid *if it is not in accordance with the comprehensive zoning plan and is merely for private gain.*

*On the other hand, it has been decided that a use permitted in a small area, which is not inconsistent with the use to which the larger surrounding area is restricted, although it may be different from that use, is not 'spot zoning' when it does not conflict with the comprehensive plan but is in harmony with an orderly growth of a new use for property in the locality.* The courts have accordingly upheld the creation of small districts within a residential district for use of grocery stores, ... and even gasoline filling stations, for the accommodation and convenience of the residents of the residential district.

*Id.* at 353–56, 73 A.2d at 488–90 (emphasis added) (citations omitted).

### 6. Contract Zoning

A final zoning concept we shall mention briefly in this primer is "contract zoning." It occurs when an agreement is entered between the ultimate zoning authority and the zoning applicant/ property owner which purports to determine contractually how the property in question will be zoned, in derogation of the legal prerequisites for the grant of the desired zone. Absent valid legislative authorization, it is impermissible because it allows a property owner to obtain a special privilege not available to others, *Wakefield v. Kraft,* 202 Md. 136, 142–44, 96 A.2d 27, 29–30 (1953), disrupts the comprehensive nature of the zoning plan, and, most importantly, impermissibly derogates the exercise of the municipality's powers. *Attman/Glazer,* 314 Md. at 685–86, 552 A.2d at 1282–83; *Baylis v. City of Baltimore,* 219 Md. 164, 169–70, 148 A.2d 429, 433 (1959); *Beachwood,* 107 Md.App. at 668–75, 670 A.2d at 504–08. Agreements between the landowner and governmental agencies who do not wield the final zoning authority or entities extrinsic to the formal zoning process, such as civic associations, however, may be permissible. *Funger v. Mayor & Council of the Town of Somerset,* 249 Md. 311, 328, 239 A.2d 748, 757 (1968); *Rodriguez v. Prince George's County,* 79 Md.App. 537, 553, 558 A.2d 742, 750 (1989).

### III.

Having surveyed generally the relevant zoning mechanisms, concepts, and principles potentially implicated by the case *sub judice*, we now shall employ them in our analysis of the relevant facts. We address the necessary certiorari issues in a different order than they were raised chronologically in this case because logic dictates that we do so.

### A.

### Article 23A, § 9(c)(1) and (2)

Maryland Code (1957, 1998 Repl.Vol.), Article 23A, § 9(c)(1)and (2) provides as follows:

(c) *Limitations on charter amendments; effect of annexation.*—(1) A municipal corporation which is subject to the provisions of Article XI–E of the Maryland Constitution may not amend its charter or exercise its powers of annexation, incorporation or repeal of charter as to affect or impair in any respect the powers relating to sanitation, including sewer, water and similar facilities, and zoning, of the Washington Suburban Sanitary Commission or of the Maryland National Capital Park and Planning Commission. *Except* that where any area is annexed to a municipality authorized to have and having then a planning and zoning authority, the municipality shall have exclusive jurisdiction over planning and zoning and subdivision control within the area annexed; provided nothing in this exception shall be construed or interpreted to grant planning and zoning authority or subdivision control to a municipality not authorized to exercise that authority at the time of such annexation; and further provided, that no municipality annexing land may for a period of five years following annexation, *place that land in a zoning classification which permits a land use substantially different from the use for the land specified in the current and duly adopted master plan or plans or if there is no adopted or approved master plan, the adopted or approved general plan or plans of the county or agency having planning and zoning jurisdiction over the*

*land prior to its annexation* without the express approval of the board of county commissioners or county council of the county in which the municipality is located.

(2) If the county expressly approves, the municipality, without regard to the provisions of Article 66B, § 4.05(a) of the Code, may place the annexed land in a zoning classification that permits a land use substantially different from the use for the land specified in the current and duly adopted master plan or general plan of the county or agency having planning and zoning jurisdiction over the land prior to its annexation. (emphasis added).

The Owners argue that the language "duly adopted master plan or plans or if there is no adopted or approved master plan, the adopted or approved general plan or plans of the county or agency having planning and zoning jurisdiction over the land prior to its annexation" should be interpreted to mean that the General Assembly intended that, upon annexation of new lands into the City of Rockville, the City is to look first to its own land use plans, if any, to determine zoning consistency. That is to say, the Owners' position is that the statutory consistency requirement is met if the new zoning is consistent with Rockville's own plan, and consistency with the plan or plans of the pre-annexation jurisdiction is not required. Given the language of the statute, as well as its legislative history, we do not conclude that to be the case.

In *Mazor v. Department of Correction*, 279 Md. 355, 360–61, 369 A.2d 82, 86–87 (1977), we set out the six principal tenets of statutory interpretation:

[1] The cardinal rule of construction of a statute is to ascertain and carry out the real intention of the Legislature.

[2] The primary source from which we glean this intention is the language of the statute itself.

[3] In construing a statute, we accord the words their ordinary and natural signification.

[4] If reasonably possible, a statute is to be read so that no word, phrase, clause, or sentence is rendered surplusage or meaningless.

[5] Similarly, wherever possible an interpretation should be given to statutory language which will not lead to absurd consequences.

[6] Moreover, if the statute is part of a general statutory scheme or system, the sections must be read together to ascertain the true intention of the Legislature. (citations omitted).

As noted, absurd results in the interpretive analysis of a statute are to be shunned. This Court stated in *D & Y, Inc. v. Winston*, 320 Md. 534, 538, 578 A.2d 1177, 1179 (1990), that "construction of a statute which is unreasonable, illogical, unjust, or inconsistent with common sense should be avoided." (citations omitted). *See also Blandon v. State*, 304 Md. 316, 319, 498 A.2d 1195, 1196 (1985) ("[R]ules of statutory construction require us to avoid construing a statute in a way which would lead to absurd results."); *Erwin and Shafer, Inc. v. Pabst Brewing Co.*, 304 Md. 302, 311, 498 A.2d 1188, 1192 (1985) ("A court must shun a construction of a statute which will lead to absurd consequences.").

We recently reiterated when recourse to legislative history is necessary in *Liverpool v. Baltimore Diamond Exchange, Inc.*, 369 Md. 304, 316–18, 799 A.2d 1264, 1271–72 (2002), stating that:

In *Mayor of Baltimore v. Chase*, 360 Md. 121, 128, 756 A.2d 987, 991 (2000), we instructed:

Of course, the cardinal rule is to ascertain and effectuate legislative intent. To this end, we begin our inquiry with the words of the statute and, ordinarily, when the words of the statute are clear and unambiguous, according to their commonly understood meaning, we end our inquiry there also.

\* \* \* \* \* \*

We have acknowledged that, in ascertaining a statute's meaning, we must consider the context in which a statute appears. In this regard we have instructed:

> When the statute to be interpreted is part of a statutory scheme, it must be interpreted in that context. That means that, when interpreting any statute, the statute as a whole must be construed, interpreting each provision of the statute in the context of the entire statutory scheme. Thus, statutes on the same subject are to be read together and harmonized to the extent possible, reading them so as to avoid rendering either of them, or any portion, meaningless, surplusage, superfluous or nugatory. *Whiting–Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 302–03, 783 A.2d 667, 671 (2001) (internal quotations omitted) (citations omitted).

On the other hand, "where the meaning of the plain language of the statute, or the language itself, is unclear, 'we seek to discern legislative intent from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based.' " We recently explained the rules applicable when the terms of a statute are ambiguous:

> 'When the words of a statutory provision are reasonably capable of more than one meaning, and we examine the circumstances surrounding the enactment of a legislative provision in an effort to discern legislative intent, we interpret the meaning and effect of the language in light of the objectives and purposes of the provision enacted. Such an interpretation must be reasonable and consonant with logic and common sense. In addition, we seek to avoid construing a statute in a manner that leads to an illogical or untenable outcome.

We defined the term "ambiguity" as "reasonably capable of more than one meaning," and further explained that:

> 'language can be regarded as ambiguous in two different respects: 1) it may be intrinsically unclear . . .; or 2) its

intrinsic meaning may be fairly clear, but its application to a particular object or circumstance may be uncertain.' Thus, a term which is unambiguous in one context may be ambiguous in another.

(Some internal citations omitted).

Although we shall conclude that no rational argument can be made to suggest that the language in Art. 23A, § 9(c)(1) refers to plans other than those of the pre-annexation zoning authority, a plain meaning approach does not yield this conclusion as the ready answer. A fair reading of the statute in its historical development, however, supports no other conclusion. Applying the interpretational rules to the pertinent statute, we first look to the language of the statute itself. Art. 23A, § 9(c) grants to the annexing municipality exclusive zoning powers, but then sets forth a number of threshold conditions or exceptions, the most important of which for our present purpose is:

that no municipality annexing land may for a period of five years following annexation, *place that land in a zoning classification which permits a land use substantially different from the use for the land specified in the current and duly adopted master plan or plans or if there is no adopted or approved master plan, the adopted or approved general plan or plans of the county or agency having planning and zoning jurisdiction over the land prior to its annexation* without the express approval of the board of county commissioners or county council of the county in which the municipality is located. (emphasis added).

The language of the clause is arguably ambiguous. As written, there are two possible plain meaning interpretations of the language.

Under the first of these, the annexing municipality is directed, as the Owners argue, to look to its own land use plans first, and only if it has none is it required to look to the plans of the pre-annexation jurisdiction. This interpretation is made possible theoretically by Maryland Code (1957, 1998 Repl.Vol., 2002 Supp.), Article 66B § 3.05(a)(2)(ii), which pro-

vides that a municipality's master plan should "include any areas outside of its boundaries which, in the commission's judgment, bear relation to the planning responsibilities of the commission." Without Art 66B, § 3.05(a), the annexing municipality would have no plan of its own to refer to, and it would be clear that the language in Art. 23A, § 9 refers solely to the plans of the pre-annexation jurisdiction. The Owners' literal interpretation is that if the annexing jurisdiction's plan includes a land use recommendation for an area originally outside of its jurisdiction in anticipation of its possible future annexation, then it may look first to its own municipal plan and is only required to look to the county plan if there is no municipal plan, or the municipal plan failed to make an anticipatory use recommendation covering the annexed area. For the reasons set forth *infra*, this interpretation is not persuasive as its logical support requires a degree of intellectual "cherry-picking" from both the overall pertinent statutory scheme and its legislative history.

The second possible interpretation is that the General Assembly merely was acknowledging the hierarchy of local governmental planning and the differing terminology used to identify those various land use plans by the various jurisdictions. Under this interpretation, the language may be read to require the annexing municipality to look to the duly adopted "master plan or plans" of the county or other jurisdiction having planning and zoning jurisdiction over the land prior to its annexation, and if the county has no duly adopted "master plan or plans," then the annexing municipality must look to the county's general plan or plans. Under this interpretation, the terms "plan" or "plans" always refers to the land use recommendations of the pre-annexation jurisdiction, and renders the land use plans of the annexing municipality, for purposes of determining zoning consistency at the time of annexation, not relevant.

Given the historical development of Article 23A, § 9, discussed *infra*, we conclude that the latter interpretation is correct. As we pointed out in *Maryland–National Capital Park and Planning Comm'n v. Mayor and Council of Rock-*

*ville,* 272 Md. 550, 561, 325 A.2d 748, 754–55 (1974), discussing the legislative purpose of this section as it existed at that time:

A major objective of Chapter 116 [Laws 1971—amending Art. 23A, § 9] is to preserve the integrity of the Master Plan adopted by the jurisdiction or commission having planning power immediately prior to annexation. In enacting Chapter 116, the General Assembly validly could have considered that the planning and zoning functions frequently involve large areas, and not merely the land being annexed; and, therefore, that a substantial change in the zoning of an annexed tract might well be disruptive to the planning for the surrounding areas. Thus, the statute is rationally related to a legitimate state objective, and is not arbitrary or unreasonable. (citations omitted).

*See also Northeast Plaza Associates v. President and Comm'rs of the Town of North East,* 310 Md. 20, 28–31, 526 A.2d 963, 967–69 (1987). Thus, we have held that the purpose of the section as previously enacted was to limit the power of municipalities and preserve the zoning of the pre-annexation jurisdiction for a period of five years,[20] and there is nothing in

---

**20.** In *City of Gaithersburg v. Montgomery County,* 271 Md. 505, 511–13, 318 A.2d 509, 512–13 (1974), we pointed out that:

The legislative history of Chapter 116 lends support to the view that the General Assembly intended the statute to apply to municipalities throughout the State. Chapter 116 was first introduced as House Bill 83 at the 1971 session of the General Assembly. After passing the House, it was read for the first time in the Senate and referred to the Committee on Judicial Proceedings. Throughout this stage, the bill's title provided in part (Journal of Proceedings of the Senate of Maryland, Regular Session 1971, p. 146):

"... to provide that a municipal corporation having planning and zoning authority shall assume exclusive jurisdiction over planning and zoning within an area annexed five years after the area is finally annexed by it over which the Maryland National Capital Park and Planning Commission had jurisdiction prior to the annexation."

The Senate Judicial Proceedings Committee, however, deleted the reference in the title to the Maryland National Capital Park and Planning Commission, and re-wrote the title as follows (Senate Journal, *supra,* p. 1227):

"to provide that no municipal corporation annexing land may, for a period of five years following annexation, place such land in a

the subsequent history of this section to suggest the General Assembly subsequently intended otherwise.

 The interpretation that the language in question is meant to limit, or to put it more precisely, delay, the exclusive zoning authority of an annexing municipality is buttressed when we view § 9 as a whole, and as part of the larger statutory scheme. It is "well settled" that "the title of an act is relevant to ascertainment of its intent and purpose. . . ." *MTA v. Balto. Co. Revenue Auth.*, 267 Md. 687, 695–696, 298 A.2d 413 (1973). Article 23A, § 9 is titled **Definitions and limitations.** As such, one legitimately may expect that the legislative intent is to define and limit the powers of annexing municipalities, rather than to expand them. Reinforcing this expectation is the fact that § 9(c) is specifically titled **Limitations on charter amendments; effect of annexation.** Again, one would expect that the contents of this sub-section are intended to set forth limits or to withhold from municipali-

---

zoning classification which permits a land use substantially different from the use for such land specified in the current and duly adopted master plan or plan of the county or agency having planning and zoning jurisdiction over such land prior to its annexation."

The Committee's amendment was adopted, and the bill was finally enacted in that form. Senate Journal, *supra*, pp. 1260–1261, 1356, 1400, 1474–1475; Journal of Proceedings of the House of Delegates of Maryland, Regular Session 1971, pp.1976, 2156–2157. This action, re-writing the title and deleting the reference to areas "over which the Maryland National Capital Park and Planning Commission had jurisdiction prior to annexation," suggests a realization by the General Assembly that Art. XI–E of the Constitution required that the Act apply to all municipalities in the State. This legislative intent, disclosed by the title of Chapter 116, confirms the scope of the language of the Act itself. It is "well settled" that "the title of an act is relevant to ascertainment of its intent and purpose. . . ." *MTA v. Balto. Co. Revenue Auth.*, 267 Md. 687, 695–696, 298 A.2d 413 (1973). In sum, principles of statutory construction, the language of Article 23A, § 9 as amended by Chapter 116 of the Laws of Maryland 1971, and the legislative history of the amendment, all lead to the conclusion that the enactment is a limitation upon the home rule powers of *all* municipalities subject to Art. XI–E of the Maryland Constitution. As such, the statutory provisions do not violate Art. XI–E. (emphasis in original).

ties, under certain circumstances, the ability to exercise zoning power in certain annexation situations.

Further reinforcing the view that the pertinent language is meant to refer only to the plans of the pre-annexation jurisdiction is the fact that Md.Code (1957, 1998 Repl.Vol., 2002 Supp.), Article 66B, § 1.00(h)(2) [21] specifically recognizes that a local government planning document may be called by different names when it states that " 'Plan' includes a general plan, master plan, comprehensive plan, or community plan adopted in accordance with §§ 3.01 through 3.09 of this article." Thus, in light of the above, when § 9(c)(1) is read together with § 9(c)(2), it becomes clear that the language in both sub-sections refers only to the plans of the pre-annexation county. As six Maryland counties [22] put it in their *Amici Curiae* brief:

> ... [T]he "county or agency having planning and zoning jurisdiction" modifier, contrary to [the Owners'] suggestion, applies to *both* "master" plans and "general" plans. While the sentence at the end of subsection (c)(1) might possibly be strained to say, as [the Owners] urge, that the "master plan or plans" language refers to any kind of master plan-including Rockville's, which extends beyond City boundaries-the sentence in subsection (c)(2) clearly means that the "master" plan or "general" plan to be followed is that of the

---

**21.** "We consistently have held that Articles 23A and 66B be read together." *Northeast*, 310 Md. at 29, 526 A.2d at 968 (1987). *See also Prince George's County v. Mayor and City Council of Laurel*, 262 Md. 171, 183–84, 277 A.2d 262, 268–69 (1971)("It has been said that the provisions of Article 23A and Article 66B of the Maryland Code are to be read together when their provisions relate to the same subject matter, and especially so when a municipality zones for the first time in the course of annexing land.")(citing *City of Annapolis v. Kramer*, 235 Md. 231, 234, 201 A.2d 333 (1964)).

**22.** The six counties filing a joint amici brief in the present case were Montgomery, Prince George's, Anne Arundel, Charles, Frederick, and Carroll. The Maryland Municipal League, Inc. and the Maryland-National Capital Park and Planning Commission also filed amici briefs. The Court acknowledges its gratitude for their collective efforts in assisting in these deliberations.

"county or agency having planning and zoning jurisdiction over the land prior to its annexation." (Brief at 13).

Reading the language of § 9(c)(1) as including reference to the plan of an annexing municipality, as urged by the Owners, renders the sub-section effectively a nullity, as any municipality wishing to avoid the five year rule could do so relatively easily by adopting its own contrarian plan, assuming that it was fully empowered to do so. We note, however, that this is not what the General Assembly said, and there is no indication that this is what it meant. Not even the City of Rockville endorses the Owners' argument in this regard.

We turn now to examine the relevant legislative history. As we pointed out in *Prince George's County v. Mayor and City Council of Laurel,* 262 Md. 171, 177–78, 277 A.2d 262, 265–66 (1971), Chapter 423, Laws 1955, a progenitor of Art. 23A, § 9(c), operated to prohibit municipalities in Montgomery and Prince George's counties from exercising annexation or zoning powers if to do so would interfere with the powers exercised by the Maryland National Capital Park and Planing Commission. This balance of power briefly shifted toward the municipalities with the passage of Chapter 197, Laws 1957, when the Legislature created an exception to the prohibition created by Chapter 423, by providing that:

Except that where any area is annexed to a municipality authorized to have and having then a planning and zoning authority, the said municipality shall have exclusive jurisdiction over planing and zoning within the area annexed. . . .

This provision represents the highwater mark of municipal power under this section, and is the last instance where municipalities with zoning and planning authority wielded relative autonomy with respect to the initial zoning of annexed lands.

In 1971 this autonomy ceased. As we previously pointed out in *Northeast,* 310 Md. at 28–29, 526 A.2d at 967–68; *M–NCPPC v. Mayor and Council of Rockville,* 272 Md. 550, 561, 325 A.2d 748, 754–55 (1974); and *City of Gaithersburg v. Montgomery County, Maryland,* 271 Md. 505, 511–13, 318

A.2d 509, 512–13 (1974), the General Assembly enacted Chapter 116, Laws 1971 [23] to limit the power of municipalities to zone annexed property. The statute specifically stated that:

> ... no municipality annexing land may for a period of five years following annexation, place such land in a zoning classification which permits a land use substantially different from the use for such land specified in the *current and duly adopted master plan or plan of the county or agency having planing and zoning jurisdiction over such land prior to its annexation.* (emphasis added).

This language was modified by Chapter 33, Laws 1972, which removed the word "plan" and replaced it with the word "plans." There can be no doubt, from the language of the statute as it existed in 1971 and 1972, that the terms "plan" or "plans" found in Chapters 116 and 33, respectively, refer to the plan or plans of the pre-annexation county jurisdiction, and not those of the annexing municipality. That the clause "of the county or agency having planning and zoning jurisdiction over the land prior to annexation" follows immediately after the terms "master plan or plan (later 'plans')" makes this point indisputable. The use of multiple terms for the concept of a plan merely indicates the General Assembly's recognition that the political subdivisions of the State use more than one term to identify their land use "plan" or their internal hierarchy of plans.[24] Nothing in subsequent amendments to this section reasonably can be taken to have altered this meaning.

---

**23.** Chapter 116 was enacted as an emergency law, apparently in anticipation of our decision in *Prince George's County v. Mayor and City Council of Laurel*, 262 Md. 171, 277 A.2d 262 (1971). As such, the heavy reliance by the Dissent upon the reasoning in *Laurel* to support it's interpretation of the current statute (Dissent, op. at 616–19, 636) is erroneous.

**24.** This recognition is consistent with the language of Art. 66B, § 1.00(h)(2), which, as we noted *supra*, provides that a particular local government planning document may be called by different names, when it states that " 'Plan' includes a general plan, master plan, comprehensive plan, or community plan adopted in accordance with §§ 3.01 through 3.09 of the article.

Chapter 613, Laws 1975, made two relevant changes to Art. 23A, § 9(c), First, language was added which clarified that the amendments of Chapter 33, Laws 1972, had been intended to acknowledge the different terminology used by the various jurisdictions to identify their land use "plans." Second, apparently in response to our decisions in *Maryland–Nat'l Capital Park and Planning Comm'n v. Mayor and Council of Rockville*, 272 Md. 550, 325 A.2d 748 (1974) and *City of Gaithersburg v. Montgomery County*, 271 Md. 505, 318 A.2d 509 (1974), where we held municipal rezoning actions invalid on the ground of inconsistency with county master plan recommendations, Chapter 613 provided a means where the five year limitation on the annexing jurisdiction's ability to change the zoning of the annexed property could be waived if express county approval were obtained. As a result of the adoption of Chapter 613, Art. 23A, § 9(c), read:

... or if there is no adopted or approved master plan, the adopted or approved general plan or plans of the county or agency having planning and zoning jurisdiction over the land prior to its annexation *without the express approval of the Board of County Commissioners or County Council of the county in which the municipality is located.* (emphasis added).

The last change that lead to the statute in its current form occurred in 1988 when Chapter 450 (House Bill (H.B.) 667 repealed and reenacted the statute with new subsection (c)(2)). It was a direct response to our opinion in *Northeast.* In *Northeast*, we held that the change-mistake requirements of Article 66B, § 4.05(a), applied even where county approval of the municipality's annexation and rezoning had been obtained. In *Northeast*, we stated that:

By ch. 613 of the Acts of 1975, the General Assembly again amended § 9(c) to allow 'substantially different' rezoning of annexed land without regard to the five-year limitation, if the municipality obtained the express approval of the appropriate county. As amended, therefore, nothing in § 9(c) purports to preclude a municipality from rezoning annexed land when, as here, it obtains the county's express

consent.... *But nothing in § 9(c) eliminates the require-
ment that the municipality comply with the pertinent pro-
visions of Art. 66B, and with its own charter, when it
engages in the process of zoning newly annexed land.*
*Id.* at 29, 526 A.2d at 968 (emphasis added) (footnote omitted).

Chapter 450, Laws of 1988, added subsection (c)(2) to abro-
gate our holding in *Northeast* by making clear that county
approval eliminated not only the five year limitation, but the
change-mistake rule as well. There is, however, nothing in
the changes made by Chapter 450 to indicate that the Legisla-
ture intended a change in its established position regarding
consistency with a county's land use plan recommendation for
annexed lands and thereby granting additional powers to
annexing municipalities by redefining the meaning of "master
plan or plans" to include, exclusively or otherwise, reference to
the plan or plans of the annexing municipality. Given the
history of the provision, such an interpretation would be cut
from whole cloth and without support either in the language of
the statute or its evolution.

For example, the Floor Report of the Economic
and Environmental Affairs Committee regarding H.B. 667, in
relevant part, provided:

This bill addresses ... *Northeast* ..., which held that when
a municipality rezones land as part of an annexation, a
municipality must comply with the ... 'change/mistake
rule'.... Historically, the zoning of annexed property has
been viewed as original zoning.... In 1975, the General
Assembly passed legislation enabling a municipality to sub-
stantially alter the land use of annexed land with the
express approval of the county....

In the course of proceedings leading to a favorable report by
the Constitutional and Administrative Law Committee on the
bill, the Attorney General, in a letter dated 18 March 1988,
observed:

The bill is designed to overrule the decision of the Court of
Appeals in *Northeast Plaza v. Town of North East,* 310 Md.
20, 526 A.2d 963 (1987), which held that a municipality's

power to rezone annexed land to a substantially different use was subject to the requirements of § 4.05(a) of Article 66B-the statutory embodiment of the "change or mistake rule" for rezoning.

As a result of House Bill 667, as amended, § 9(c) would establish two different regulations for municipal rezoning in annexed areas. If a county expressly approved the zoning change, the municipality would not have to show a change or mistake to rezone. If the county did not approve, the municipality would have to wait five years before it could change to a substantially different use in the annexed areas; and even after the five-year period, it would have to show a change or mistake, as provided in § 4.05(a) of Article 66B in order to rezone.

We agree with the Attorney General. The proper interpretation of § 9(c) is that a municipality may not zone, for a five year period, newly annexed lands to a zone substantially different from the pre-annexation jurisdiction's plan recommendation, without the express approval of the pre-annexation jurisdiction. Where that approval is forthcoming, the municipality may zone without regard to the change-mistake rule, though it still must comply with the remaining provisions of Art. 66B and with its own local zoning ordinance. Where that approval is not forthcoming, the municipality must zone in compliance with the pre-annexation jurisdiction's plan and then wait five years before considering a substantially different zone, which zone will require, if a Euclidean zone, compliance with the change-mistake rule or, in the case of a floating or PUD zone, satisfaction of the applicable regulatory prerequisites.

### B.

1. Under what circumstances do the provisions of Md.Code (1957, 1998 Repl.Vol., 2001 Supp.), Art. 66B, Section 4.01(c) ('may impose such additional conditions, restrictions, or limitations') (which was first enacted in 1970 subsequent to the *Carole Highlands* and *Baylis cases* ), and Rockville City Code (2000) Section 25–126 ('may

impose additional restrictions, conditions or limitations') (enacted after the enactment of the State statute) authorize conditional zoning by the city?

a) What is the effect, if any, of *Prince George's County v. Collington Corporate Center 1 Limited Partnership,* 358 Md. 296, 747 A.2d 1219 (2000), which upheld conditional zoning in Prince George's County, on this issue?

2. Does a limitation in an annexation agreement restricting certain uses on newly annexed property constitute conditional zoning?

3. Do the above provisions authorize the City's actions in the present case?

As was pointed out, *supra,* Maryland is among those states that have relaxed the earlier prohibition against all forms of conditional zoning. In respect to the rule in effect at the time of *Montgomery County v. National Capital Realty Corp.,* 267 Md. 364, 374, 297 A.2d 675, 680–81 (1972), we quoted in that case extensively from 3 Rathkopf, *Zoning and Planning,* 74–79:

The general rule in these jurisdictions in which the validity of such covenants [25] has been litigated is that they are illegal. The basis of such rule is that the rezoning of a particular parcel of land upon conditions not imposed by the zoning ordinance generally in the particular district into which the land has been rezoned is *prima facie* evidence of "spot zoning" in its most maleficent aspect, is not in accordance with a comprehensive plan and is beyond the power of the municipality.

Legislative bodies must rezone in accordance with a comprehensive plan, and in amending the ordinance so as to confer upon a particular parcel a particular district designation, it may not curtail or limit the uses and structures

---

25. The restrictions in *National Capital Realty* were required by an agreement between Montgomery County and the property owner. The conditions were required by the agreement to be placed in a declaration of restrictions recorded among the land records, with appropriate language making them covenants running with the land.

placed or to be placed upon the lands so rezoned differently from those permitted upon other lands in the same district. Consequently, where there has been a concatinated rezoning and filing of a "declaration of restrictions" the general view (where the question has been litigated) is that both the zoning amendment and the restrictive covenant are invalid for the reasons expressed above.

For additional cases discussing this older view in Maryland, see *Carole Highlands Citizens Ass'n, Inc. v. Board of County Comm'rs of Prince Georges County,* 222 Md. 44, 47–48, 158 A.2d 663, 665–66 (1960) and *Baylis,* 219 Md. at 169–70, 148 A.2d at 432–33, where, quoting from *Wakefield v. Kraft,* 202 Md. 136, 149, 96 A.2d 27, 32–33 (1953), we said:

If the decision of the County Commissioners was that the area called for the status of Commercial A, any of the nineteen uses permitted under that classification had a rank and force equal to any other. The County Commissioners are not a Planning Board, nor have they a right to exact conditions, or promises of a particular use in return for deciding that the public interest justifies that an area should be zoned commercial. . . .

. . . There seem to be three chief reasons for the rule stated in these cases: that rezoning based on offers or agreements with the owners disrupts the basic plan, and thus is subversive of the public policy reflected in the overall legislation, that the resulting 'contract' is nugatory because a municipality is not able to make agreements which inhibit its police powers, and that restrictions in a particular zone should not be left to extrinsic evidence.

At the time *Wakefield, Baylis,* and *Carole Highlands* were decided, the sole State statutory authority granting zoning power to municipalities was found in Maryland Code (1957, 1967 Repl.Vol.), Article 66B, Sections 1–Grant of Power and 2–Districts. Section–2 provided, as relevant here, that "All such regulations shall be uniform for each class or kind of buildings throughout each district. . . ." This provision is retained today, now codified as Art. 66B, § 4.02.

Subsequent to the *National Capital, Carole Highlands, Baylis,* and *Wakefield* cases, the Legislature, in 1970, enacted a new section 4.01 of Art. 66B, relevant to the issue before us, as a part of a general recodification. Chapter 672, Laws 1970 (Senate Bill 356). It granted to covered counties and municipal corporations the power to impose conditions upon rezoning. It, in effect, authorized "conditional zoning" in certain circumstances. It stated, in relevant part:

(B) The local legislative body of a county or municipal corporation, upon the zoning or rezoning of any land ... may impose such additional restrictions, conditions, or limitations as may be deemed appropriate to preserve, improve, or protect the general character and design of the lands and improvements being zoned or rezoned, or of the surrounding or adjacent lands and improvements, and may, upon the zoning or rezoning of any land or lands, retain or reserve the power and authority to approve or disapprove the design of buildings, construction, landscaping, or other improvements, alterations, and changes made or to be made on the subject land or lands to assure conformity with the intent and purpose of this article and of the jurisdiction's zoning ordinance. The powers provided in 4.01(B) shall be applicable only if the local legislative body adopts an ordinance which shall include enforcement procedures and requirements for adequate notice of public hearings and conditions sought to be imposed.

These provisions remain the same to the present date, although rearranged as a part of another recodification in 2000. Section 4.01 was divided into several sections. Current subsection (c) (with its several subsections) contains the same provisions first enacted in 1970. Art. 66B, § 4.01(c). Accordingly, since at least 1970, Maryland has joined those states retreating from the across-the-board prohibition against conditional zoning, and, as a result, not all conditional zoning in Maryland is impermissible.

This conclusion is supported when the available legislative history is examined. In 1966, the General Assembly created a commission to examine the planning and zoning provisions and

to make recommendations. In 1969 the report was forwarded to the Legislature. As recommended, a new Art. 66B, Section 4.01, was to be created as a part of a general recodification of Maryland's planning and zoning provisions. Nevertheless, certain changes were intended to be substantive.

Section 4.01 was clearly an intended substantive change to permit, so long as certain requirements were met, conditional zoning in those Maryland jurisdictions to which Art. 66B applied, which, through the "zoning" provisions of the Express Powers Act,[26] applied to charter counties as well as municipalities. The recodification began with the Legislature creating the Maryland Planning and Zoning Law Study Commission. As we indicated, the Commission reported back to the Legislature in 1969. Accordingly, its recommendations were first considered in the 1970 Session.

In respect to the Commission, the records of the General Assembly reflect, in a document entitled REPORT TO THE GENERAL ASSEMBLY OF 1970—PROPOSED BILLS— SPECIAL COMMITTEE REPORTS, VOLUME II, Minutes and Reports of Special Committees to the Legislative Council of Maryland, that the Commission report was presented on Wednesday, 12 November 1969, to the Legislative Council. It was described to the Council by the Study Commission Chairman, Senator Goodloe E. Byron, in relevant part, as follows:

Under revised Article 66B, counties can have conditional zoning. Further, the Commission has attempted to provide for periodically updating of all plans.

With the assistance of a research man, the Commission will prepare an analysis and . . . . a commentary explaining each change as revised Article 66B is in preparation.

---

**26.** Maryland Code (1957, 1998 Repl.Vol., 1999 Supp.), Art. 25A, §§ 5(U),(X), (BB), and (EE). *See also* Municipal Express Powers Act, Md Code (1957, 1998 Repl.Vol., 1999 Supp.), Art. 23A, §§ 2, 2B. *See also Mayor and Council of Forest Heights v. Frank,* 291 Md. 331, 339– 51, 435 A.2d 425, 430–35 (1981); *but see Frank Krasner Enters. v. Montgomery County,* 166 F.Supp.2d 1058, 1061 n. 3 (2001).

The report was referred, without change, to the Judiciary Committee. Whether Senator Byron misspoke when he mentioned only "counties," or did not realize that Art. 66B also applied to municipalities, or whether it was later decided not to limit its application to counties, is unclear. In any event, the analysis in the Commission's report made no distinction between counties and municipalities, nor did the resulting statute.

As did some of the commentators at the time, the Commission referred to the changing conception of the utility of conditional zoning. It stated, as relevant to the case *sub judice:*

> *Paragraph 2 of Section 4.01 gives to the local legislative body the powers of "conditional zoning." "Since 1960, some courts have recognized that the attachment of conditions to zoning might be a highly desirable means of minimizing the adverse effects of zoning changes. Their decisions reveal a tendency to inject needed flexibility into the American zoning system." Shapiro, R.: The Case for Conditional Zoning* 41 Temple L.Q. 267 (1968) *at* 287. *"A distinction should be made between this type of zoning and that commonly referred to as contract zoning." The latter type of zoning was discussed in Baylis v. City of Baltimore,* 219 Md. 164, 148 A.2d 429 (1959) *where "the ordinance made the reclassification conditional upon the execution of an agreement." Yokley clarifies this distinction in his commentary on Church v. Town of Islip,* 8 N.Y.2d 254, 203 N.Y.S.2d 866, 168 N.E.2d 680 (1960), *where he concludes that · though "contract zoning will not be permitted, conditional zoning may be valid if not bargained for in the sense that zoning is granted in return for the condition."* 2 Yokley, Zoning Law and Practice (3rd edition 1965) 19–11. *Therefore, under conditional zoning the usual requirements for reclassification must be met before the powers enunciated in this section are available to the local legislative body. It is believed that this provision avoids previous constitutional pitfalls but still permits the planning commission to provide for the orderly development using controls similar to*

*those already found in the subdivision regulations (Section 5.00). Several variations of this provision already exist at the local level, such as the Carroll and Frederick County provisions* .... (emphasis and quotations in the original. *See* Final Report–Legislative Recommendations, Maryland Planning and Zoning Law Study Commission, December, 1969, at 28–29.)

 It is clear that conditional zoning is not prohibited in Maryland if local governments comply with the statutory requirements of Section 4.01. Article 66B applies to non-charter/home rule counties and to municipal corporations. Charter counties, should they choose to implement it, likewise have the power to do whatever is permitted under Art. 66B. Contrary to the argument advanced by the Dissent, it is also clear that allowing conditional zoning to limit otherwise permissible uses was not the intention, either of the Commission, or of the statutes as subsequently adopted by the Legislature.[27] The Commentary Notes of the Commission clearly state that *"under conditional zoning the usual requirements for reclassification must be met before the powers enunciated in this section are available to the local legislative body. It is believed that this provision avoids previous constitutional pitfalls but still permits the planning commission to provide for the orderly development using controls similar to those already found in the subdivision regulations (Section 5.00)."* *Id.* (emphasis in original). This language indicates that the intent was to allow jurisdictions to fashion supplementary conditions in the placement of a given property in a Euclidean zone, not in derogation of the uses allowed in that zone. Corresponding to this language in the Commission's Report,

---

**27.** It is important to note that the Commission dedicated only a few paragraphs of its 122 page Report to issues involving § 4.01. The Dissent attempts to argue that the Commission was responding directly to a selective body of prior Maryland cases (Dissent, op. at 584–92, 601–02), but offers no support for this assertion other than that it is the Dissent's view. In fact, there is no evidence to that effect, and as the Dissent quietly admits, the Commission only mentions in passing one (*Baylis* ) of the many cases that the Dissent asserts the Commission was focused upon intently.

the powers retained by the zoning authority after zoning are clearly set forth in Article 66B, § 4.01. The statute now reads:

> On the zoning or rezoning of any land, a local legislative body may retain or reserve the power to approve or disapprove the *design* of buildings, construction, landscaping or other improvements, alteration and changes made or to be made on the land being zoned or rezoned to assure conformity with the intent and purpose of this article and of the local jurisdiction's zoning ordinance.

(Emphasis added).

These powers to control design, layout, siting, and appearance are similar to those powers governing subdivisions, found in Article 66B, § 5.03. Article 66B, § 4.01 provides that it is permissible to impose those conditions "appropriate to preserve, improve, or protect the *general character and design of the lands and improvements* being zoned or rezoned, or the surrounding or adjacent lands and improvements." (emphasis added). The statute says nothing about utilizing conditions to limit permissible "uses," and therefore grants no such power. As the Court of Special Appeals correctly pointed out in *Bd. of County Comm'rs of Washington County v. H. Manny Holtz, Inc.*, 65 Md.App. 574, 582–83, 501 A.2d 489, 492–93(1985), conditional zoning which acts as a limitation as to otherwise permissible uses is not permitted under Art. 66B. Furthermore, municipal zoning authorities are not permitted under Art. 66B to enter into contracts which inhibit the proper exercise of the municipality's governmental powers.[28]

The Court of Special Appeals in its opinion in the present case was correct in relying upon *Rodriguez v. Prince George's*

---

28. *Bd. of County Comm'rs of Washington County v. H. Manny Holtz,* 65 Md.App. 574, 583–84 n. 3, 501 A.2d 489, 493–94 n. 3 (1985); *See also Attman/Glazer,* 314 Md. at 687 n. 8, 552 A.2d at 1284 n. 8; *Montgomery County v. Nat'l Capital Realty Co.,* 267 Md. 364, 373–76, 297 A.2d 675, 680–82 (1972); *Carole Highlands,* 222 Md. at 46–48, 158 A.2d at 664–65; *Baylis,* 219 Md. at 169–70, 148 A.2d at 433.

*County,* 79 Md.App. 537, 558 A.2d 742 (1989). In *Rodriguez,* the Court of Special Appeals found that:

> The applicant was offering a deal to the District Council: in order to induce the Council to approve its application for reclassification, the applicant would agree in advance to exclude from the scope of the approval certain uses expressly permitted in the approved zone.

79 Md.App. at 553, 558 A.2d at 750. In response, the court in *Rodriguez* held that "[a]lthough there appears to be no impediment to an applicant entering into private covenants with other parties to lessen their opposition to an application, or to garner their support for it, such offerings cannot be made to the legislative body authorized to grant or deny the application." *Id.*

Although the reasoning in *Rodriguez* is apt to apply in the case at bar, a better predicate exists in *Bd. of County Comm's of Washington County v. H. Manny Holtz, Inc.,* 65 Md.App. 574, 582–83, 501 A.2d 489, 492–93(1985). *Holtz* involved the rezoning of a tract of land by the Board of County Commissioners of Washington County. As a condition of the rezoning, the Commissioners imposed restrictions prohibiting uses otherwise permitted under the zoning granted. In holding that the action of the Commissioners constituted illegal conditional zoning, the intermediate appellate court was required to interpret Art. 66B, §§ 4.01(a) and (b) and 4.02, holding that "[o]ur reading of § 4.01(a) and (b) leads us to conclude that it does not authorize conditional use rezoning. This is further bolstered by the requirements of § 4.02." *Id.* at 582, 501 A.2d at 493. We adopt that interpretation insofar as Euclidean zones are concerned. The court found that:

> Section 4.01(b) permits local legislative bodies to impose "additional restrictions, conditions or limitations" on the design and construction of buildings and landscaping on the subject or adjacent tract. The plain meaning of this subsection is clear. The language referring to "restrictions, conditions, and limitations" applies only to the structural and architectural character of the land and the improvements thereon. "Conditions, restrictions or limitations" on use are

neither explicitly provided for in this subsection nor can they be implied therefrom.

*Id.* at 582, 501 A.2d at 492. The Court then noted that this interpretation was dictated by the language of § 4.02, explaining that:

Section 4.02 requires uniformity within the class or development in a district. Hence, it necessarily prohibits conditional use zoning. The allowance of conditional use rezoning by appellant flies directly in the face of this section and the mandated uniformity.

Section 4.02 must be construed in relation to § 4.01. Under the broad grant of power to (re)zone conferred under § 4.01(a), the local legislative body is permitted under § 4.02 to divide the county into divisible components, provided there is uniformity within those districts. The regulations and restrictions that must be uniform include the use of buildings and land. Hence, where, as here, the legislative body has predetermined the acceptable categories of uses in a given district, to conditionally restrict some of those uses violates the mandate of § 4.02. If we were to authorize the Board of County Commissioners through rezoning to limit or restrict the permitted uses of certain tracts within a zone, the Board would have the power to destroy the uniformity of that district.

65 Md.App. at 583, 501 A.2d at 493.

The dissenting opinion (Dissent, op. at 597–98) brushes aside the import of § 4.02, forgetting the very rules of statutory construction in whose name it laments. It bears repeating (see *supra* at 551) that in *Liverpool v. Baltimore Diamond Exchange, Inc.,* 369 Md. 304, 316–18, 799 A.2d 1264, 1271–72 (2002), we instructed, citing *Mayor of Baltimore v. Chase,* 360 Md. 121, 128, 756 A.2d 987, 991 (2000):

We have acknowledged that, in ascertaining a statute's meaning, we must consider the context in which a statute appears. In this regard we have instructed:

When the statute to be interpreted is part of a statutory scheme, it must be interpreted in that context. That

means that, when interpreting any statute, the statute as a whole must be construed, interpreting each provision of the statute in the context of the entire statutory scheme. Thus, statutes on the same subject are to be read together and harmonized to the extent possible, reading them so as to avoid rendering either of them, or any portion, meaningless, surplusage, superfluous or nugatory. (internal quotations omitted) (citations omitted).

Contrary to the assertions of the Dissent here (Dissent, op. at 607–10), the reasoning in *Manny Holtz* reflects the analysis required by the principles of statutory interpretation overlooked by the Dissent. Unlike the Dissent here, the Court of Special Appeals in *Manny Holtz* recognized that § 4.02 remained unchanged by the Legislature, and that, had the Legislature intended the reach of conditional zoning to include uses, amendments to the uniformity requirements of § 4.02 would be required. *See, e.g. County Council of Prince George's County v. Collington Corp. Center I Ltd. P'ship.*, 358 Md. 296, 303, 747 A.2d 1219, 1222 (2000). Because the Legislature did not amend § 4.02, *Manny Holtz* correctly declined to extend the authority to zone with conditions to include uses where there existed no indication of such an intent on the part of the Legislature.[29]

 In the case *sub judice*, the Planning Staff of the City, in its final report on the appropriate zone for the subject property upon annexation, noted that the Land Use Plan component of the City's 1993 Master Plan recommended service industrial uses for the subject property, consistent with uses permitted in the City's I–1 zone. Thus, at least facially, the imposition of the I–1 zone was consistent with the City's

---

**29.** We further point out that the Dissent's argument that a zoning authority's limitation of permissible uses does not violate the "uniformity" requirement (Dissent, op. at 585, 605), misses the point. As we explained in some detail, *supra*, the purpose of the uniformity requirement is not to make development on every property in the zone look the same. The purpose of the uniformity requirement is to protect the rights of the property owner and to insure fair and equal treatment by local authorities of those similarly situated within a given Euclidean zone throughout the given jurisdiction.

Plan. Upon a further examination of the City's I–1 zone, however, one notes there are a number of commercial retail uses also permitted, as a matter of right. See n. 1, *supra.* Gasoline service stations, however, are only allowed in the I–1 zone with the grant of a special exception. It is because the City endeavors to foreclose, by limitation pertaining only to the subject property of this case, all of the otherwise permitted commercial retail uses, and impliedly those commercial retail uses, other than a gasoline service station, allowed by special exception, in the I–1 Zone that we hold City Zoning Ordinance No. 10–99 to be impermissible conditional zoning.

The Court of Special Appeals, in its opinion in this case, correctly noted as irrelevant the fact that the condition pertinent to this case was explicit only in the annexation agreement. City Zoning Ordinance No. 10–99 makes reference to the annexation agreement containing the land use limitation. That is sufficient to indicate that Zoning Ordinance No. 10–99 was passed with the intended legal effect that the use condition limit the I–1 zone granted. *Carole Highlands,* 222 Md. at 46–48, 158 A.2d at 664–66. As the Court of Special Appeals further pointed out, "[t]he fact that the implicit conditions in the [zoning] ordinance were made explicit in the annexation agreement does not make them solely a part of that agreement." The court continued by observing that:

> although municipalities are authorized to enter into annexation agreements that zone a subject property, they may not exercise that authority in a manner that violates the prohibitions set forth in Article 66B § 4.01 The applicants in *Rodriguez* offered to limit the permissible uses of the subject property in order to induce the council's approval of their application [citation omitted]. Here, the Mayor and Council eliminated all but one of the permissible retail uses of the subject property to accommodate Mr. Fanaroff's efforts to have a gas station. The effect in both cases is the formation of a distinct mini-district that undermines uniformity. (citation omitted).

Pursuant to § 4.01 of Art. 66B, Rockville has enacted within its zoning ordinance only one provision to implement the

power to zone with conditions, although in a form substantially different than the Prince George's County ordinance construed in *Rodriguez,* and then only in the context of the grant of "local amendment applications." That ordinance provision, now codified as Rockville City Code, Chp. 25 (Zoning and Planning), Article III (Amendments), Division 2 (Map Amendments), § 25–126 (Supplement 2002), reads as follows:

"**Sec. 25–126. Grant of local amendment application with conditions-Authorized.**

The Council may impose additional restrictions, conditions or limitations upon the grant of any application for a local amendment to the zoning map pursuant to the authority contained in State law. (Rockville, Md., Code of Ordinances ch. 25, art. III, div. 2, § 25–126 (2002))

The Dissent (Dissent, op. at 611, n. 17 and 634) seems to concede, as it must, that the City's act of zoning of the subject property at the time of annexation was an act of original zoning, insofar as the initial exercise of the municipality's zoning power is concerned.[30] In fact, Rockville City Code, Ch.

---

**30.** The Dissent erroneously conflates original zoning with the "piecemeal" rezoning process (Dissent, op. at 611–14). Worse, it implies (without benefit of citation to a location in the Majority opinion where such may be found) that the Majority mis-labels the City's zoning act as a "comprehensive rezoning" (Dissent, op. at 611, n. 17). Neither assertion is grounded in fact or law

The City's piecemeal rezoning process for a single tract of property is, as described in Ch. 25, Art. III, Div. 2 § 116(1) of the City Code of Ordinances, the "local amendment" process. The procedure and standards for the processing and action on a local amendment application are prescribed in Divisions 1 and 2 of Article III. Within that framework, and specifically at § 25-99, it is made clear, as noted *supra,* that the provisions of Division 2 governing local amendment applications do not apply to original zoning of land annexed to the City. It is also evident, from an examination of the record in this case, that the Owners did not apply for a local amendment, as that term and process are given substance by the City ordinance, but rather availed themselves of the process to seek original zoning at annexation as governed by § 25-99 and Articles 23A and 66B of the Md.Code. Accordingly, the Dissent's characterization of the City's zoning of the subject property as having been accomplished through a piecemeal or local amendment process is wrong.

25, Art. III, Div. 1 (Amendments—"Generally"), § 25–99, defines such zoning as original zoning. Further, § 25–99(c) states, in relevant part, that "[t]he provisions of *division 2* [Map Amendments] of this article [III] shall not apply to procedures under this section [original zoning]." (emphasis added). The section relied upon by the City, the Owners, and the Dissent to support the City's invocation of the conditional zoning power authorized by Art. 66B, § 4.01, § 25–126, is contained in *division 2.* Thus, it appears that the City does not purport, in acts of original zoning, to possess the authority to attach conditions of any kind, even if such were authorized by State law. Rockville City Code, § 25–126 applies only to local amendment applications, i.e., piecemeal zoning (Rockville, Md., Code of Ordinances Ch. 25, Art. III, Div. 2, § 25–116 (2002)), and does not apply to cases of original zoning upon annexation.(Rockville, Md., Code of Ordinances Ch. 25, Art. III, Div. 1, § 25–99(c)(2002)).

 Under our reasoning, however, it makes no difference how the City's action is characterized, piecemeal zoning ("local map amendment") or original zoning, because there is no grant of authority from the State for conditional use zoning.[31]

---

At no place in the Majority opinion is the City's act of zoning in this case described as a "comprehensive rezoning." This is merely a strawman constructed by the Dissent so it would have something to pounce on, in lieu of coming to grips with the actual attributions made in the Majority opinion. No one would describe the City's action in zoning the subject property as a comprehensive rezoning, given the definition of that term explained *supra,* at 535–38, and in § 25–116(3) of the City Ordinance (a "comprehensive" zoning amendment is defined as "covering the entire City").

31. Municipalities wield only such zoning powers as are granted to them by the Legislature. Here, the Legislature has specifically limited that power. In those cases where approval to the contrary is not forthcoming from the pre-annexation authority, the Legislature has dictated that the annexing municipality's initial zoning of the annexed property be in compliance with the pre-annexation jurisdiction's plan. As a result, despite the fact that the annexing jurisdiction is not free to zone the annexed property as it chooses, its initial act of zoning, though in conformity with the pre-annexation jurisdiction's plan, is an act of original zoning, as the Dissent concedes. As a result of this fact, dictated by the Legislature, the zoning which may occur after the

The Dissent's focus on the language of municipal ordinances in its discussion of this and prior cases, such as *Rodriguez* (Dissent, op. at 604–06), in the absence of a grant of authority for imposing conditional use zoning from the State, places the statutory cart before the horse.[32] Absent a grant of authority from the State, the language of a local ordinance is irrelevant and therefore interpreting a local ordinance as properly authorizing conditional *use* zoning would be in error.

Accordingly, we answer the first question posed in Petitioners' original briefs: "Does a limitation in an annexation agreement restricting certain uses on newly annexed property constitute conditional zoning?" by saying "yes"; and, under the circumstances here present, such conditional zoning is impermissible conditional use zoning. While by this holding we make clear that any conditional use zoning is impermissible, we note also that, on the facts and circumstances of the present case, it is impermissible contract zoning as well.

▇▇▇ In the case of *Attman/Glazer*, we held that:
the mayor and alderman could not by agreement lawfully bind themselves to a future zoning or conditional use decision. We do so on the familiar premise that a municipality may not contract away the exercise of its zoning powers. *Baylis v. City of Baltimore*, 219 Md. 164, 170, 148 A.2d 429 (1959; 10 McQuillin, *Municipal Corporations*, § 29.07 (3d ed.1981)); 2 Anderson, *American Law of zoning 3d*, § 9.21 (1986); 4 Yokley, *Zoning Law and Practice*, § 25–11 (4th ed.1979).

---

running of the five year period would be an act of piecemeal zoning, unless it is part of a greater comprehensive rezoning.

**32.** The Dissent's position is not aided by its reliance on *Prince George's County v. Collington Corporate Center 1 Limited Partnership*, 358 Md. 296, 747 A.2d 1219 (2000)(Dissent, op. at 604–05). The conditions in question in *Collington* were not imposed by Prince George's County as required pre-conditions for zoning, nor were they a part of an instance of impermissible contract zoning. Rather, they were limitations voluntarily placed on the property by a prior property owner as a part of his prior zoning approval. 358 Md. at 302 n. 4, 307, 747 A.2d at 1222 n. 4., 1224.

*Id.* at 684–85, 552 A.2d at 1282. This position was revisited recently by the Court of Special Appeals in *Beachwood,* where the court noted that Maryland's treatment of contract zoning is consistent with the definition of "illegal contract zoning" set out in Arden H. Rathkopf and Daren A. Rathkopf, 2 *The Law of Zoning and Planning,* § 29A.03[b] at 29A–25, which the court quoted as follows:

Illegal contract rezoning is said to involve the process by which a local government enters into an agreement with a developer whereby the government exacts a performance or promise from the developer in exchange for its agreement to rezone the property. The developer may agree to restrict development of the property, make certain improvements, dedicate a portion of land to the municipality, or make payments to the municipality. Numerous state court decisions have held such express or implied agreement invalid as illegal contact zoning. (Footnotes omitted).

*Beachwood,* 107 Md.App. at 669, 670 A.2d at 505. Additionally, we reiterate that in *Rodriguez,* discussed *supra,* the Court of Special Appeals held that "[a]lthough there appears to be no impediment to an applicant entering into private covenants with other parties to lessen their opposition to an application, or to garner their support for it, such offerings cannot be made to the legislative body authorized to grant or deny the application." *Rodriguez,* 79 Md App. at 553, 558 A.2d at 750.[33] Upon examination of the record in the present case, it is clear that the City's action represents not only impermissible conditional use zoning, but also impermissible contract zoning. The act of zoning was accomplished through the passage of City Zoning Ordinance No. 10–99, which, in pertinent part, provided:

_____

**33.** We have pointed out in prior cases that the impermissible influence need not be explicit. Where the record shows that the zoning action would not have taken place but for the understanding that impermissible conditions would be in operation, impermissible conditional use zoning will be struck down. *Carole Highlands,* 222 Md. at 46–48, 158 A.2d at 664–66.

WHEREAS, the [County Council's Planning, Housing and Economic Development] Committee agreed to support rezoning of the site from the County's I–2 zone to the City's I–1 zone under certain conditions; and

WHEREAS, on February 23, 1999, the District [County] Council reviewed Annexation Petition ANX97–0124 and agreed with the comments and recommendations of the Planning, Housing and Economic Development Committee; and

WHEREAS, by Resolution No. 14–57, the County Council for Montgomery County, sitting as a District Council, approved City of Rockville Annexation Petition No. ANX97–0124, and its rezoning from the County's I–2 zone to the City's I–1 zone, under certain conditions; and

WHEREAS, the Mayor and Council of Rockville, having fully considered the matter, has determined to place the annexed property in the City's I–1 zone, under certain conditions to be set forth in an annexation agreement, so as to promote the health, security and general welfare of the community of the City of Rockville.

As was pointed out *supra*, this language alone, referencing the use limiting conditions contained in the annexation agreement as a basis for the zoning action, is sufficient, in our view, to make this a case of impermissible conditional use zoning.

When we look to the annexation agreement, we note that the agreement is "by and between Louis H. Fanaroff, surviving tenant by the entirety of a one-half interest in the subject property, Stanford C. Steppa and Elaine B. Steppa, hereinafter collectively called 'Owners,' and 'The Mayor and Council of Rockville, Maryland . . . .' This is the same 'Mayor and Council of Rockville, Maryland,' that passed Zoning Ordinance No. 10–99. Therefore, the Owners made a contract, containing an illegal condition, with the legislative body authorized to grant or deny the desired I–1 zone, making this a case of impermissible contract zoning.

It matters not whether the agreement was a part of the zoning or annexation processes. Our appellate cases consistently have held that it is the identity of the contracting

parties that is the critical issue. As the Court of Special Appeals made clear in *Beachwood:*

> The Maryland cases have treated "contract zoning" narrowly as a situation wherein the developer of property enters into an express and legally binding contract with **the ultimate zoning authority.** In such circumstances, the Maryland cases have not hesitated to hold such contact zoning to be null and void. Part of the reason why the governmental authority may not enter into such a contract is because the governmental unit may not bargain away its future use of the police power.

*Beachwood,* 107 Md.App. at 668–69, 670 A.2d at 505. *See also Attman/Glazer,* 314 Md. at 686–87, 552 A.2d at 1283–84. On the facts of this case, the zoning of the subject property by the City of Rockville involved the placement of use limitations on the zoning which constituted impermissible conditional use zoning, and the mechanism used by the City of Rockville to place those impermissible conditions on the property further constituted impermissible contract zoning.[34]

## C.

**What zoning classification, if any, would the subject property have if the Court were to rule that the I–1 zoning was invalid? Is there a state or city statute covering the situation?**

■ Having determined that the actions of the City of Rockville in zoning the land to the City's I–1 zone were

---

**34.** The reasoning and holding of this opinion with regard to the impermissible contract zoning presented by this case should not be read to cast wider doubt on the traditional and legitimate contractual undertakings customarily entered into between a property owner desiring to be annexed and a municipality desiring to annex. It is normal for such parties to express in writing certain executory accords, for which they have bargained, governing the anticipated annexation, including the zoning to be assigned at the time of annexation. As long as the portions of such agreements relative to the anticipatory zoning action do not violate other legal requirements, such as the prohibition against conditional use zoning in the present case, the practice of entering into annexation contracts is otherwise unaffected by this holding.

improper, it remains to be determined what then is the current zoning classification of the subject property.[35] Our reading of the relevant statutes and case law indicates that the subject property retains the zoning classification it enjoyed prior to annexation, at least until such time as the City of Rockville acts properly to rezone it if it remains a part of the City. The Owners, the City of Rockville, and Rylyns, urge that the land be declared "unzoned" until further zoning action is taken by the City of Rockville.[36] For the reasons set forth below, we find this position unpersuasive and not supported by the statutes or our prior holdings in this area.

The essential underpinning of their arguments is that the language of Art. 23A § 9(c)(1) provides, in part, that "where any area is annexed to a municipality authorized to have and having then a planning and zoning authority, the municipality shall have exclusive jurisdiction over planning and zoning and subdivision control within the area annexed[.]" Similar language appears in Md.Code (1957, 1998 Repl.Vol.), Art. 23A, § 19. Apparently these parties feel that the foregoing statutory provisions dictate that the property will remain unzoned until Rockville takes action necessary to zone it properly, in compliance with Art. 23A, § 9(c)(1) & (2), because only Rock-

---

**35.** We shall answer this question without deciding whether the annexation agreement and annexation resolution otherwise remain valid in the absence of severability provisions. Only the validity of the City's Zoning Ordinance No. 10–99 was at issue in this case. As the validity of the annexation agreement *vel non* and ordinance, are not before this Court, we take no position as to their legal status, although interesting questions in connection with them may exist. *See Dwayne Clay, M.D., P.C. v. GEICO*, 356 Md. 257, 263–64, 739 A.2d 5, 8–9 (1999); *Post v. Bregman*, 349 Md. 142, 161, 707 A.2d 806, 815 (1998); *State Farm Mut. Auto. Ins. Co. v. Nationwide Mut. Ins. Co.*, 307 Md. 631, 643, 516 A.2d 586, 592 (1986); *Maryland–Nat'l Capital Park and Planning Comm'n v. Washington Nat'l Arena*, 282 Md. 588, 605–06, 386 A.2d 1216, 1228–29 (1978); *Riden v. Philadelphia, B. & W.R. Co.*, 182 Md. 336, 346, 35 A.2d 99, 104 (1943); *Campitelli v. Johnston*, 134 Md.App. 689, 696–97, 761 A.2d 369, 372–73, *cert. denied*, 363 Md. 206, 768 A.2d 54 (2001).

**36.** Amicus Curiae Maryland Municipal League, Inc. also takes this position.

ville is empowered by statute to make a zoning determination now that it has annexed the subject property.

The parties attempt to bolster this argument by citing to our cases interpreting these statutory provisions and upholding the proposition that a county's zoning ordinances and regulations previously applicable to a property will have no effect on it once the area is annexed by a municipality authorized to have, and in fact having, planning and zoning authority, such as Rockville. *See Maryland–Nat'l Capital Park and Planning Comm'n v. Mayor and Council of Rockville*, 272 Md. 550, 557–58, 325 A.2d 748, 753 (1974); *Prince George's County v. Mayor and City Council of Laurel*, 262 Md. 171, 190, 277 A.2d 262, 272 (1971); *Beshore v. Town of Bel Air*, 237 Md. 398, 410–11, 206 A.2d 678, 685 (1965).

The argument is not compelling because it fails to recognize that the exclusive municipal powers to zone set forth in the relevant statutes are limited at the threshold by Art. 23A, § 9 and, when read together with other relevant statutes, a condition of "unzoned" land is not contemplated. Art. 23A, § 9(c)(2) states that:

if the county expressly approves, the municipality, without regard to the provisions of Article 66B, § 4.05(a) of the Code, [the change-mistake rule], may place the annexed land in a zoning classification that permits a land use substantially different from the use for the land specified in the current and duly adopted master plan or general plan of the county or agency having planning and zoning jurisdiction over the land prior to its annexation.

As set forth persuasively in the *Amici* briefs of the six counties and the Maryland National Capital Park and Planning Commission, § 9(c)(2) "clearly sets forth the legislature's intention to relieve municipalities from the requirement of proving change/mistake to permit a land use substantially different from the use for the land specified in the Master Plan applicable to the property prior to annexation *if* the municipality receives express county approval. The logical conclusion based on the plain language of this section is that if

express county approval is not received, then, after the five-year limitation period, the municipality must prove change/mistake," unless the municipality rezones the newly annexed piece of land to a floating zone or as a part of a comprehensive rezoning of a larger surrounding area. For the change/mistake rule to be relevant, and the statute makes clear that it is, then some form of prior zoning would have to be in effect, and as the statute clearly indicates, that zoning is the one assigned by the pre-annexation jurisdiction, which in this case is that of Montgomery County.

Nowhere does the relevant statutory scheme provide that an annexing jurisdiction's failure to comply with the provisions of § 9 results in the property becoming akin to a "stateless person" for zoning purposes. On the contrary, as we stated in *Maryland–Nat'l Capital Park and Planning Comm'n v. Mayor and Council of Rockville,* 272 Md. at 561, 325 A.2d at 754, the whole purpose of this section is to "preserve the integrity of the Master Plan adopted by the jurisdiction ... having planning power immediately prior to annexation." Were we to find that the land became a zoning cipher, the five-year limitation under § 9 would be toothless and meaningless, as it would allow municipalities to undo indirectly that which they cannot accomplish directly. We think that this was not the intent of the Legislature. The language of § 9 clearly indicates that it is intended that the pre-annexation zoning remain in effect until: 1) the annexing municipality grants a new zone substantially consistent with the pertinent plan recommendation of the pre-annexation jurisdiction; or 2) the pre-annexation jurisdiction grants permission for the annexing municipality to establish a substantially inconsistent zone; or 3) the five year period expires. *Id. See also Northeast,* 310 Md. at 28–30, 526 A.2d at 967–68; *City of Gaithersburg v. Montgomery County,* 271 Md. at 511–13, 318 A.2d at 512–13. In the present case, the subject property is zoned I–2, in accordance with the Montgomery County Zoning Ordinance, until one of the aforesaid three scenarios comes to pass.

JUDGMENT AFFIRMED; COSTS TO BE EVENLY DIVIDED BY PETITIONERS.

Dissenting Opinion by CATHELL, Judge in which BELL, Chief Judge joins.

I dissent. It is difficult to disagree with such a well-written, comprehensive opinion on general land use principles that has so much in it with which I agree. However, because it also has holdings in it with which I disagree, I shall overcome the difficulty. As to the determinative questions presented to this Court, I believe the relevant statutory interpretations made by the majority, and the ultimate decisions here rendered, are wrong.

I first, and primarily, dissent from the majority's holding that conditional zoning, as contemplated by the 1970 Enabling Act and subsequent local statutes, was not, and is not, intended to apply to conditions that limit uses within districts. The majority essentially asserts that the enabling act that authorizes local governmental entities to pass statutes permitting "conditional zoning," [1] was designed to permit only those conditions that would not result in limiting the uses that are otherwise permitted in a new classification. The majority states:

> "As the Court of Special Appeals correctly pointed out, however, in *Bd. of County Comm'rs of Washington County v. H. Manny Holtz, Inc.*, 65 Md.App. 574, 582–83, 501 A.2d 489, 492–93 (1985), conditional zoning which acts as a limitation as to otherwise permissible uses is not permitted under Art. 66B." [2]

---

**1.** As Judge Harrell correctly states, "Conditional zoning" even if it relates to conditions such as uses, is a very different concept than the term "conditional use."

**2.** *Manny Holtz* is solely responsible for the confusion over conditions that limit uses during reclassifications. For over seventeen years we have avoided accepting its interpretation that prohibits conditions that limit uses. *See Attman, infra.* Today, with little independent analysis, the majority states that the Court of Special Appeals was correct and automatically elevates it to a holding of this Court. Because the writer of *Manny Holtz* failed to conduct any analysis and declined to even acknowledge the relevant statutes, a mere statement in that opinion, unsupported by anything, is now likewise declared by this Court to be the law.

First, as I shall later discuss, the Court of Special Appeals was not correct in respect to that statement in *Manny Holtz*. This Court in *Attman/Glazer P.B. Company v. Mayor and Aldermen of Annapolis*, 314 Md. 675, 686, 552 A.2d 1277, 1283 (1989), has already expressly declined to adopt the Court of Special Appeals' reasoning in *Manny Holtz* as to the scope of the statute. In *Attman*, we pointed out the trend away from a prohibition of conditional zoning, but noted that we were not adopting the *Manny Holtz* reasoning the majority now adopts. We said in *Attman*, 314 Md. at 686 n. 8, 552 A.2d at 1283 n. 8, that:

> "Conditional zoning, once roundly condemned, appears to be in the ascendency. In Maryland, the concept has evolved indirectly through the use of various zoning devices such as planned developments, and has found at least limited favor with the state legislature. *See* Article 66B, § 4.01(b) permitting a county or municipal corporation to impose certain conditions at the time of zoning or rezoning land under certain circumstances. *See also People's Counsel v. Mockard*, 73 Md.App. 340, 343–45, 533 A.2d 1344 (1987); and *Bd. of Co. Comm'rs v. H. Manny Holtz, Inc.*, 65 Md.App. 574, 579–86, 501 A.2d 489 (1985)(holding that § 4.01(b) of Article 66B authorizes the imposition of conditions applicable to structural and architectural character of the land and improvements thereon, and does not authorize conditional use rezoning). ***We need not, and do not, offer an opinion concerning the intermediate appellate court's interpretation of the scope of § 4.01(b).***" [Emphasis added.]

Interestingly, the majority opinion on page 544–45, states: "it is clear that Maryland now approves of at least limited conditional zoning.... As we pointed out in *Attman* ...." *Attman* does not support the present position of the majority. Nor does it support the relevant parts of *Manny Holtz*.

Accordingly, the Court of Special Appeals' *Manny Holtz* offers no precedential support, at this level, for the position of the majority. As I shall indicate, there is absolutely no prior support for the majority's position that the conditional zoning

permitted by the statutes cannot be used during classifications to apply limitations on uses.

The majority also states in respect to the charter amendment issue:

"Although we shall conclude that no rational argument can be made to suggest that the language in Art. 23A, § 9(c)(1) refers to plans other than those of the pre-annexation zoning authority, a plain meaning approach does not yield this conclusion as the ready answer."

In my view, it is sophistry to posit that a contrary rational argument cannot be made to the majority's position, and in the same breath admit that the plain meaning of the language of the statute does not support the majority's position. On top of that, the majority also states that: "The language of the clause is arguably ambiguous. As written there are two possible plain meaning interpretations of the language." Both statements are, in my view, clearly wrong. The position of the majority depends on what the word "or" is. In this respect, in my view, the majority adopts a 'Clintonism' of the highest order.

## I. Arguments

I first address the conditional zoning issue.

### Part A. Conditional zoning

The majority, in essence, states that to hold that the statute permits limitations as to uses, would adversely affect the uniformity or consistency of uses within a classification that is required, generally. I fail to perceive, utterly, how limiting a use, so long as the use to which the property is limited is a use otherwise permitted in a district, affects the uniformity of a district.[3] The history of the conditional zoning law of this

---

3. A gas station is a gas station. Without the reclassification/annexation condition, as a special exception, a gas station can be operated on the subject annexed property within the new district as a permitted use. With the condition, the identical gas station can be operated on the subject annexed property within the new district if it can qualify for a

state, prior to the enactment of the enabling act that permitted conditional zoning, is directly and completely contrary to the majority's position as to use conditions. The prior conditional zoning cases exclusively involved instances where the conditions related to use limitations. It was exactly those cases, where the Court had disapproved conditional zoning as to uses, that caused the 1968–69 Maryland Planning and Zoning Law Study Commission (Commission) to recommend to the Legislature, and the Legislature to adopt, the enabling act permitting conditional zoning. If the prohibition on conditional zoning relating to limitations on uses was intended to survive the 1970 amendment and remain a prohibited practice because it adversely affected "uniformity" requirements within the districts, the 1970 amendment is completely meaningless. The pre-existing case law already so provided. Additionally, in Maryland, conditional zoning in respect to use limitations was what had been, *and the only thing that had expressly been*, prohibited by the prior Maryland cases. Nothing in the case law prior to the passage of the 1970 enabling act, or in the legislative history of the act, supports the position of the majority, that the intent of the Commission, and ultimately the Legislature, was to permit conditional zoning only as it relates to non-use matters. That is what the law already provided. There is absolutely no pre 1970 legal authority in Maryland for the position the majority now takes. The Maryland cases prior to that point in time relating to conditional zoning generally involved conditions as to uses.[4]

---

special exception. In my view a permitted use of this nature cannot destroy the "uniformity" of uses within a district.

It is, I respectfully suggest, logically impossible for a use permitted within a district to destroy the statutory uniformity of a district. Allowing a use not permitted within a district might adversely affect the uniformity of a district, but conditional zoning is not concerned with allowing uses not otherwise permitted, but with limiting uses that are permitted. Accordingly, a permitted use simply cannot destroy the uniformity which the statute requires.

**4.** I use the word "generally" merely as cautionary language in the event that there is some Maryland non-use conditional zoning case, prior to

Although there was a suggestion of conditional zoning in the earlier *Wakefield* case,[5] the earliest "conditional zoning" case, certainly the most cited (and quoted) conditional use case in Maryland, appears to have been the case of *Baylis v. Mayor and City Council of Baltimore*, 219 Md. 164, 148 A.2d 429 (1959), although it can also be argued, as the majority posits, that it was a case of contract zoning. In reality, it was both.

Property owners sought to have their property in Baltimore City rezoned to a classification that would permit the property to be used as a "funeral home or undertaking establishment." The then current classification of the property in the district in which it was situated prior to the reclassification did not permit funeral homes. The local Board of Municipal and Zoning Appeals recommended approval of the reclassification provided that certain restrictions be placed on the use of the property in the new district classification that limited its use to a funeral home. This recommendation was, in essence, a recommendation for conditional zoning imposing a limitation on *use*—not a yard type limitation. The Planning Commission recommended disapproval for several reasons, including that an ordinance that permitted reclassification, but only by restricting the property to funeral home use, would be "special privilege legislation" and that "legislation should not be based upon trades or conditions."

The ordinance that was subsequently adopted, while reclassifying the property, required as a condition that the property owners enter into a recordable agreement (such an agreement under certain circumstances might also be characterized as contract zoning), creating use restrictions running with the land that bound the owners and their successors to use the

---

the enabling act, of which I am unaware. I have found none. The majority mentions none.

5. *Wakefield v. Kraft*, 202 Md. 136, 141, 96 A.2d 27, 28–29 (1953). The suggestion of conditional zoning mistakenly emanating from *Wakefield* probably results from the fact that there was a private purchase contract between the property owner and a prospective buyer that was "conditioned" on the property being rezoned. That language has apparently been improperly picked up in some of the subsequent cases.

property only as a funeral home. Such a restriction, required by governmental officials, limiting uses is conditional zoning however it is created, either by contract or by it being simply imposed. Thus, in *Baylis,* the provision constituted both contract and conditional zoning. The condition at issue in *Baylis* was clearly a condition as to uses, as opposed to other types of conditions, *i.e.,* yard, height, density, etc. (commonly in variance law referred to as "yard variances"). The agreement was also to provide that at any time the property ceased to be used as a funeral home, it would revert back to its previous classification. The conditions attached to the rezoning were attacked as *ultra vires.* We held:

> "There is authority to the effect that reasonable conditions and restrictions may be imposed by a board in connection with a special exception or variance, at least where the power to do so is express, or may fairly be implied.... But these considerations disappear when we deal with a reclassification involving a revision of the comprehensive plan and a change in the district or zone by the legislative body.... Moreover, the Council, under the Enabling Act and Ordinance, has set up districts for Residential Uses, and First Commercial Uses. *If it were permitted in special cases to allow inconsistent uses in such districts, it would destroy the uniformity required by Sec. 2 of the Enabling Act.*
>
> . . .
>
> "... [t]here seem to be three chief reasons for the rule stated in these cases:[6] that rezoning based on offers or

---

**6.** The *Baylis* Court cites several Maryland cases. One, *Huff v. Bd. of Zoning Appeals of Baltimore County,* 214 Md. 48, 57, 133 A.2d 83, 88 (1957), relates to "spot zoning" issues; two, *Marino v. Mayor and City Council of Baltimore,* 215 Md. 206, 215, 137 A.2d 198, 201 (1957); three, *Oursler v. Bd. of Zoning Appeals of Baltimore County,* 204 Md. 397, 406, 104 A.2d 568, 572 (1954), to "variance" or "special exception" issues; four, *Baltimore County v. Missouri Realty Inc.,* 219 Md. 155, 148 A.2d 424 (1959), to the change/mistake rule applicable to reclassifications generally. None of them were pure conditional zoning cases. Thus, at least arguably, *Baylis* is the first, and certainly the seminal, pre 1970's case in Maryland on conditional zoning.

agreements with the owners disrupts the basic plan, and thus is subversive of the public policy reflected in the overall legislation, that the resulting 'contract' is nugatory because a municipality is not able to make agreements which inhibit its police powers, and that restrictions in a particular zone should not be left to extrinsic evidence.

"In terms of zoning, the primary objection is the effect of permitting additional districts which have little or nothing in common and are unlike the basic zones." *Baylis*, 219 Md. at 168–70, 148 A.2d at 432–33. [Emphasis added.] [Footnote added.]

Accordingly, *Baylis* is the first Maryland case that involved conditional zoning; it involved conditions as to uses—*"inconsistent uses."* The problems the *Baylis* Court discussed as resulting from conditional uses, are, in all relevant aspects, similar to the problems the majority discusses in the case at bar. *Baylis* can be said to stand for the proposition the majority adopts today. If the subsequent statute authorizing conditional zoning had never been passed, the majority's position here might be precedentially correct. However, by adopting the pre 1970 law in spite of the 1970 statute, the majority is resurrecting a dinosaur.

The 1968–1970 Maryland Planning and Zoning Law Study Commission, in making its recommendations to the Legislature that ultimately resulted in the current statutory authorization for local governments to conditionally zone, was fully aware of the application of conditional zoning to "uses." In fact, the only Maryland case mentioned in the Commission's report, albeit in its contract zoning aspect, was *Baylis*, the then seminal case in respect to conditional zoning as to uses.

Just a year after *Baylis, Rose v. Paape*, 221 Md. 369, 157 A.2d 618 (1960), became the second case in Maryland to squarely address, and then reject, the concept of conditional zoning in the pre 1970's era. The Court there described the proposed rezoning:

"[T]he Board undertook to make the rezoning of the appellants' strip along the east, south and west sides of Rose

Haven Harbor conditional upon (a) the approval of counsel for the objectors and (b) a limitation of the uses which would otherwise be permissible under a Light Commercial classification. The latter condition was also sought to be made applicable to the harbor itself, whether that was sought to be done as a matter of original zoning or as a matter of rezoning." *Rose,* 221 Md. at 376, 157 A.2d at 622. We held that:

"Zoning powers in Anne Arundel County are derived partly from Ch. 388 of the Acts of 1947, as amended, and partly from §§ 10–37 Article 66–B of the Code of Public General Laws (1957 Ed.). In neither of them ... do we find any power vested in the Board to attach special conditions to resolutions rezoning properties from one classification to another, or establishing original zoning, which are not applicable generally to all properties in the given classification in which the property in question may be placed." *Id.* at 375–76, 157 A.2d at 621–22.

*Rose,* as is evident in its conditional zoning aspect, concerned "use" limitations or conditions.

*Pressman v. Mayor and City Council of Baltimore,* 222 Md. 330, 160 A.2d 379 (1960), involved several rezonings to new classifications that would permit the construction of shopping centers. In respect to some of the reclassifications we noted:

"Two of them ... dealing with Tract One were approved by the Planning Commission on condition that Food Fair and Stewart's enter into an agreement [contract zoning] with the City relating thereto.... The Agreement itself recites that its execution was a condition to the approval of the Commission....

"These ordinances ... were passed in April, 1959.... None of them make any reference to the Agreement. We think it reasonable to suppose that its purport was known to the City Council.

. . .

"The resolution of the Commission ... relating to the Agreement was, in substance, as follows:

'That this Commission's action of approval is based upon an agreement ... providing ... if it is subsequently determined that this project cannot be carried out as substantially proposed and in the event the City takes action to repeal the rezoning ordinance to the end that the property will revert to its present existing *uses* [conditional zoning], the transferees will not interpose objections to the passage of the repeal ordinance. . . .'

. . .

" . . . No matter how moderate, reasonable or even desirable these conditions may be we find no authority for their imposition by the Planning Commission. The State Enabling Act (Code 1957), Art. 66 B, Sec. 7(g)(4) authorizes a zoning board (except in two counties) to 'approve buildings, and uses limited as to location under such rules and regulations as may be provided by ordinance of the local legislative body,' but no such authorization extends to the Planning Commission. . . .

" . . . A purported grant of rezoning might be invalid because actually based upon conditions destructive of uniformity of zoning, even though the rezoning ordinance itself made no express reference to such conditions." *Id.* at 341–44, 160 A.2d at 384–86. [Alterations added.] [Emphasis added.]

As can be seen, *Pressman* also involved conditional zoning relating to uses, and was rejected, at least in part, because the Court felt that the conditions imposed were "destructive of uniformity of zoning." The same argument the majority makes in the case *sub judice*.

The main condition imposed on the rezoning in the case of *Carole Highlands Citizens Association, Inc. v. Board of County Commissioners of Prince Georges County,* 222 Md. 44, 46, 158 A.2d 663, 664–65 (1960), was a "prohibition against the erection of a gasoline station on the premises zoned C 2 [as in this case, a clear condition as to uses]." (internal quotation omitted) (alteration added).[7] We found the prohibition to be a

---

7. In the case at bar all retail uses except gas stations were prohibited.

then impermissible conditional zoning. Although we found that the allegations of conditional zoning in *Town of Somerset v. County Council for Montgomery County*, 229 Md. 42, 181 A.2d 671 (1962), had not been proven, the conditional zoning there alleged also related to uses. My research indicates that there are no other pre 1970 Maryland cases of this Court relating to conditional zoning. All of the pre 1970 cases were cases involving conditions limiting the otherwise permitted "uses" for certain property.[8]

Thus, in respect to conditional zoning, the only situation with which the 1970 Commission Report was concerned arose out of prior zoning cases that exclusively involved limitations on uses, which is exactly the issue in the case at bar. The Commission, to the extent it believed that it was addressing prior Maryland cases relating to conditional zoning, and when suggesting a need that the case law be modified by statute, of necessity, had to be referring to conditional zoning as to use conditions. There were no prior Maryland cases that had

---

**8.** A Planning Commission recommended non-use conditions (limitations) in *Rohde v. County Board of Appeals for Baltimore County and Ortel Realty, Inc.*, 234 Md. 259, 263, 199 A.2d 216, 218 (1964), but the issue of conditional zoning was not raised before this Court, "Despite some possible ambiguity in the order, it is not directly attacked as being conditioned with regard to the reclassification from one zone to another." In another case apparently decided after the 1968–69 Commission had completed its work and made its recommendations, and shortly after the statute was amended by the Legislature, this Court, in a case apparently decided below before the 1970 amendment was finally passed, upheld the denial of a rezoning that had included recommendations by a local commission for certain non-use conditions. However, the denial below, which we affirmed, had been based on reasons, other than the recommendation for conditional zoning. *Messenger v. Board of County Commissioners for Prince George's County*, 259 Md. 693, 271 A.2d 166 (1970). In any event, no notice of the new 1970 amendments was taken by the Court. This Court decided the case in November of 1970; the advance sheets may not have been published at that time. Even then, however, we recognized that "In Prince George's County, conditional zoning is permitted by statute. See Sec. 59–839 of the Prince George's County Zoning Ordinance." *Messenger*, 259 Md. at 707, 271 A.2d at 173. The Court noted that whereas the applicants had failed to establish the basic prerequisites for the rezoning in the first instance, it would have been "a waste of time and effort" to consider the matter of the conditions recommended.

been decided based upon any other types of conditions attached to rezonings. Moreover, the controversy over conditional zoning, both prior to the 1970 statute, and since, has, related to conditions affecting uses.

In that respect, commentators have spoken as to the subsequent erosion of the prohibition against conditional zoning. In her article, *Moving Toward The Bargaining Table: Contract Zoning, Development Agreements, and the Theoretical Foundations of Government Land Use Deals*, 65 N.C. L.Rev. 957, 981–86 (1987), Judith W. Wegner addressed the issue:

"Thus, this Article adopts the neutral term 'contingent zoning' to describe all types of individualized rezoning arrangements, instead of the more traditional dichotomy 'contract' and 'conditional zoning' or the more recent references to 'unilateral contracts' or 'concomitant agreement zoning.' A final conclusion follows from the first two: To the extent that contingent zoning arrangements run the gamut between involuntarily imposed conditions and bilateral agreements, all are potentially affected by the presence of a bargaining process. . . .

. . .

"Other courts, including many of the more recent cases," have upheld contingent zoning in the face of charges of per se invalidity. These courts have concluded that traditional zoning legislation provided ample authority, *and that textual restrictions designed to guide the implementation of other types of zoning simply did not apply* . . . .

. . .

". . . Contingent zoning merely promotes more finetuned accommodations, instead of all-or-nothing rezoning decisions, thereby facilitating compromises designed to approximate all interested parties' expectations." [Footnotes omitted.] [Emphasis added.]

Some states, either by case law or statute, have approved of some level of conditional zoning that are particularly illustra-

tive. The cases include *Sweetman v. Town of Cumberland,* 117 R.I. 134, 151 n. 4, 364 A.2d 1277, 1288 n. 4 (1976), where that state's Supreme Court stated, in relevant part:

"This court has not passed upon the validity of conditional zoning either before or after the enactment of the provision here which expressly authorizes it. Although both *Arc–Lan Co. v. Zoning Bd. of Review,* 106 R.I. 474, 261 A.2d 280 (1970), and *Nicholson v. Tourtellotte,* 110 R.I. 411, 415, 293 A.2d 909, 911 (1972), involved conditional zoning, in each instance we expressly declined to rule whether the practice was valid."

Then, in the body of its opinion, the court stated:

"First, imposing differing conditions on the property in the same land-use category is not a wholly arbitrary differentiation per se. Owners of property in the same land-use category are not necessarily 'similarly situated' so that they must be treated identically under the equal protection clause. The particular *use* of one parcel, by virtue of the property's location, may have a greater impact on surrounding properties than that of another parcel in the same zoning district. In addition, two parcels may have been classified at different times when the needs of the municipality differed. Different pieces of property may also have physical characteristics which differ enough to require some minor differences in *use* restriction, while still permitting the land to be placed in the same general category." *Id.* at 151–52, 364 A.2d at 1288–89. [Emphasis added]

Finally, the Rhode Island Supreme Court stated:

"In *Nicholson v. Tourtellotte,* 110 R.I. 411, 293 A.2d 909 (1972), this court, while not reaching the issue of the validity of conditional zoning, noted the position of the Supreme Court of the State of Washington that

'"* * * An amendment to a zoning ordinance and a concomitant agreement should be declared invalid only if it can be shown that there was no valid reason for a change and that they are clearly arbitrary and unreasonable, and have no substantial relation to the public health,

safety, morals, and general welfare, or if the city is using the concomitant agreement for bargaining and sale to the highest bidder or solely for the benefit of private speculators." ' *Id.* at 415, 293 A.2d at 911.

*Accord, Pecora v. Zoning Comm'n,* 145 Conn. 435, 144 A.2d 48 (1958); *Hudson Oil Co. of Missouri v. City of Wichita,* 193 Kan. 623, 396 P.2d 271 (1964); *cf. Sylvania Elec. Prods., Inc. v. City of Newton,* 344 Mass. 428, 183 N.E.2d 118 (1962). *See generally* Shapiro, *The Case for Conditional Zoning,* 41 Temp. L.Q. 267 (1968), and the cases cited therein. We assume that in adopting conditional zoning the Legislature also meant to adopt the commonly understood limitations on that power."

*Id.* at 152 n. 5, 364 A.2d at 1289 n. 5. *And see Collard v. Village of Flower Hill,* 52 N.Y.2d 594, 600–01, 439 N.Y.S.2d 326, 421 N.E.2d 818, 821 (1981), where, citing our *Baylis* decision, the Court stated:

"Probably the principal objection to conditional rezoning is that it constitutes illegal spot zoning, thus violating the legislative mandate requiring that there be a comprehensive plan for, *and that all conditions be uniform within, a given zoning district.* When courts have considered the issue (see, e.g., *Baylis v. City of Baltimore,* 219 Md. 164, 148 A.2d 429; *Houston Petroleum Co. v. Automotive Prods. Credit Ass'n,* 9 N.J. 122, 87 A.2d 319; *Hausmann & Johnson v. Berea Bd. of Appeals,* 40 Ohio App.2d 432, 320 N.E.2d 685), the assumptions have been made that conditional zoning benefits particular landowners rather than the community as a whole and that it undermines the foundation upon which comprehensive zoning depends by destroying uniformity within use districts. *Such unexamined assumptions are questionable. First, it is a downward change to a less restrictive zoning classification that benefits the property rezoned and not the opposite imposition of greater restrictions on land use.* Indeed, imposing limiting conditions, while benefitting surrounding properties, normally adversely affects the premises on which the conditions are imposed. Second, zoning is not invalid per se merely because only a

single parcel is involved or benefitted (*Matter of Mahoney v. O'Shea Funeral Homes*, 45 N.Y.2d 719, 408 N.Y.S.2d 470, 380 N.E.2d 297); the real test for spot zoning is whether the change is other than part of a well-considered and comprehensive plan calculated to serve the general welfare of the community. Such a determination, in turn, depends on the reasonableness of the rezoning in relation to neighboring uses—an inquiry required regardless of whether the change in zone is conditional in form. Third, if it is initially proper to change a zoning classification without the imposition of restrictive conditions notwithstanding that such change may depart from uniformity, then no reason exists why accomplishing that change subject to condition should automatically be classified as impermissible spot zoning.

". . . If modification to a less restrictive zoning classification is warranted, then a fortiori, conditions imposed by a local legislature to minimize conflicts among districts should not in and of themselves violate any prohibition against spot zoning." [Citation omitted.] [Emphasis added.]

Ronald S. Cope, in his article "*Annexation Agreements—Boundary Agreements: Walking a Fine Line Into The Future—A Map of the Dangers to the Unwary Land Use Traveler*," 17 N. Ill. U.L.Rev. 377, 388 (1977), writes:

"However, we do not believe it to be an absolute precept that any and all conditional rezoning in Illinois is forbidden. Without doubt, there is a suitable and proper place for utilization of the process. *Some conditional rezoning may be in the public good, subservient to a comprehensive plan, in the best interest of the public health, safety and welfare and enacted in recognition of changing circumstances. Not all conditional rezoning is onerous, destructive or an abandonment of the power of the zoning agency nor does it stem from improper motives.*" [Emphasis added.]

The controversy over conditional zoning prior to 1970, and even afterwards, has almost **always focused on conditions constituting limitations on uses** in the reclassified district, not "yard" type limitations. The position of the majority, in

my view, is neither legally nor intellectually supportable by the past legal history relating to the concept.

In the case *sub judice*, Rockville's Planning Staff's final report noted that the approved Land Use Plan, part of the city's 1993 Master Plan, recommended that the subject property be for service industrial uses consistent with the I-1 District's uses. Evidence to the contrary has not been brought to our attention. Accordingly, the zoning classification itself is consistent with the relevant city plans and goals. Thus, any use permitted within that district, in my view, would likewise be consistent. Gasoline service stations, the Court is informed, are permitted, as special exceptions, in the I-1 District.

In respect to the rule that the Court apparently believed to be in effect at the time of *Montgomery County v. National Capital Realty Corporation*, 267 Md. 364, 373, 297 A.2d 675, 680 (1972),[9] we initially stated, "The invalidity of conditional zoning in Maryland is not seriously open to question," citing *Citizens Association, Rose* and *Baylis, supra.* All of the cases cited in *National Capital* predated the 1970 amendment to Article 66B that, by its express terms, authorized conditional zoning.[10] We made no mention of the new 1970 amendment

---

9. The proceedings before the administrative agency in *National Capital* occurred prior to the enactment of the State enabling statute authorizing conditional zoning. Our opinion does not note the date of the lower court decision. But, it is clear that the statute authorizing conditional zoning was not presented to this Court in that case.

10. In *National Capital,* the Montgomery County Attorney had rendered an opinion that conditional zoning "is not permitted in Montgomery County." The Court took note of that opinion but, as I state above, took no notice of the 1970 amendment to Article 66B, which, for the first time, expressly permitted conditional zoning by local governments that expressly and properly adopt such provisions. Apparently, even by the time of our decision, Montgomery County had not exercised the authority granted by the 1970 Article 66B amendment, and that amendment, if known by Montgomery County, was not brought to the Court's attention in that, with the county's failure to adopt such provisions, the Article 66B amendment, even if applicable because it was enacted while the case was in progress below, was not relevant to the case. More important, as I note, the Court's comments relative to conditional

that permitted conditional zoning in *National Capital.* To support our reliance on these prior cases, we stated:

" 'The general rule in these jurisdictions in which the validity of such covenants has been litigated is that they are illegal. The basis of such rule is that the rezoning of a particular parcel of land upon conditions not imposed by the zoning ordinance generally in the particular district into which the land has been rezoned is prima facie evidence of "spot zoning" [11] in its most maleficent aspect, is not in accordance with a comprehensive plan and is beyond the power of the municipality.

" 'Legislative bodies must rezone in accordance with a comprehensive plan, and in amending the ordinance so as to confer upon a particular parcel a particular district designation, it may not curtail or limit the uses and structures placed or to be placed upon the lands so rezoned differently from those permitted upon other lands in the same district. Consequently, where there has been a concatinated rezoning and filing of a "declaration of restrictions" the general view (where the question has been litigated) is that both the zoning amendment and the restrictive covenant are invalid for the reasons expressed above.' " *National Capital,* 267 Md. at 374, 297 A.2d at 680–81 (quoting extensively from *3 Rathkopf,* Zoning and Planning, 74–79). [Footnote added.]

At the time of *Baylis,* the sole Maryland statute that granted power to municipalities to create zoning districts was found in Maryland Code (1957, 1967 Repl.Vol.), Article 66B, Sections 1—Grant of Power and 2—Districts. Section 2 provided, as relevant here, that "All such regulations shall be uniform for each class or kind of buildings throughout each

---

zoning were based on the Court's prior cases, the holdings of which, had been to a large degree superseded by the 1970 amendment to Article 66B. Thus our language in that case, relative to the prohibition of conditional zoning in Maryland was dicta and, by 1972, inaccurate.

11. The concept of "spot zoning" always relates to uses of property; never to such things as set backs, design of buildings, height of buildings; *i.e.,* "yard issues."

district." As the majority notes, this provision remains in Maryland law, now codified as Maryland Code (1957, 1998 Repl.Vol., 2001 Supp.), Article 66B, Section 4.02. Now, however, unlike the *Baylis* era, there is a specific statute permitting that which *Baylis* stated was prohibited. Like the unqualified prohibition of our pre 1970 cases, the permissive language of the 1970 statute is also equally unqualified, although the majority seeks to qualify it. So long as local governmental entities adopt proper ordinances, as in my view Rockville has, the Maryland statute was not intended to, and does not, and cannot be construed to, limit the ability of local governmental bodies to attach conditions limiting uses during zoning reclassifications. To me, to construe the amendment any differently is to ignore all applicable precepts of statutory construction. Local governments do not have to permit conditional zoning, but they have the power to do so. And that power is not limited to imposing conditions on yard or area requirements. No intellectually correct construction otherwise is, in my view, possible. There is absolutely no historical support for the majority's position, nor can it be supported by the canons of statutory construction. Moreover, any jurisdiction that does not want to have conditional zoning can simply decline to pass an authorizing ordinance.

In 1970, subsequent to the *Carole Highlands, Baylis* and *Wakefield* cases, the Legislature, granted the power to impose conditions upon rezoning to municipal corporations. It authorized "conditional zoning." It stated in relevant part:

"(B) The local legislative body of a county or municipal corporation, upon the zoning or rezoning of any land ... *may impose such additional restrictions, conditions, or limitations as may be deemed appropriate to preserve, improve, or protect the general character and design of the lands and improvements being zoned or rezoned, or of the surrounding or adjacent lands and improvements, and may, upon the zoning or rezoning of any land or lands, retain or reserve the power and authority to approve or disapprove the design of buildings, construction, landscaping, or other improvements, alterations, and changes made*

*or to be made on the subject land or lands to assure conformity with the intent and purpose of this article and of the jurisdiction's zoning ordinance.* The powers provided in 401(B) shall be applicable only if the local legislative body adopts an ordinance which shall include enforcement procedures and requirements for adequate notice of public hearings and conditions sought to be imposed." [12] [Emphasis added.]

The provisions above have remained through subsequent revisions. *See* Md.Code (1957, 1998 Repl.Vol.), Art. 66B § 4.01(b). Current subsection (c) (with its several subsections) contains the same provisions first enacted in 1970. *See* Md.Code (1957, 1998 Repl.Vol., 2001 Supp.), Art. 66B § 4.01(c). The City of Rockville has apparently enacted ordinances complying with the state statute. Therefore, the present conditional zoning is, in my view, not improper.

Additionally, I believe my position is strongly supported when the available legislative history I refer to is further examined. In 1966, the General Assembly created the Planning and Zoning Law Study Commission to examine the planning and zoning provisions in State law and to make recommendations for changes by 1967. No such report was made in 1967 or in 1968. However, in 1969, the report was finally forwarded to the Legislature. As recommended, a new Article 66B § 4.01 was to be created as a part of a general recodification of Maryland's planning and zoning provisions. Nevertheless, certain changes were intended to be substantive.

Section 4.01 was clearly an intended substantive change to permit, so long as certain requirements were met, conditional zoning of all types in Maryland, or at least in those jurisdictions to which Article 66B applied, which, through the "zoning" provisions of the Express Powers Act, applied to charter counties as well as municipalities.

---

**12.** In this quotation, I omitted the legislative editing marks.

In respect to the Commission, the records of the General Assembly reflect, in a document entitled "REPORT TO THE GENERAL ASSEMBLY OF 1970–PROPOSED BILLS–SPECIAL COMMITTEE REPORTS, VOLUME II, Minutes and Reports of Special Committees to the Legislative Council of Maryland," that the Commission report was presented on Wednesday, November 12, 1969 to the Legislative Council. It was described to the Council by Senator Goodloe E. Byron in relevant part, as follows:

"Under revised Article 66B, counties can have conditional zoning. Further, the Commission has attempted to provide for periodically updating of all plans.

"With the assistance of a research man, the Commission will prepare an analysis and.... A commentary explaining each change as revised Article 66B is in preparation."

The Commission's report in its analysis, and the Legislature's resulting statute, made no distinction between counties and municipalities.

As had the commentators, the commission referred to the changing conception of the utility of conditional zoning. It stated, as relevant to the case *sub judice:*

*"Paragraph 2 of Section 4.01 gives to the local legislative body the powers of 'conditional zoning.' 'Since 1960, some courts have recognized that the attachment of conditions to zoning might be a highly desirable means of minimizing the adverse effects of zoning changes. Their decisions reveal a tendency to inject needed flexibility into the American zoning system.' Shapiro, R.: The Case for Conditional Zoning' 41 Temple, L. Q 267 (1968) at 287. A distinction should be made between this type of zoning and that commonly referred to as 'contract zoning.' The latter type of zoning was discussed in Baylis v. City of Baltimore, 219 Md. 164, 148 A.2d 429 (1959) where 'the ordinance made the reclassification conditioned upon the execution of an agreement.' Yokley clarifies this distinction in his commentary*

*on Church v. Town of Islip, 8 N.Y.2d 254, 203 N.Y.S.2d 866, 168 N.E.2d 680 (1960) where he concludes that though 'contract zoning will not be permitted, conditional zoning may be valid if not bargained for in the sense that zoning is granted in return for the condition.' 2 Yokley, Zoning Law and Practice (3rd edition 1965) 19–11. Therefore, under conditional zoning the usual requirements for reclassification must be met before the powers enunciated in this section are available to the local legislative body. It is believed that this provision avoids previous constitutional pitfalls but still permits the planning commission to provide for orderly development using controls similar to those already found in the subdivision regulations (Section 5.00). Several variations of this provision already exist at the local level, such as the Carroll and Frederick County provisions."* [Emphasis and quotations exactly as in the Report. *See* Final Report–Legislative Recommendations, Maryland Planning and Zoning Law Study Commission, December, 1969, pgs 28 and 29.]

It is thus in my view crystal clear [13] that conditional zoning is not prohibited in Maryland if local governments comply with the statutory requirements of Section 4.01. Article 66B applies to Commissioner counties and to all municipal corporations. Charter counties, should they choose to do so, have the power to do whatever is permitted under Article 66B. Additionally, there is nothing in the legislative history, including the Commission's recommendations, that indicates that there was ever any intent during the process to limit conditional zoning so as to continue the prohibition against conditions relating to uses. Certainly, there is no evidence that the

---

**13.** Because the language is so clear, I suppose that is why the majority could not get to the position it takes by a "plain meaning" analysis. Because a plain meaning analysis takes it where it does not want to go and because it would lead to a different interpretation than the land use bar in the suburban areas had given the language, the majority, essentially ignores the statute's plain meaning in this case of first impression for this Court.

Commission or Legislature intended to continue a prohibition which the amendment was intended to overrule.

What type of conditional zoning the Law Study Commission was recommending depends upon what types of prohibitions as to conditional zoning the Maryland cases had established. All of the prior Maryland cases where this Court had found conditional zoning to be improper were cases where rezonings had been limited as to uses, not as to "yard" type limitations. The position the majority now adopts, the grafting of its own limitations on the concept of "conditional zoning," is unsupported by anything the Commission found or did, or by any legislative history or by any proper legal authority. The majority is simply wrong.

Additionally, the Court of Special Appeals, in the present case, erred in relying on *Rodriguez v. Prince George's County,* 79 Md.App. 537, 558 A.2d 742 (1989). *Rodriguez* was correct law at the time it was decided in respect to the statute that court was then construing, even though that statute has now been changed and that holding is not correct in present circumstances, even in that particular county. The *Rodriguez* court was construing a Prince George's County ordinance that then permitted a limited degree of conditional zoning. That county ordinance had a provision then found in Prince George's County Code Section 27–195(c)(2) that, in respect to conditional zoning, stated: " '[i]n no case shall the conditions waive or lessen the requirements of, *or prohibit uses* allowed in, the approved zone.' " *Rodriguez,* 79 Md.App. at 542, 558 A.2d at 744 (emphasis added). In the case *sub judice,* the intermediate appellate court, relying on that emphasized provision in *Rodriguez,* stated the language of a local statute as if it was applicable, generally, throughout Maryland.

As I have indicated, Maryland Code (1957, 1998 Repl.Vol.), Article 66B, Section 4.01(b), *"Same—Additional restrictions, conditions, or limitations"* permits local governments to enact ordinances permitting conditional zoning. Pursuant to this subsection of Article 66B, Rockville enacted an ordinance substantially different than the former Prince George's Coun-

ty [14] ordinance construed in *Rodriguez*. It is now codified as Rockville City Code, Sections 25–126 and 25–127 (Supplement 2000), and reads as follows:

**"Sec. 25–126. Grant of local amendment application with conditions-Authorized.**

"The Council may impose additional restrictions, conditions or limitations upon the grant of any application for a local amendment to the zoning map pursuant to the authority contained in State law." (Rockville, Md., Code of Ordinances ch. 25, art. III, div. 2, § 25–126 (2002)).

**"Sec. 25–127. Same Procedures.**

"(a) *Adoption of resolution proposing conditions.* If the decision of the Council is to grant a local amendment application, with conditions, it shall adopt a resolution proposing the restrictions, conditions or limitations upon which such application is to be granted.

"(b) *Hearing on proposed conditions.* The Council shall thereafter hold a public hearing on such proposed conditions, notice of which shall be given as in the case of an original local amendment application and in writing by first class mail to any person who has registered an appearance in writing prior to adoption of such resolution.

"(c) *Adoption of ordinance granting with conditions.* Following such public hearing on the proposed conditions, the Council may adopt an ordinance granting the application with the additional restrictions, conditions or limitations contained in the resolution required under subsection (a) hereof, or such modification thereof as is not substantially different therefrom. Upon the adoption of such ordinance, the letter and number of the classification of such property on the zoning map shall be followed by the letter 'C' to

---

**14.** Generally, county zoning provisions do not apply within municipal corporations. While municipalities, other than Baltimore City, may be within the geographical boundaries of counties or regional entities, they are not, contrary to the opinions of some, subservient to county or regional governments unless the State has, by statute, otherwise dictated. Each local municipal entity gets its power directly from the State, not from the county or region in which it is located.

designate the zoning classification as conditional, and the number of the ordinance imposing the conditions shall be placed in parenthesis in the following manner; 'C–2C (Ord.21–78).' (Laws of Rockville, Ch. 6, § 6–211)"

The laws of Rockville contain provisions relating to the enforcement of the conditions that comply with the requirements of Article 66B § 4.01(b).[15] As can be clearly seen, there is no provision disallowing a condition limiting uses in the Rockville statute.

Accordingly, the Court of Special Appeals in relying on *Rodriguez, supra,* construed the wrong statute in arriving at its determination that the conditional zoning in the case *sub judice* violated conditional zoning standards because it prohibits uses otherwise permitted in the zoning classification in which the subject property was placed. There is no such applicable limitation in the local Rockville statute. Likewise, that standard in respect to prohibiting uses stated in *Rodriguez,* was case specific in respect to the local statute and not the applicable State statute, and, thus, should not have been construed in this case as a statewide standard. Article 66B § 4.01(b) (now 4.01(c)) imposes no such specific standard.

Moreover, as we recently stated in *County Council of Prince George's County v. Collington Corporate Center I Limited Partnership,* 358 Md. 296, 747 A.2d 1219 (2000), the statutory provision construed in *Rodriguez,* was modified in response to that case. It, as it was then written, no longer applies anywhere. Section 27–195(c)(2) of the Prince George's County Code now reads, as relevant to the specific provision at issue in *Rodriguez,* "except as provided in subparagraph (a)(1), above." (emphasis in original). The relevant provisions of Section (a)(1) were amended to read: *"Whenever an applicant designates a limitation of uses within an application, the District Council may approve specific land use types and their general locations ... in accordance with the applicant's designation, as a part of the approval of the Basic Plan."*

---

**15.** As stated, *supra,* this section is now codified in Maryland Code (1957, 1998 Repl.Vol., 2001 Supp.), Article 66B, Section 4.01(c).

(emphasis in original). At the present time, the specific *Rodriguez* standard relied on by the intermediate appellate court does not even apply in the Prince George's County jurisdiction.

Accordingly, I would answer the first question posed in petitioner's original brief: "Does a limitation in an annexation agreement restricting certain uses on newly annexed property constitute conditional zoning?" by saying "yes; but, under the circumstances here present, such conditional zoning was permitted." The lower court erred by relying on the wrong case and the wrong statute to declare the condition imposed in the present case to be impermissible conditional zoning.

In its discussion the majority emphasizes the need for uniformity. While I suggest that uniformity concerns were well known to the Commission when it made its recommendations that resulted in the 1970 amendment, uniformity, while important, is not the conclusive factor in respect to "conditional zoning" under the statute. Any special condition, be it of the use type or the "yard" type, does not, by definition, promote uniformity. But the question really is, if uniformity is an issue in conditional zoning, does conditional zoning destroy uniformity? The Legislature has, in any event, the authority to compromise uniformity principles by statute. In fact, the Legislature can, if it chooses, abolish uniformity principles altogether, so long as it does not violate constitutional provisions in the process. The Legislature can abolish zoning if it chooses to do so. More important, in respect to the present situation, is the fact that so long as the condition imposed does not permit a "use," which is otherwise prohibited, it cannot cause lessening of uniformity in a district. To limit uses to a permitted use or uses, does not reduce uniformity. Uniformity, in Euclidean zoning, relates not to the quality of treatment of property owners-that is a 14th Amendment constitutional issue. Uniformity in Euclidean zoning relates to keeping uses uniform. To allow a prohibited use would reduce uniformity-a permitted use cannot.

The first time this Court recognized the existence of the 1970 amendment authorizing conditional zoning by local governments was, as indicated previously, in the *Attman case.* I reiterate what Judge McAuliffe, for the Court noted about the Court of Special Appeals' *Manny Holtz* limiting interpretation of the scope of the statute: *"We need not, and do not, offer an opinion concerning the intermediate appellate court's interpretation of the scope of § 4.01(b)."* *Attman,* 314 Md. at 686 n. 8, 552 A.2d at 1283 n. 8 (emphasis added). In my view, that is a clear statement that this Court was not then accepting the interpretation placed upon the statute by the Court of Special Appeals.[16]

In *Manny Holtz,* the writer of the opinion for the Court of Special Appeals undertook little legislative history surrounding the 1970 amendment and either failed altogether to find, or simply ignored, the Planning and Zoning Law Study Commission report and recommendations. Therefore, the case made no reference to the prior Maryland cases involving rezoning conditions relating to uses that the Commission's recommendations were intended to change. Moreover, the Court of Special Appeals failed to note the virtual absence of cases prior to 1970 in Maryland, where the decision was based on conditional zoning that did not relate to conditions as to "uses." All of the cases decided on the then invalidity of conditional zoning had involved conditions as to uses. Even more important, however, is that the writer completely omitted any consideration of the primary provision of the amending statute (Art. 66B § 4.01(b)), choosing instead to rely

---

**16.** The availability of 'conditional zoning' that permits limitations as to uses is, in reality, a tool that can ease the burdens on property owners that seek reclassifications in order to engage in specific projects. Persons who are opposed to any development on a specific piece of property because they want the private property of others to remain open space, often use as a weapon a refrain to legislative bodies, that essentially states: "If you permit the reclassification, there is nothing to prohibit the developer from using the property for any of the uses permitted in the district. Some of these uses could be very detrimental to our properties." Private property owners counter this argument by displaying a willingness to be limited to specific uses and projects.

completely on a later ancillary provision in the statute. The Court of Special Appeals, as Judge McAuliffe noted, stated, as relevant here:

"Section 4.01(b) permits local legislative bodies to impose 'additional restrictions, conditions or limitations' on the design and construction of buildings and landscaping on the subject or adjacent tract. The plain meaning of this subsection is clear. The language referring to 'restrictions, conditions and limitations' applies only to the structural and architectural character of the land and the improvements thereon. 'Conditions, restrictions or limitations' on use are neither explicitly provided for in this [latter] subsection nor can they be implied therefrom." *Manny Holtz,* 65 Md.App. at 582, 501 A.2d at 492.

As noted in *Attman,* this Court expressly declined to accept the limiting interpretation, although the majority in the present case strains to join the Court of Special Appeals' dicta from *Manny Holtz,* and, in the process, to metamorphose incorrect, previously rejected dicta in an intermediate appellate court opinion, into the law of Maryland. If one reads only the language of the section quoted by the *Manny Holtz* court without reading the statutory language it leaves out, it might be possible to arrive at that court's interpretation. Apparently, it is this *Manny Holtz* misinterpretation that has led the bar to accept the proposition that conditional zoning power under the statute does not apply to use issues. However, perhaps unrealized by the bar (but apparently realized by Judge McAuliffe), The writer of *Manny Holtz* left out most of the primary portion of the statute. She took the first part of the primary section, deleted completely what it referred to, and then attached the opening provisions of the primary section to a subsequent, completely unrelated, lessor, ancillary part of the statute. She completely changed the statute. In the process the correct meaning of the quoted language was concealed if it is considered in its complete and actual context. I reiterate the full, appropriate language of the section, in proper context, placing emphasis on the language utilized out of context by the Court of Special Appeals in *Manny Holtz:*

" 'The local legislative body of a county or municipal corporation, upon the zoning or rezoning of any land ... may impose *such additional restrictions, conditions, or limitations* as may be deemed appropriate to preserve, improve, or protect the general character and design of the lands and improvements being zoned or rezoned, or of the surrounding or adjacent lands and improvements, and *may, upon the zoning or rezoning of any land or lands, retain or reserve the power and authority to approve or disapprove the design of buildings, construction, landscaping, or other improvements, alterations, and changes made or to be made on the subject land or lands to assure conformity with the intent and purpose of this article and of the jurisdiction's zoning ordinance.* The powers provided in subsection (b) shall be applicable only if the local legislative body adopts an ordinance which shall include enforcement procedures and requirements for adequate notice of public hearings and conditions sought to be imposed.' " *Manny Holtz,* 65 Md.App. at 581, 501 A.2d at 492 (quoting Md.Code (1957, 1983 Repl.Vol.), Art. 66B § 4.01(b)) [Some emphasis added.]

As the intermediate appellate court used the language it read "... may impose such additional restrictions ... to ... approve or disapprove the design of the buildings...." What the statute actually states is "may impose such additional restrictions ... to preserve, improve or protect the general character of the lands ... being zoned or rezoned ... *and may reserve* the power to approve or disapprove the design of the buildings ...." (emphasis added).

As can readily be seen, Art. 66B § 4.01(b) actually has two provisions. The first, and I suggest the primary provision, states that local governments *in the present:* "may impose *such additional restrictions, conditions, or limitations as may be deemed appropriate to preserve, improve, or protect the general character and design of the lands and improvements being zoned or rezoned, or of the surrounding or adjacent lands and improvements."* (some emphasis added). It is this section that authorizes general conditional zoning,

whether it be "uses" or "yard" type conditions. The next section permits that which the first section does not specifically permit. It permits local governments to *"retain or reserve the power and authority to approve or disapprove the design of buildings, construction, landscaping, or other improvements, alterations.* **[in the future]***"* (emphasis added). The *Manny Holtz* court improperly took the *"restriction, condition, or limitation "* language and separated it from what it applied to, and attached it to a section to which it was not relevant in the first instance. The second section permits the reservation or retaining of power in the local authority to, *in the future,* approve or disapprove "yard" type plans whenever in the future they are presented. This last language has absolutely nothing to do with the granting of the power to impose conditions on a current reclassification. It is totally unrelated to the first section-the section that authorizes, generally, conditional zoning as to uses *in present time.*

It appears that the writer of *Manny Holtz* began with the idea that the Legislature in the 1970 amendment should have limited conditional zoning to the conditions she felt appropriate, and, accordingly, interpreted the language of the amendment in that fashion. By joining the two provisions and completely eliminating the language in between, she completely misapplied the statutory language. In order to arrive at the *Manny Holtz* interpretation of the statute that the writer apparently desired, the omitted language had to be deleted in order to conceal the actual context of the provision. In order to hold as the Court of Special Appeals held in *Manny Holtz,* the context of the statute had to be ignored. So it was. The majority of this Court, rather than summarily elevating the practice conducted in *Manny Holtz* to the law of Maryland, should condemn it.

This Court has not heretofore construed Art. 66B § 4.01(b), but, in *Attman,* we were very careful not to accept the *Manny Holtz* interpretation. A fair reading of the statute simply does not support the limitations on its language placed there by the *Manny Holtz* court and that is now being placed there by the majority in this case. In my view the *Manny Holtz*

interpretation cannot be supported by the language of the statute, its legislative history, or the prior cases the statute was designed to redress.

*People's Counsel for Baltimore County v. Mockard,* 73 Md.App. 340, 533 A.2d 1344 (1987), was also written by the *Manny Holtz* author. *Mockard* relies in all relevant respects on *Manny Holtz.* It fails completely to acknowledge the 1970 amendment, and cites only to one other Maryland case, a case I cited earlier, *National Capital.* As I have indicated, *National Capital* was a case decided during the period the 1970 amendment was being enacted and failed completely to discuss that amendment, but cited to the pre 1970 cases when it referred to the general invalidity of conditional zoning. As noted earlier, in *National Capital* the County Attorney had informed the court that Montgomery County had not authorized conditional zoning. As previously mentioned, our comments in *National Capital* were dicta in the first instance, and, because of the 1970 amendments which were not brought to our attention, inaccurate when made.

The combination of *Manny Holtz* and *Mockard* represents a primary example of how an appellate court makes law, as opposed to applying law. In *Manny Holtz,* the intermediate appellate court misinterpreted a statute; in *Mockard,* it relied on *Manny Holtz* without mentioning the statute that *Manny Holtz* misinterprets. Thereafter, the intermediate appellate court merely refers to *Mockard,* and the original misinterpretation of the statute is lost in time. Along now comes this Court, ignores its *Attman* reservations and describes the *Manny Holtz* misinterpretation as the law in Maryland. Through this device, the original misinterpretation of the statute can become transformed by case precedent into the law on the issue, unless the misinterpretation is promptly discovered. And that is what the majority is permitting to happen in the case at bar.

Subsequent to *Manny Holtz* and *Mockard,* even the Court of Special Appeals has recognized that a fuller analysis of "conditional zoning" might be appropriate. As dicta, in *Peo-*

*ple's Counsel for Baltimore County v. Beachwood I Limited Partnership*, 107 Md.App. 627, 674, 670 A.2d 484, 508 (1995), where, when citing to the series of cases decided under pre 1970 law, it also cites to the post 1970 *Manny Holtz* and *Mockard* cases, when it states: "Because it [contract zoning] is the only form of suspect zoning charged by Beachwood in this case, we have confined our analysis to contract zoning specifically and not to conditional zoning generally, a full analysis of which must abide some future occasion." (alteration added).

The majority in its effort to justify the result, asserts that Rockville's conditional zoning ordinance does not apply in this case because its ordinance only applies to amendments to the local zoning map. The majority posits that the local map is not being amended because the zoning of the annexed area is original zoning.[17]

---

**17.** The majority states that the dissent "erroneous[ly] conflates original zoning with the "piecemeal" rezoning process." This dissent to be sure, is a conflation of two tests into a new concept. That is because this is a case of first impression. If one assumes, as even the majority accepts, that there are only two types of Euclidean zoning-piecemeal and comprehensive-the individual application of one property owner for a zoning of one piece of property must be one or the other. It obviously cannot be comprehensive-it is an individual application for a zoning classification for a single, specific parcel. Unless the majority creates a completely new type of zoning, the process here was piecemeal, and the application would be an individual application for which the Rockville statute would have to apply. As to the majority's accusation that the dissent creates a strawman, the appropriate response is 'to ask.' What is it-this zoning upon an individual combined petition for annexation and zoning? It has to be subject to some characterization; two are available-piecemeal or comprehensive. Piecemeal is the characterization traditionally associated with individual applications. The majority's opinion rejects that characterization. There is only one left-comprehensive; but the majority knows that trying to characterize the process as comprehensive has as much chance of success as getting a pig to fly. Instead, the majority continues to avoid the real issue by insisting on the difference between "original" zoning and "change/mistake" zoning, arguing in essence that if it is not "change/mistake" zoning it is "original." I agree. If that was the issue rather than a proposition obscuring the issue, the majority would be correct. In essence, the majority has created its own "strawman," one that supports the position it wants to reach.

The correct issue of whether conditional zoning applies under the Rockville statute is whether the zoning is upon a specific request i.e., piecemeal or otherwise. If piecemeal, the Rockville ordinance applies because it is a request for a local map amendment. What the majority virtually ignores is that local zoning maps may be amended during the process of annexation by the zoning imposed on annexed property during that process. Prior to annexation the subject site was not contained within the area laid out by the zoning district map. After annexation the area is contained within the area laid out by the zoning district map. Ergo—the map of necessity has been modified during a non-comprehensive process. The map has been amended upon an individual application.

Moreover, there was a petition for zoning in this case. The brief of appellant points out specifically: "When the petition [for annexation] was filed the property was zoned I–2 (Heavy Industrial) pursuant to the Montgomery County Zoning Ordinance. *The petition* requested the property be placed within the city's I–1 (Service Industrial) zone . . . .

"The City of Rockville Planning Division staff recommended approval . . . ."

We long ago held contrary to the majority's position on this issue. In *Beshore v. Town of Bel Air,* 237 Md. 398, 409, 206 A.2d 678 (1965) one of the issues present was explained:

"The appellant next contends that the resolution No. 20, providing for both annexation and zoning . . . is invalid for four specific reasons . . . . The appellants argue that 'zoning changes and classifications for which there is a specific statute [Code (1957), Art. 66B] are not intended to be included in an annexation resolution under the guise of "conditions and circumstances" provisions of the annexation statute.'

. . .

"Resolution No. 20 in the case before us adequately describes the four tracts and provides for their annexation, and then fixes their zoning classifications . . . .

. . .

"A municipality having an authorized planning and zoning authority has exclusive jurisdiction to zone annexed property. . . . To require such a municipality to annex and then later zone, in separate proceedings, would appear to be illogical and wasteful when the requirements of both Art. 23A and Art. 66B can be satisfied in one proceeding, as happened in the instant case. . . . "

*See also Northeast Plaza, supra* at 30, 526 A.2d 963: "We have also approved the combination of zoning and annexation in one resolution."

Thus, I respectfully submit, the majority is again mistaken. The zoning here involved was not a comprehensive rezoning, it was upon a specific application; it was piecemeal and cannot be anything else, and that zoning amended the zoning district map. It is immaterial whether it was original or otherwise. It was piecemeal zoning, and the majority can point to no other piece or parcel of property zoned or rezoned at the same time. The majority can point to no other property owner who had filed a petition for zoning. The majority cannot possibly claim that it was a *comprehensive* rezoning. The majority's argument that the Rockville statute does not apply because annexation zoning is original zoning is an attempt at obscuration. The issue in respect to the Rockville ordinance is not whether the zoning is original or a rezoning, but whether it is upon specific application *i.e.,* 'local zoning map amendment' or as part of 'comprehensive zoning.' The majority's position that the Rockville ordinance does not apply is grievously wrong. The Rockville ordinance states in clear, concise language "The counsel may impose . . . conditions . . . upon the grant of **any** application for a local amendment to the zoning map. . . . " The inclusion of zoning requests during individual annexations are applications for amendments to local zoning maps because, if granted, they amend the zoning maps by the inclusion of the annexation area.

Under the majority's theory newly annexed land would be unzoned because annexation could not amend the zoning map

to include it. The Legislature specifically provided that conditional zoning authority was conferred "upon the [original] zoning or rezoning of any land. . . ." Anytime the area of newly zoned land, via annexation or otherwise, is added to an existing zoning map-that map is amended. With all due respect, there is nothing in the Rockville ordinance, or before this Court indicating that Rockville did not intend conditional zoning to apply to any land then, or thereafter, included in the zoning map.

Today, in regards to conditional zoning, the majority of this Court, influenced by a misinterpretation by the intermediate appellate court, creates new law, unsupported by the common law, any of this Court's cases, the statutes or the Constitutions.

### Part B. Annexation issue[18]

### (Whatever "or" is)

One of the relevant statutes in respect to the annexation issues in this case is Maryland Code (1957, 2001 Repl.Vol.), Article 23A, Section 9(c)(1) and (2). It provides as follows:

"(c) *Limitations on charter amendments; effect of annexation.*—(1) A municipal corporation which is subject to the provisions of Article XI–E of the Maryland Constitution may not amend its charter or exercise its powers of annexation, incorporation or repeal of charter as to affect or impair in any respect the powers relating to sanitation, including sewer, water and similar facilities, and zoning, of the Washington Suburban Sanitary Commission or of the Maryland National Capital Park and Planning Commission. *Except* that where any area is annexed to a municipality authorized to have and having then a planning and zoning

---

18. I rely in this portion of my dissent on my perception that the plain meaning of the statute controls. If I believed that the statute was ambiguous, my opinion as to its meaning would constitute pure conjecture and would be no better than the conjecture of the majority. In that event, I would probably concur with the result the majority reaches on this issue.

authority, the municipality shall have exclusive jurisdiction over planning and zoning and subdivision control within the area annexed; provided nothing in this exception shall be construed or interpreted to grant planning and zoning authority or subdivision control to a municipality not authorized to exercise that authority at the time of such annexation; and further provided, that no municipality annexing land may for a period of five years following annexation, place that land in a zoning classification which permits a land use substantially different from the use for the land specified *in the current and duly adopted master plan* or plans **or** if there is no adopted or approved master plan [**in the annexing municipality**], the adopted or approved general plan or plans of the county or agency having planning and zoning jurisdiction over the land prior to its annexation without the express approval of the board of county commissioners or county council of the county in which the municipality is located.

"(2) If the county expressly approves, the municipality, without regard to the provisions of Article 66B, § 4.05(a) of the Code, may place the annexed land in a zoning classification that permits a land use substantially different from the use for the land specified in the current and duly adopted master plan or general plan of the county or agency having planning and zoning jurisdiction over the land prior to its annexation." [Some emphasis added.] [Alteration added.]

Regardless of the agreement of the parties at the times of the oral arguments, I read the provision much differently than they did and much differently than the majority opinion. A careful reading of the statute and the proper consideration of its plain meaning, and I believe a fair consideration of the legislative circumstances in which it was first placed in a form similar to the present, supports a different interpretation if the annexing municipality already has the appropriate planning and zoning authority and procedures, as Rockville has in the case *sub judice*.

The majority states on page 553 of its opinion that:

"The Owners' literal interpretation is that if the annexing jurisdiction's plan includes a land use recommendation for an area originally outside of its jurisdiction in anticipation of its possible future annexation, then it may look first to its own municipal plan, and is only required to look to the county plan if there is no municipal plan. . . ."

The majority thus concedes that the owners' position constitutes a literal interpretation of the statute. I agree. It is literal and it represents the plain meaning of this statute-and there is, contrary to the assertions of the majority, absolutely no relevant legislative history that conflicts with that literal and plain meaning.

Additionally, the majority states on page 536 of its opinion:

"Frankly put, the requirement of uniformity serves to protect the landowner from favoritism towards certain landowners within a zone by the grant of less onerous restrictions than are applied to others within the same zone elsewhere in the district, and also serves to prevent the use of zoning as a form of leverage by the local government seeking land concession, transfers, or other consideration in return for more favorable zoning treatment."

I may be dense (the majority, and others, may well agree) but for the life of me, I fail to perceive how imposing more onerous restrictions, such as a prohibition as to uses upon property being annexed, not less onerous restrictions, constitutes favoritism towards the landowner who is being prohibited by the condition from doing that which he would otherwise have the right to do. The situation in the case at bar is one hundred eighty degrees from the situation the majority describes as "Frankly put. . . ."

Moreover, the Legislature's intention, I believe, is, generally, to protect the rights of municipalities in respect to annexation and zoning. Accordingly, in respect to any ambiguity in language which the majority concedes has a literal meaning, ambiguity that I do not believe exists in the first instance, such dreamed ambiguity should be resolved in favor of the municipality, here Rockville. In respect to annexation stat-

utes generally, we held in *Prince George's County v. Mayor and City Council of Laurel*, 262 Md. 171, 277 A.2d 262 (1971), in respect to similar provisions relating to annexation and zoning conflicts between municipalities and Prince George's County and the Maryland–National Capital Park and Planning Commission, that the Legislature intended to protect the rights of municipalities as they extended their boundaries into additional territory, specifically holding that when Laurel extended its boundaries into the area of the Commission, the newly annexed property was no longer within the boundaries or jurisdiction of the Commission and thus the city zoning would control:

> "At the time of the annexation and rezoning, the property in question was part of, and was situated within, the borders of the Regional District. Laurel's actions were the source of some dismay to the ... Commission ... both of which refused to give any recognition to the attempted rezoning....

> . . .

> "... Again in 1957, as we have previously noted, the Legislature addressed itself even more precisely to the particular question presented, and granted pre-eminence in planning and zoning to certain municipalities (e.g. Laurel) over areas which they might annex.

> "... the Legislature generally intended ... [to grant] protection to the zoning rights of certain municipalities over areas which they might annex." *Id.* at 174, 182–83, 277 A.2d at 264, 268. [Alteration added.]

In the case at bar, Rockville, as are all municipalities under the "exclusive" language of the statutes, is granted pre-eminence in zoning matters.

We additionally noted in *Laurel* the existence of a statute, then section 2 of Article 23A, similar to the present statute, which the Commission claimed limited the power of Laurel to exercise exclusive zoning power in the annexed area:

" 'The legislative body of every incorporated municipality ... shall have general power ... but nothing in this article shall be construed to authorize ... any incorporated municipality to pass any ordinance which is inconsistent or in conflict with any ordinance ... ordained or adopted by the ... Commission....' "

*Id.* at 181, 277 A.2d at 267 (quoting Md.Code (1957, 1966 Repl.Vol.) Art. 23A § 2) (emphasis omitted). We answered by holding:

"the Legislature generally intended that where ordinances of municipalities and the Commission come into conflict the authority of the Commission shall prevail, *with the particular exception stated in the second half of Sections 9(c)* and 19(p) *granting protection to the zoning rights of certain municipalities over areas which they might annex.*" *Id.* at 183, 277 A.2d at 268. [Emphasis added.]

Later we noted what is also absolutely relevant in the case at bar:

"It is further essential to keep in mind ... that the Town of Laurel is not within the Regional District....

...

"Indeed, if one were to reason that Laurel were exempt from the workings of the law *only* to the extent of its boundaries of April 24, 1961, and that when it annexed the acreage ... it became a municipal corporation 'within the area of the Regional District' by extending those boundaries into the Regional District, *one comes to the somewhat absurd conclusion that Laurel would thereby lose all of its zoning and planning authority because of the annexation. ... What the Legislature intended* ... was basically what it had earlier said in sections 9(c) and 19(p) of Article 23A-*that the Commission is to prevail in matters of planning and zoning, except for instances of municipalities having a planning and zoning authority.*" *Id.* at 185–87, 277 A.2d at 269–70. [Some emphasis added.]

By comparison, the majority's position in the case *sub judice* would lead to the same "somewhat absurd conclusion that [ ] [Rockville] would thereby lose all of its zoning and planning authority [over the annexed area] because of the annexation." *Id.* at 186, 277 A.2d at 270 (alterations added) (emphasis omitted). In the conclusion portion of this dissent, I point out just some of the other land use absurdities that result from the position the majority takes on this issue.

We also noted in *Laurel:*

"This serves to buttress the interpretation which we have given to Article 23A. As was noted by Judge Loveless in his opinion:

'Consequently, considering Chapter 596 [of the Acts of 1957] with Chapter 197 of the Acts of 1957, we see an apparent clear legislative intent to permit municipalities in Montgomery County to retain and possess planning and zoning authority; and certainly from Article 23A, Section 9(c) and 19(p), these municipalities would have this power in Prince George's County areas which were not in the Regional District.' " [19] *Id.* at 183 n. 3, 277 A.2d at 268 n. 3.

Upon careful examination of the language of the primary statute at issue in the case *sub judice,* as it was enacted, the provisions at issue primarily provide that when a municipality having planning and zoning authority and approved master plans, annexes land, it shall have exclusive jurisdiction over planning and zoning within the area annexed, provided that for a period of five years land so annexed may not be placed in a zoning district substantially different from the original zoning district in which the annexing municipality first places the annexed property. In other words, it might limit the right of

---

**19.** On page 553 the majority also states that a second possible interpretation of the statute is that "the General Assembly merely was acknowledging the hierarchy of local governmental planning and the differing terminology used to identify those various land use plans by the various jurisdictions." There is no hierarchy as between county and municipal plans. They are on equal footing. Both get their zoning power directly from the State-neither gets its power from the other. There is no pecking order.

the property owner whose property is annexed to seek a reclassification, or perhaps even a variance, for a period of five years. Once a municipality annexes property, that property, *for zoning purposes,* is outside the boundaries and jurisdiction of the County.

The majority utilizes the legislative history of a prior statute in interpreting the subsequent statute that modifies the prior statute. It attempts to support its position by quoting from our case of *Maryland–National Capital Park and Planning Commission v. Mayor and City Council of Rockville,* 272 Md. 550, 561, 325 A.2d 748, 754–55 (1974). It proffers that the case supports the position the majority takes in the present case. It does; but only if one ignores the 1975 statute that presents the issue the Court is resolving today. The 1975 amendment was intended to change the thrust of the earlier statute that was at issue in *Maryland–National.* The majority is particularly disingenuous to rely on the intention of the Legislature when it originally passed a statute, to determine what it means when it later substantively modifies that very statute in order to achieve a different purpose.

The majority also cites to *Northeast Plaza Associates v. President and Commissioners of the Town of North East,* 310 Md. 20, 28–31, 526 A.2d 963, 967–69 (1987), for the same proposition. In *Northeast* the only thing this Court held was that zoning upon annexation was not original zoning and that such zoning had to satisfy the change/mistake rule. In 1988 the Legislature then immediately amended the statute to overrule our holding. The issue of county approval was only mentioned as dicta in the case. Neither *Northeast* nor *Maryland–National,* fairly read and construed, in my view, support the majority's position, and neither does *City of Gaithersburg v. Montgomery County,* 271 Md. 505, 318 A.2d 509 (1974). It was decided before the enactment of the amendment that raises the questions in this case. This Court's interpretation of the legislative intent in respect to the prior statute, offers little, if any, light on the legislative intent in respect to the 1975 amendment. If the majority is correct, the Legislature was just repeating itself when it modified the statute to an

either "or" type of statute. Such an interpretation of a substantive amendment is simply insupportable.

Since 1975, the last clause of Article 23A § 9(c), and later (c)(1), has, as I read its clear and unambiguous language, only applied, and only applies, in instances where the annexing municipality has no planning and zoning authority and/or master plans and thus the prior zoning classifications in the county are relevant in such circumstances by reason of the last long clause in subsection (1) following the "or" I have bolded above.

In 1974, Judge Eldridge for the Court in *Gaithersburg, supra,* interpreted certain language of the statute as it then existed. At that time there was no subsection (c)(2), nor any provision relating to current master plans of annexing municipalities or county approval; all of the then provisions were contained in one subsection. The last several clauses, those relevant to our inquiry, then stated:

"(c) *Limitations on charter amendments; effect of annexation.* ... and further provided, that no municipality annexing land may for a period of five years following annexation, place that land in a zoning classification which permits a land use substantially different from the use for the land specified in the current and duly adopted master plan or plans of the county or agency having planning and zoning jurisdiction over the land prior to its annexation."

Md.Code (1957, 1973 Repl.Vol.), Art. 23A § 9(c). What the majority holds today is identical to that 1974 holding, which was prior to the 1975 amendment at issue in the present case. In the majority's collective mind, nothing has changed. In my view, that is incorrect. A mere reading clearly shows that the statute changed substantively in 1975.

The primary issue before the Court in *Gaithersburg* was whether the statute only applied in Prince George's and Montgomery County, because if so, it might be subject to constitutional challenge in that such provisions are required to be uniform within a class of municipal corporations and the general assembly had only created one class; thus, a provision

that applied only to municipalities in two counties might be unconstitutional. The Court's opinion included language in respect to the then statute that provided that "no municipality annexing land may, for a period of five years ... place such land in a zoning classification which permits a land use substantially different from a use" that existed under the County's master plan just prior to annexation. *Gaithersburg,* 271 Md. at 512–13, 318 A.2d at 513. That is exactly what the language of the statute in effect *at that time* stated. Similar language was reiterated by this Court in October of the same year in *Maryland–National, supra.* At issue in that case was the constitutionality of that *prior* specific provision. Again, referring to the statute as it existed in October of 1974, we stated:

> "The question is whether the words 'prior to its annexation' modify only the phrase 'county or agency' or whether they also refer to 'duly adopted Master Plan.' ... In short, the city's new zoning must be compared with the Master Plans in effect prior to the annexation."

*Maryland–National,* 272 Md. at 557, 325 A.2d at 752–53. It is thus clear that under the circumstances of the provisions as they existed in 1974, the new zoning classifications imposed by the municipalities during annexation was, from 1970 to 1975, compared with the prior county zoning and master plans.

However, in the 1975 Legislative session the Legislature modified the language of section (c) to read basically as (c)(1) currently does. The 1975 statute replaced the old statute and reenacted it with added language that changed the focus to the municipality's zoning from prior county zoning *if* the municipality had independent planning and zoning authority and master plans. The majority argues that interpreting plans to mean the plans of the municipality would render "the sub-section effectively a nullity." Actually, to construe the modification to the section as the majority interprets it, renders the statute modifying the section to be a nullity. The majority's position reverts the statute to its meaning before the 1975 amendment. From 1970 to 1975, the exclusive

jurisdiction of a municipality was limited by the prior zoning in the County.

However, the pertinent language added in 1975 created a two-step process. The added language changed the statute to entail a consideration of whether the municipality had zoning to be the first consideration. It recognized the exclusivity of existing municipal zoning. Prior to 1975, and even early in that year's legislative process, the provision that zoning not be changed for five years expressly referred to the provision:

"that no municipality annexing land may for a period of five years ... place that land in a zoning classification which permits a land use substantially different for the use specified in the current and duly adopted master plan or plans[*] of the county or agency having planning and zoning jurisdiction over the land prior to its annexation." Md.Code (1957, 1973 Repl.Vol.), Art. 23A § 9(c).

However, the provision was intentionally amended in the Senate Judiciary Committee to its final form by the insertion right at the point of the bracketed asterisk above, this language:

"or if there is no adopted or approved master plan, the adopted or approved general plan or plans of the county or agency having planning and zoning jurisdiction over...."

Without the language of the Judiciary Committee amendment, the relevant plans were county plans. If it was the intention of the Senate to retain the requirement of conformance with county plans and county approval in all circumstances, that above amending language during the adoption process of the bill would have been totally unnecessary. *It would be meaningless.* Considering that the entire lengthy sentence preceding the asterisked language referred to the exclusive jurisdiction of a municipality if it had zoning authority and master plans, the "or" amendment can only be to provide for county consideration and approval *if a municipality has no zoning authority or* master plan or plans. Every known precept of applicable statutory construction supports

the position that I take in reference to the meaning of the word "or."

The majority then construes another statute that is not applicable in this case. It states at 558: "There can be no doubt, from the language of the statute as it existed in 1971 and 1972, that the terms 'plan' or 'plans' found in Chapters 116 and 33, respectively, refer to the plan or plans of the pre-annexation county jurisdiction, and not those of the annexing municipality." If one is construing the law as it existed in 1972 that may very well be correct. In 1971 the Legislature had passed a statute that appeared to so provide. However, in 1975 it passed a new statute, amending that prior statute. The new statute provided just to the contrary. It is that 1975 statute, not the 1971 statute that is at issue in the case *sub judice.* The prior statute affords no support for the intentions of the Legislature in 1975; instead, the fact that the same statute was modified supports the position I believe to be appropriate.

I find it unusual that the majority in explaining its position states, in part, on page 559 that:

"Second, apparently in response to our decisions in . . . [the cases above referred to], where we held municipal rezoning actions invalid on the ground of inconsistency with county master plan recommendations, Chapter 613 provided a means where the five year limitation on the annexing juris-diction's ability to change the zoning of the annexed proper-ty could be waived if express county approval were ob-tained. As a result of the adoption . . . [it] read:

'. . . or. . . .' "

Because it cannot explain the language preceding the "or" in such a fashion that it supports the majority's decision, the majority eliminates it. It *Manny Holtzed* it. In describing how the statute now reads, the majority intentionally leaves out the language preceding the "or." By doing so it summari-ly deletes the qualifying language that requires the "or" in the first place. If that language, the language preceding the "or," is included it would clearly indicate that the annexing authori-

ty's zoning, if it has any, is the relevant zoning and, only in the case of the absence of zoning in the annexing authority, does the county's previous zoning become relevant. Had I focused on the end that the majority wishes to achieve, I would have ignored the same language. However, I am completely unaware of any canon of statutory construction that allows a court to arbitrarily write out language of a statute if that language supports a position contrary to the position a Court wants to reach. It is wrong to do so.

I have examined the records in the Department of Legislative Reference, the Maryland State Archives and the Maryland State Law Library. The records merely indicate that Senate Bill 864 was introduced by Senator Malkus during the 1975 legislative session, and, as introduced, was in the original form that I indicated above. It was then amended as indicated. There was an additional attempt by Senator Malkus to limit its application to Dorchester County, but that failed to make its way into the bill.

The legislative history I have found is, therefore, limited to the changes in language that occurred during the bill's passage.

This Court has said that " '[t]he cardinal rule [of statutory interpretation] is to ascertain and effectuate legislative intent.'" *Liverpool v. Baltimore Diamond Exchange, Inc.,* 369 Md. 304, 316, 799 A.2d 1264, 1271 (2002) (quoting *Mayor and City Council of Baltimore v. Chase,* 360 Md. 121, 128, 756 A.2d 987, 991 (2000)); *see also State v. Bell,* 351 Md. 709, 717, 720 A.2d 311, 315 (1998) (quoting *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423, 429 (1995)). Legislative intent must be sought in the first instance in the actual language of the statute. *Liverpool,* 369 Md. at 316, 799 A.2d at 1271; *Chase,* 360 Md. at 128, 756 A.2d at 991; *Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.,* 346 Md. 437, 444–45, 697 A.2d 455, 458 (1997); *Stanford v. Maryland Police Training & Correctional Comm'n,* 346 Md. 374, 380, 697 A.2d 424, 427 (1997) (quoting *Tidewater v. Mayor and City Council of Havre de Grace,* 337 Md. 338, 344, 653 A.2d 468, 472 (1995)); *Coburn v.*

*Coburn,* 342 Md. 244, 256, 674 A.2d 951, 957 (1996); *Romm v. Flax,* 340 Md. 690, 693, 668 A.2d 1, 2 (1995); *Oaks,* 339 Md. at 35, 660 A.2d at 429; *Mauzy v. Hornbeck,* 285 Md. 84, 92, 400 A.2d 1091, 1096 (1979); *Board of Supervisors v. Weiss,* 217 Md. 133, 136, 141 A.2d 734, 736 (1958). Furthermore, where the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts do not normally look beyond the words of the statute itself to determine legislative intent. *Liverpool,* 369 Md. at 316–17, 799 A.2d at 1271–72; *Chase,* 360 Md. at 128, 756 A.2d at 991; *Marriott Employees,* 346 Md. at 445, 697 A.2d at 458; *Kaczorowski v. Mayor and City Council of Baltimore,* 309 Md. 505, 515, 525 A.2d 628, 633 (1987).

In *Liverpool,* 369 Md. at 316–17, 799 A.2d at 1271, we stated:

> " 'Where the statutory language is plain and unambiguous, a court may neither add nor delete language so as to "reflect an intent not evidenced in that language," nor may it construe the statute with " 'forced or subtle interpretations' that limit or extend its application." Moreover, whenever possible, a statute should be read so that no word, clause, sentence or phrase is rendered superfluous or nugatory.' "

(quoting *Chase,* 360 Md. at 128, 756 A.2d at 991 (quoting *Chesapeake and Potomac Tel. Co. of Md. v. Dir. of Fin. for Mayor of Balt.,* 343 Md. 567, 578–79, 683 A.2d 512, 517 (1996) (internal citations omitted))).

The majority notes how we set out the six principal tenets of statutory interpretation in *Mazor v. Department of Correction,* 279 Md. 355, 360–61, 369 A.2d 82, 86–87 (1977):

"[1.] The cardinal rule of construction of a statute is to ascertain and carry out the real intention of the Legislature.

[2.] The primary source from which we glean this intention is the language of the statute itself.

[3.] In construing a statute, we accord the words their ordinary and natural signification.

[4.] If reasonably possible, a statute is to be read so that no word, phrase, clause, or sentence is rendered surplusage or meaningless.

[5.] *Similarly, wherever possible an interpretation should be given to statutory language which will not lead to absurd consequences.*

[6.] Moreover, if the statute is part of a general statutory scheme or system, the sections must be read together to ascertain the true intention of the Legislature." [Emphasis added.] [Citations omitted.]

In statutory construction, absurd results are to be avoided. This Court recently stated in *Annapolis Market Place, L.L.C. v. Parker,* 369 Md. 689, 715, 802 A.2d 1029, 1044 (2002), "that a 'statute [must] be given a reasonable interpretation, not one that is illogical or incompatible with common sense.' " (quoting *State v. Brantner,* 360 Md. 314, 321, 758 A.2d 84, 88–89 (2000) (citing *D & Y, Inc. v. Winston,* 320 Md. 534, 538, 578 A.2d 1177, 1179 (1990))) (alteration added). *See also Blandon v. State,* 304 Md. 316, 319, 498 A.2d 1195, 1196 (1985) ("[R]ules of statutory construction require us to avoid construing a statute in a way which would lead to absurd results."); *Erwin and Shafer, Inc. v. Pabst Brewing Co.,* 304 Md. 302, 311, 498 A.2d 1188, 1192 (1985) ("A court must shun a construction of a statute which will lead to absurd consequences."); *Comptroller of the Treasury v. Fairchild Indus., Inc.,* 303 Md. 280, 284, 493 A.2d 341, 343 (1985) ("A statute should not be construed by forced or subtle interpretations.").

In the absence of any legislative history to the contrary, it is clear that the phrase added during the bill's progress through the Legislature, was intended to create alternatives. *Merriam Webster's Collegiate Dictionary,* 817 (10th ed.1998), proffers as its first definition of the word "or": "1-used as a function word to indicate an alternative <coffee ˜tea> <sink ˜swim>." *The Random House Dictionary of the English Language,* 1011 (Unabridged ed.1983), provides in its first definition: "1. (used to connect words, phrases, or clauses representing alternatives)." That portion of the complex sen-

tence at issue here that preceded the use of the word "or" referenced municipalities, and only municipalities; that portion of the sentence following the word "or" referenced counties, and only counties. To state otherwise is to create an unsupportable statement. It is the equivalent of stating that everything depends upon what "or" is.

In my view, "or" is "or."

And I believe the unambiguous language of the statute lends itself to no other interpretation. Additionally, there is no available legislative history that indicates a different interpretation; one that would permit "or" to mean whatever a majority of this Court, from time to time, determines it to mean.

The municipality's zoning and master plans, of necessity, had to be the zoning and plans described in the statute that preceded the "or." Up until that point in sub-section (c) in the statute (the relevant provision of the statute), the only governmental entities that had been mentioned were municipalities. In other words, the language following the "or" presented an alternative to what preceded the "or." Logically, the clause preceding the "or" referred to a municipality's zoning authority or master plans.

That logic, in my view, is further supported by some of the language of the definitions section of Maryland Code (1957, 2001 Repl.Vol.) Article 66B, Section 1.00(g)(1) and (2), which provides a generic definition of the term "plans" in respect to scope of the term in zoning matters applicable under that article. It provides:

"(g) *Plan.*—(1) 'Plan' means the policies, statements, goals, and interrelated plans for private and public land use, transportation, and community facilities documented in text and maps which constitute the guide for the area's future development.

(2) 'Plan' includes general plan, master plan, comprehensive plan, community plan, and the like as adopted in accordance with §§ 3.01 through 3.09 of this article."

Section 3.05, referring to the powers of planning commissions in respect to a plan, refers to one plan, with multiple required elements such as a "land use plan element," "transportation plan element," "community facilities plan element" and so forth. The statute appears to define and require one plan, whether it is titled a general plan, master plan, comprehensive plan or the like, that must contain numerous elements. It may be the practice in some jurisdictions to satisfy the elements of the overall plan, however it is titled in a particular jurisdiction, by the method of adopting various transportation "plans," land use "plans" and the like. Even so, there is only one plan that may incorporate the other plans as necessary elements of that one plan. Therefore, when Article 23A § 9(c) speaks in one place of "current and duly adopted master plan or plans" and in a following clause "or if there is no adopted or approved master plan, the adopted or approved general plan or plans of the county," it is really referring to the same type of plan-the single overarching plan, however tilted, of a particular jurisdiction (the municipality's plan, if it has one; the county's, if there is no municipal plan) that may be comprised of various "plan elements." If the plans discussed in the current version of Article 23A § 9(c) preceding the "or" were meant to be the county plans, then the subsequent mention of plans following the "or" is redundant and the provisions preceding the "or" are meaningless. That construction, the one the majority adopts, is, in my view, incorrect. The better view, the only logical meaning of the language that modified the statute, is that if the municipality has no overall plan or plans at the time of annexation, then, but only then, is the county plan or plans relevant. The majority today holds that the law remains as it was before 1975, and in the process bastardizes the meaning of the word "or."

The last change that resulted in the statute in its current form occurred in 1988 Maryland Laws, Chapter 450 (House Bill 667), and it repealed and reenacted the statute. Whereas, the next previous form of the statute had provided in an undivided section that *when a municipality did not have zoning authority or master plans*, the new zoning must not be

substantially dissimilar to the previous county zoning "without the express approval" of the county, the new 1988 statute created a new subsection (c)(2).

The 1988 statute was a direct reaction to our opinion in *Northeast, supra.* It is somewhat difficult to determine where the misinterpretation of the prior 1975 amending statute began. In any event, a confusing situation resulted from *Northeast* and the Legislature's attempt to, in essence, reverse our holding. As I indicate elsewhere, there was dicta in *Northeast* that mentioned the language that had been originally contained in the statutes prior to 1975. In the *Northeast* case, the municipality had obtained county approval and our opinion was framed in that context-a presumption that county approval was necessary and was obtained. In that context, our discussion of the 1975 statute *as dicta,* contained this statement (indicated by our bolding):

> **"By ch. 613 of the Acts of 1975, the General Assembly again amended § 9(c) to allow 'substantially different' rezoning of annexed land without regard to the five-year limitation, if the municipality obtained the express approval of the appropriate county.** As amended, therefore, nothing in § 9(c) purports to preclude a municipality from rezoning annexed land when, as here, it obtains the county's express consent.... *But nothing in § 9(c) eliminates the requirement that the municipality comply with the pertinent provisions of Art. 66B, and with its own charter, when it engages in the process of zoning newly annexed land."*

*Northeast,* 310 Md. at 29, 526 A.2d at 968 (emphasis added) (footnote omitted). The italicized language, not the bolded language, was our holding. It was, however, the initial bolded statement, the dicta, that has contributed to the continuation of that statute being misconstrued. We failed to recognize in 1988, just as the majority fails to realize in the present case, that the 1975 change, in essence, made municipal zoning paramount if a city had zoning, and that the county zoning consideration under the 1975 statute was merely an alternate that applied only when a municipality did not have zoning and master plans. We were not asked to construe that part of the

1975 amendment in *Northeast.* We assumed that county approval was required because it had actually been obtained in that case.[20] Our focus was not on county approval. We focused, instead, on whether zoning upon annexation had to comply with the change/mistake rule or whether it constituted original zoning. In that context the whole issue of whether county approval was required was completely irrelevant.

Local governments, prior to *Northeast,* had always assumed that the first zoning classification upon annexation was original zoning and that the "change/mistake" rule did not apply. In the Court's opinion in *Northeast,* we held the "change/mistake" rule to apply, which led to the Legislature's attempt to modify our *Northeast* holding, but only as relevant to the applicability of the "change/mistake" rule and the character of the initial zoning upon annexation.

The new 1988 paragraph (c)(2), in my view, only provides an exemption from the provisions of the "change/mistake" rule found in Article 66B § 4.05 and only in those instances where county approval *is necessary,* and obtained. Otherwise, it does not apply because the municipal zoning upon annexation is original zoning in the first instance, albeit, as I have noted, it is a request for a local map amendment made simultaneously, as permitted, with a request for annexation. If the county zoning was, in such instances, the applicable zoning, any change upon annexation would not be original zoning, and the "change/mistake"rule would apply. The purpose of the 1988 statute was to make crystal clear that the "change/mistake" rule did not apply to the zoning of annexed property because, as the municipality's zoning applied, it was original zoning and not a change in zoning. Its only purpose was to negate this Court's holding in *Northeast* that the "change/mistake" rule applied in annexation situations because it was a change from prior county zoning.

---

**20.** "On February 4, 1986, the Cecil County Commissioners passed a resolution approving the proposed zoning changes." *Northeast,* 310 Md. at 23, 526 A.2d at 965.

It appears clear to me that the intention of the Legislature in 1975 was to restrict, for a period of five years, rezoning of annexed land by a municipality with planning and zoning authority and master plans, from its initial *original* zoning upon annexation. In the event that the annexing municipality did not have zoning authority or did not have master plans and planning, then, and only in that event, the provisions relating to the prior zoning in the county would be applicable. In either event, the annexed land's zoning would remain stable for a period of five years. Subsequent amendments have not, in my opinion, reordered that focus. My perception, I respectfully suggest, is further supported by a consideration of the relevant statutes concerning charter counties' relationships with zoning and planning generally.

Maryland Code (1957, 2001 Repl.Vol.) Article 25A, Section 5, Express Powers, Paragraph (X) *Planning and Zoning,* enumerates certain zoning powers for counties in which it is applicable. Sub-paragraph (v)1 and 3 provide:

"(v) The powers granted to the county pursuant to this paragraph shall not be construed:

"1. To grant to the county powers in any substantive area not otherwise granted to the county by other public general or public local law;

. . .

"3. To authorize the county or its officers to engage in any activity which is beyond their power under other public general law, public local law, or otherwise . . . ."

These limiting provisions are not found in any of the other twenty-nine express powers enumerated in the Express Powers Act. Only zoning powers are so limited.

Maryland Code (1957, 1997 Repl.Vol.) Article 28, Title 7, Maryland-Washington Regional District (sometimes referred to as the Regional District Act), Section 7–105, *Powers restricted in municipalities in Montgomery County,* provides in sub-section (b):

"Except as provided by agreement under this section, neither the Commission nor the Montgomery County Planning Board nor the district council may exercise any planning or zoning power or jurisdiction within any municipal corporation that existed as of June 1, 1957, as provided under subsection (a) of this section. A municipality that incorporates after June 1, 1957 may not exercise planning, zoning, or subdivision power unless expressly provided for in this article."

Rockville was an incorporated municipality prior to 1957. According to the Rockville office contacted by this member of the Court, Rockville was first incorporated in either 1802 or 1803. Unless Rockville has agreed otherwise, the zoning powers of Montgomery County, *i.e.*, the District Council, in respect to areas within the boundaries of Rockville, including post-annexation boundaries, are limited to the provisions of sub-section (i), which states that

"The Commission or the Montgomery County planning board ... may submit recommendations to any municipal corporation with respect to any planning or zoning action ... and the recommendation ... shall be incorporated as a part of the record of the action by the municipal corporation."

This Court was not made aware of any agreement that exists that divests the City of Rockville of its zoning powers. Accordingly, in respect to zoning matters within its boundaries and jurisdiction, it is bound by the requirements, and only the requirements, of Article 66B.

We stated in *Laurel,* 262 Md. at 179, 277 A.2d at 266, also a case involving annexation and zoning under predecessor statutes to those at issue here:

"A reading of sections 9(c) and 19(p) as they were originally enacted, coupled with the amendment added to each section in 1957, indicates that the Legislature intended to protect the zoning rights of municipalities having a planning and zoning authority and to extend their jurisdiction into areas which the municipality annexed or had authority to annex."

As to the five-year provision, I, likewise, see no other purpose for the 1975 amendment, other than to grant primacy to an authorized municipality's current zoning upon annexation, and only reserving a consideration of prior county zoning to those situations in which municipalities have no zoning authority or master plans. The interest of the State is that newly annexed lands conform with the zoning in the particular district. If a municipality has no zoning, the State's interest is that the land retain the zoning it previously had. In other words, for a period of five years the State desires that the property be zoned. Its interests are served regardless of which entity's zoning is impressed upon the newly annexed land.

I would hold that when a municipality has planning and zoning authority, and has duly adopted and appropriate master plans, the prior county zoning and county approval of annexation zoning is not relevant. Moreover, the initial municipal zoning upon annexation generally, is original, piecemeal zoning. The municipality, however, is limited in respect to changing the original zoning it first imposes on newly annexed land for a period of five years.

I emphasize again that it is my view that under the statute, when municipalities have zoning authority and have adopted and approved master plans, the County, has no power to impose conditions. A municipality's desires in such instances should not be held hostage to county approval. Under the governance scheme in Maryland, a municipal corporation is not subordinate to county government, nor is a municipal corporation required to be subservient to the wishes of a county. Municipalities get their power directly from the State government.

In any event, the County Council for Montgomery County, sitting as the District Council for the relevant portion of the Maryland Washington Regional District in Montgomery County, approved of the annexation by Resolution No. 14–57, dated February 23, 1999, but conditioned its approval on the city prohibiting "retail use of the site, except for a gasoline service

station." Thereafter, Rockville entered into an Annexation Agreement with the property owner that provided, as relevant here, in a whereas clause that "the Owners and the City agree that the annexation of the subject property should be made subject to the conditions set forth in Resolution No. 14–57 of the Montgomery County Council as hereinafter set forth." The annexation agreement then contained several conditions, including the provision imposed by the County, that no retail uses other than a "gasoline service station," could be conducted on the premises.[21] The annexation agreement was executed between the property owners and Rockville on July 20, 1999. The actual annexation resolution was enacted on July 26, 1999 and, pursuant to statute, was to be effective forty-five days thereafter.

A zoning ordinance, imposing I–1 zoning on the annexed property, was finally approved on August 2, 1999, by the passage of Ordinance No. 10–99. As relevant to the case at bar, zoning ordinance No. 10–99 provided in certain whereas clauses:

"WHEREAS, by Resolution No. 14–57, the County Council for Montgomery County ... approved City of Rockville Annexation Petition No. ANX97–0124, and its rezoning from the County's I–2 zone to the City's I–1 zone, under certain conditions; and

"WHEREAS, the Mayor and Council of Rockville, having fully considered the matter, has determined to place the annexed property in the City's I–1 zone, under certain conditions to be set forth in an annexation agreement...."

The actual enactment clause of the zoning ordinance made no further reference to the conditions imposed by the annexation and zoning arrangement with the County.

In this case it was ultimately determined by Montgomery County that the I–1 District, the city's heaviest industrial

---

**21.** As Judge Harrell correctly points out, even with the prohibition against other retail uses, there are, according to the use provisions of the Rockville zoning statutes, numerous other uses permitted either as of right or by special exception in the I–1 zone.

district, was not substantially the same as the County I–2 District. If there were no "approval" exception to the annexation statute, and if that "approval" provision applied (which, in my view it should not) even when municipalities have planning and zoning authority and master plans, it would mean that the City of Rockville could never annex into the County where the property was county-zoned I–2. *Any County could then, by structuring its zoning ordinances to conflict with the city ordinances, be able to completely stymie the annexation process.* As we indicated in *Laurel,* 262 Md. at 179, 277 A.2d at 266, and *supra,* the State's scheme appears to encourage municipal annexations.

"A reading of Sections 9(c) and 19(p) as they were originally enacted, coupled with the amendment added to each section in 1957, indicates that the Legislature intended to protect the zoning rights of municipalities having a planning and zoning authority and to extend their jurisdiction into areas which the municipality annexed or had authority to annex."

I am unaware of any change in the Legislature's intent in the matter of annexation and the majority points to none.

The correct interpretation of the stated provisions of Article 23A § .9, that I discussed and noted at the inception of this portion of the dissent, especially where it refers to qualified municipalities having exclusive zoning jurisdiction over annexed cases, is buttressed by the inclusion elsewhere of similar provisions in Maryland Code (1957, 2001 Repl.Vol.), Article 23A, Section 19, which deals primarily with the procedures for annexation. Section 19(s) restates that "where any area is annexed to a municipality authorized to have and having then a planning and zoning authority, the said municipality shall have exclusive jurisdiction over planning and zoning. . . ." The proposition that counties somehow retain some level of relevance to municipal zoning is inconsistent with the use of the word "exclusive." Moreover, the thrust of the statutes, even under their former language, appears to attempt to encourage and further the enlargement of municipal boundaries by annexation. To read the last clause of the relevant portion of section 9(c)(1) to mean that upon annexation the

annexed property's zoning must be substantially similar under all circumstances to the previous zoning in the County ignores, as I have repeatedly noted, the use of the disjunctive "or," and makes some of the prior language, and other language elsewhere, relating to municipalities having "exclusive" jurisdiction if they have their own planning and zoning processes, completely meaningless.

Rockville has, in my view, expressly authorized conditional zoning by ordinance consistent with the power granted to it by the State. The condition imposed is not in conflict with the State statute or Rockville's ordinance. Accordingly, to the extent the condition constitutes "conditional zoning," it would be authorized "conditional zoning" and, therefore, would be valid.

## II. Conclusion

My last comments concern the result that occurs by reason of the holdings that the majority renders today. Because of it's holding, the majority actually is placing this property (and any property involved in annexation) in limbo. It is, according to the majority, still zoned County I–2. That holding, that upon zoning at the time of annexation municipal property remains in county zoning districts, will apply to all future annexations anywhere in Maryland. In many other municipal annexations, not just the present one, annexed property may remain designated in county zoning districts for up to five years even where the municipality has had its own zoning for decades. Nonetheless, such property remains annexed to, and is accordingly, within the city, in this case Rockville.

Does the zoning inspector (or equivalent enforcement official) of Montgomery County enforce the county zoning requirements in the area annexed to the city? If so, how does he have any power to enforce anything relating to zoning in respect to parcels in Rockville, which the State says has "exclusive" zoning powers within its boundaries? Conversely, how does the zoning inspector of Rockville enforce a statute or zoning district classification that does not exist within the municipality? When the county zoning administrator takes an

alleged violating property owner before one of its administrative bodies or into court the defendant will allege that he is within the city and thus cannot violate a county zoning ordinance's district classification because the municipality's zoning power is, under State statutes, exclusive. If such a property owner is taken before the city's administrative bodies or to court by the city zoning inspector, the property owner will allege that the city zoning inspector has no authority to prosecute violations of county statutes and county district classifications and that he is violating no municipal ordinance. As importantly, how does a property owner in the annexed area seek variance or special exception relief from the constraints of the county I–2 classification? Does he or she apply to the authorities in the county in respect to property not within county jurisdiction because it is "exclusively" within the jurisdiction of the city? Does he or she apply to the authorities in the city for relief from the constraints of a zoning district not in the city's zoning classifications? If it can ever be figured out who to apply to for relief, which entity's procedural requirements control? If the county's ordinance says re-applications for relief after a denial of a request must wait two years and the city's ordinance says one year, how long does the applicant have to wait? If it is claimed that the provisions of the county I–2 district, in relation to a particular parcel in annexed territory, constitute a unconstitutional taking, which governmental entity is sued? The county or the city? Which one is 'taking' it. There may well be many other irreconcilable situations? Not only are the interpretations of the majority, in my view, incorrect, the result, by any reasonable standard, is, I suggest, clearly absurd. To go where the majority's opinion on this issue takes this court is, in my view, to ignore any reasonable interpretation of the words "or" and "exclusive."

For all the reasons expressed herein, I would reverse the holding of the Court of Special Appeals.

Chief Judge BELL joins in this dissent.